# Exhibit 1



1  Michael J. Avenatti, Bar No. 206929
2  AVENATTI & ASSOCIATES, APC
   mavenatti@eoalaw.com
3  520 Newport Center Drive, Suite 1400
   Newport Beach, CA 92660
4  Tel:   (949) 706-7000
   Fax:   (949) 706-7050
5
6  Attorneys for Plaintiff Stephanie Clifford
   a.k.a. Stormy Daniels a.k.a. Peggy Peterson
7

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAR 0 6 2018

Sherri R. Carter, Executive Officer/Clerk
By: Glorietta Robinson, Deputy

8                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9
                     **FOR THE COUNTY OF LOS ANGELES**
10

11  STEPHANIE CLIFFORD a.k.a. STORMY        Case No.        **BC 6 9 6 5 6 8**
    DANIELS a.k.a. PEGGY PETERSON, an
12  individual,

13        Plaintiff,                        **COMPLAINT FOR DECLARATORY
                                            RELIEF**
14
               vs.
15

16  DONALD J. TRUMP a.k.a. DAVID DENNISON,
    an individual, ESSENTIAL CONSULTANTS,
17  LLC, a Delaware Limited Liability Company, and
    DOES 1 through 10, inclusive
18
          Defendants.
19

20

21

22

23

24

25

26

27

28

Plaintiff Stephanie Clifford a.k.a. Stormy Daniels a.k.a. Peggy Peterson ("Ms. Clifford" or "Plaintiff") hereby alleges the following:

## THE PARTIES

1.      Plaintiff Ms. Clifford, an individual, is a resident of the State of Texas.

2.      Defendant Donald J. Trump a.k.a. David Dennison ("Mr. Trump"), an individual, is a resident of the District of Columbia (among other places).

3.      Defendant Essential Consultants, LLC ("EC") is a Delaware limited liability company formed on October 17, 2016.

4.      Mr. Trump and EC together shall be referred to hereafter as "Defendants."

5.      The true names and capacities of the defendants DOES 1 through 10, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiff, who therefore sues said defendants by such fictitious names.  Plaintiff will seek leave of court to amend this Complaint to show the true names and capacities of defendants DOES 1 through 10, inclusive, when the same have been ascertained.

6.      Plaintiff is also informed and believe and thereon alleges that DOES 1 to 10 were the agents, principals, and/or alter egos of Defendants, at all times herein relevant, and that they are therefore liable for the acts and omissions of Defendants.

## JURISDICTION AND VENUE

7.      Jurisdiction for this matter properly lies with this Court because Plaintiff seeks declaratory relief.

8.      Venue is appropriate in the County of Los Angeles, and this Court has personal jurisdiction over Defendants and each of them, by reason of the fact that, among other things, (a) the alleged agreement that is at issue in this Complaint was purportedly made and negotiated, at least in substantial part, in the County of Los Angeles, and (b) many of the events giving rise to this action arose in California, including within the County of Los Angeles.

**COMPLAINT**

# FACTUAL BACKGROUND

9.     Ms. Clifford began an intimate relationship with Mr. Trump in the Summer of 2006 in Lake Tahoe and continued her relationship with Mr. Trump well into the year 2007.  This relationship included, among other things, at least one "meeting" with Mr. Trump in a bungalow at the Beverly Hills Hotel located within Los Angeles County.

10.     In 2015, Mr. Trump announced his candidacy for President of the United States.

11.     On July 19, 2016, Mr. Trump secured the Republican Party nomination for President.

12.     On October 7, 2016, the Washington Post published a video, now infamously known as the *Access Hollywood Tape*, depicting Mr. Trump making lewd remarks about women.  In it, Mr. Trump described his attempt to seduce a married woman and how he may start kissing a woman that he and his companion were about to meet.  He then added: "I don't even wait.  And when you're a star, they let you do it, you can do anything . . ."

13.     Within days of the publication of the *Access Hollywood Tape*, several women came forward publicly to tell their personal stories about their sexual encounters with Mr. Trump.

14.     Around this time, Ms. Clifford likewise sought to share details concerning her relationship and encounters with Mr. Trump with various media outlets.

15.     As a result of Ms. Clifford's efforts aimed at publicly disclosing her story and her communications with various media outlets, Ms. Clifford's plans came to the attention of Mr. Trump and his campaign, including Mr. Michael Cohen, an attorney licensed in the State of New York.  Mr. Cohen worked as the "top attorney" at the Trump Organization from 2007 until after the election and presently serves as Mr. Trump's personal attorney.  He is also generally referred to as Mr. Trump's "fixer."

16.     After discovering Ms. Clifford's plans, Mr. Trump, with the assistance of his attorney Mr. Cohen, aggressively sought to silence Ms. Clifford as part of an effort to avoid her telling the truth, thus helping to ensure he won the Presidential Election.  Mr. Cohen subsequently prepared a draft non-disclosure agreement and presented it to Ms. Clifford and her attorney (the "Hush Agreement").  Ms. Clifford at the time was represented by counsel in California whose office is located in Beverly Hills, California within the County of Los Angeles.

17.     The parties named in the Hush Agreement were Ms. Clifford, Mr. Trump, and Essential Consultants LLC.  As noted above, Essential Consultants LLC ("EC") was formed on October 17, 2016, just weeks before the 2016 presidential election.  On information and belief, EC was created by Mr. Cohen with Mr. Trump's knowledge for one purpose – to hide the true source of funds to be used to pay Ms. Clifford, thus further insulating Mr. Trump from later discovery and scrutiny.

18.     By design of Mr. Cohen, the Hush Agreement used aliases to refer to Ms. Clifford and Mr. Trump.  Specifically, Ms. Clifford was referred to by the alias "Peggy Peterson" or "PP."  Mr. Trump, on the other hand, was referred to by the alias "David Dennison" or "DD."

19.     Attached hereto as Exhibit 1 is a true and correct copy of the Hush Agreement, titled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-Disparagment [sic] Agreement.  Exhibit 1 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

20.     Attached hereto as Exhibit 2 is a true and correct copy of the draft Side Letter Agreement, which was Exhibit A to the Hush Agreement.  Exhibit 2 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

21.     Importantly, the Hush Agreement imposed various conditions and obligations not only on Ms. Clifford, but also on Mr. Trump.  The agreement also required the signature of all parties to the agreement, including that of Mr. Trump.  Moreover, as is customary, it was widely understood at all times that unless all of the parties signed the documents as required, the Hush Agreement, together with all of its terms and conditions, was null and void.

22.     On or about October 28, 2016, only days before the election, two of the parties signed the Hush Agreement - Ms. Clifford and Mr. Cohen (on behalf of EC).  Mr. Trump, however, did not sign the agreement, thus rendering it legally null and void and of no consequence.  On information and belief, despite having detailed knowledge of the Hush Agreement and its terms, including the proposed payment of monies to Ms. Clifford and the routing of those monies through EC, Mr. Trump purposely did not sign the agreement so he could later, if need be, publicly disavow any knowledge of the Hush Agreement and Ms. Clifford.

23.     Despite Mr. Trump's failure to sign the Hush Agreement, Mr. Cohen proceeded to cause $130,000.00 to be wired to the trust account of Ms. Clifford's attorney.  He did so even though there was no legal agreement and thus no written nondisclosure agreement whereby Ms. Clifford was restricted from disclosing the truth about Mr. Trump.

24.     Mr. Trump was elected President of the United States on November 8, 2016.

25.     In January 2018, certain details of the draft Hush Agreement emerged in the news media, including, among other things, the existence of the draft agreement, the parties to the draft agreement, and the $130,000.00 payment provided for under the draft agreement.  Also in January 2018, and concerned the truth would be disclosed, Mr. Cohen, through intimidation and coercive tactics, forced Ms. Clifford into signing a false statement wherein she stated that reports of her relationship with Mr. Trump were false.

26.     On or about February 13, 2018, Mr. Cohen issued a public statement regarding Ms. Clifford, the existence of the Hush Agreement, and details concerning the Hush Agreement.  He did so without any consent by Ms. Clifford, thus evidencing Mr. Cohen's apparent position (at least in that context) that no binding agreement was in place.  Among other things, Mr. Cohen stated:  "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford.  Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly."  Mr. Cohen concluded his statement with lawyer speak:  "Just because something isn't true doesn't mean that it can't cause you harm or damage.  *I will always protect Mr. Trump.*" (emphasis added).

27.     Importantly, at no time did Mr. Cohen claim Ms. Clifford did not have an intimate relationship with Mr. Trump.  Indeed, were he to make such a statement, it would be patently false.

28.     Because the agreement was never formed and/or is null and void, no contractual obligations were imposed on any of the parties to the agreement, including any obligations to keep information confidential.  Moreover, to the extent any such obligations did exist, they were breached and/or excused by Mr. Cohen and his public statements to the media.

29.     To be clear, the attempts to intimidate Ms. Clifford into silence and "shut her up" in order to "protect Mr. Trump" continue unabated.  For example, only days ago on or about February 27, 2018, Mr. Trump's attorney Mr. Cohen surreptitiously initiated a bogus arbitration proceeding against Ms. Clifford in Los Angeles.  Remarkably, he did so without even providing Ms. Clifford with notice of the proceeding and basic due process.

30.     Put simply, considerable steps have been taken by Mr. Cohen in the last week to silence Ms. Clifford through the use of an improper and procedurally defective arbitration proceeding hidden from public view.  The extent of Mr. Trump's involvement in these efforts is presently unknown, but it strains credibility to conclude that Mr. Cohen is acting on his own accord without the express approval and knowledge of his client Mr. Trump.

31.     Indeed, Rule 1.4 of New York Rules of Professional Conduct governing attorneys has required Mr. Cohen *at all times* to promptly communicate all material information relating to the matter to Mr. Trump, including but not limited to "any decision or circumstance with respect to which [Mr. Trump's] informed consent [was] required" and "material developments in the matter including settlement or plea offers."  Moreover, this same Rule required Mr. Cohen *at all times* to "reasonably consult with [Mr. Trump] about the means by which [his] objectives are to be accomplished" and to "keep [Mr. Trump] reasonably informed about the status of the matter."

32.     Accordingly, unless Mr. Cohen flagrantly violated his ethical obligations and the most basic rules governing his license to practice law (which is highly unlikely), there can be no doubt that Mr. Trump *at all times* has been fully aware of the negotiations with Ms. Clifford, the existence and terms of the Hush Agreement, the payment of the $130,000.00, the use of EC as a conduit, and the recent attempts to intimidate and silence Ms. Clifford by way of the bogus arbitration proceeding.

33.     Because there was never a valid agreement and thus, no agreement to arbitrate, any subsequent order obtained by Mr. Cohen and/or Mr. Trump in arbitration is of no consequence or effect.

**COMPLAINT**

## FIRST CAUSE OF ACTION

### Declaratory Relief

### (Against all Defendants)

34.     Plaintiff restates and re-alleges each and every allegation in Paragraphs 1 through 33 above as if fully set forth herein.

35.     This action concerns the legal significance, if any, of the documents attached hereto as Exhibit 1, entitled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-Disparagment [sic] Agreement, and Exhibit 2, entitled Side Letter Agreement.

36.     California Code of Civil Procedure section 1060 authorizes declaratory relief for any person who desires a declaration of rights or duties with respect to one another.  In cases of actual controversy relating to the legal rights and duties of the respective parties, such a person may seek a judicial declaration of his or her rights and duties relative to an instrument or contract, or alleged contract, including a determination of any question of construction or validity arising under the instrument or contract, or alleged contract.  This includes a determination of whether a contract was ever formed.

37.     An actual controversy exists between Plaintiff and Defendants as to their rights and duties to each other.  Accordingly, a declaration is necessary and proper at this time.

38.     Specifically, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 between Plaintiff and Defendants were never formed, and therefore do not exist, because, among other things, Mr. Trump never signed the agreements.  Nor did Mr. Trump provide any other valid consideration.  He thus never assented to the duties, obligations, and conditions the agreements purportedly imposed upon him.  Plaintiff contends that, as a result, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2.  Moreover, as a further result, there is no agreement to arbitrate between the parties.

39.     In the alternative, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable, and/or void under the doctrine of unconscionability.  Plaintiff contends that, as a result, she is not bound by any of the duties,

obligations, or conditions set forth in Exhibits 1 and 2.  Moreover, as a further result, there is no agreement to arbitrate between the parties.

40.     In the further alternative, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable, and/or void because they are illegal and/or violate public policy.  Plaintiff contends that, as a result, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2.  Moreover, as a further result, there is no agreement to arbitrate between the parties.

41.     Defendants dispute these contentions.

42.     Accordingly, Ms. Clifford desires a judicial determination of her rights and duties with respect to the alleged agreements in the forms set out in Exhibits 1 and 2.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, declaring that no agreement was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable.

## **ON THE FIRST CAUSE OF ACTION**

1.     For a judgment declaring that no agreement was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable.

2.     For costs of suit; and

3.     For such other and further relief as the Court may deem just and proper.

DATED: March 6, 2018                      AVENATTI & ASSOCIATES, APC


                                          _____
                                          MICHAEL J. AVENATTI
                                          Attorneys for Plaintiff

**COMPLAINT**

# Exhibit 1

# CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE; ASSIGNMENT OF COPYRIGHT AND NON-DISPARAGMENT AGREEMENT

## 1.0   THE PARTIES

1.1    This Settlement Agreement and Mutual Release (hereinafter, this "Agreement") is made and deemed effective as of the ___ day of October, 2016, by and between "**EC, LLC**" and/or **DAVID DENNISON**, (DD), on the one part, and **PEGGY PETERSON**, (PP), on the other part. ("EC, LLC," "DD" and "PP" are pseudonyms whose true identity will be acknowledged in a Side Letter Agreement attached hereto as "EXHIBIT A") This Agreement is entered into with reference to the facts and circumstances contained in the following recitals.

## 2.0   RECITALS

2.1    Prior to entering into this Agreement, PP came into possession of certain "Confidential Information" pertaining to DD, as more fully defined below, only some of which is in tangible form, which includes, but is not limited to information, certain still images and/or text messages which were authored by or relate to DD (collectively the "Property", each as more fully defined below but which all are included and attached hereto as Exhibit "1" to the Side Letter Agreement).

2.2    (a)    PP claims that she has been damaged by DD's alleged actions against her, including but not limited to tort claims proximately causing injury to her person and other related claims. DD denies all such claims. (Hereinafter "PP Claims").

(b)    DD claims that he has been damaged by PP's alleged actions against him, including but not limited to the alleged threatened selling, transferring, licensing, publicly disseminating and/or exploiting the Images and/or Property and/or other Confidential Information relating to DD, all without the knowledge, consent or authorization of DD.  PP denies all such claims. (Hereinafter "DD Claims").

(c)    The PP Claims and the DD Claims are hereinafter collectively referred to as "The Released Claims."

2.3    DD desires to acquire, and PP desires to sell, transfer and turn-over to DD, any and all tangible copies of the Property and any and all physical and intellectual property rights in and to all of the Property.  As a condition of DD releasing any claims against PP related to this matter, PP agrees to sell and transfer to DD all and each of her rights in and to such Property.  PP agrees to deliver each and every existing copy of all tangible Property to DD (and permanently delete any electronic copies that can not be transferred), and agrees that she shall not possess, nor directly nor indirectly disclose convey, transfer or assign Property or any Confidential Information to any Third Party, as more fully provided herein.

2.4    It is the intention of the Parties that Confidential Information, as defined herein, shall remain confidential as expressly provided hereinbelow.  The Parties expressly acknowledge, agree and understand that the Confidentiality provisions herein and the



Page 0



representations and warranties made by PP herein and the execution by her of the Assignment &
Transfer of Copyright are at the essence of this Settlement Agreement and are a material
inducement to DD's entry into this Agreement, absent which DD would not enter into this
Agreement. DD expects and requires that PP never communicate with him or his family for any
reason whatsoever.

2.5     The Parties wish to avoid the time, expense, and inconvenience of potential
litigation, and to resolve any and all disputes and potential legal claims which exist or may exist
between them, as of the date of this Agreement including but not limited to the PP Claims and/or
the DD Claims. The Parties agree that the claims released include but are not limited to DD's
Claims against PP  as relates to PP having allowed, whether intentionally, unintentionally or
negligently, anyone else other than those listed in section 4.2 herein below to become aware of
the existence of and content of the Property, to have gained possession of the Property, and to
PP's having allegedly engaged in efforts to disclose, disseminate and/or commercially exploit the
Images and/or Property and/or Confidential Information, and any harm suffered by DD
therefrom. The Parties agree that the claims released include but are not limited to PP's Claims
against DD  as relates to DD having allowed, whether intentionally, unintentionally or
negligently, anyone else to have interfered with PP's right to privacy or any other right that PP
may possess.

2.6     These Recitals are essential, integral and material terms of this Agreement, and
this Agreement shall be construed with respect thereto.  The Parties enter into this Agreement in
consideration of the promises, covenants and conditions set forth herein, and for good and
valuable consideration, the receipt of which is hereby acknowledged. It is an essential element of
this Settlement Agreement that the Parties shall never directly or indirectly communicate with
each other or attempt to contact their respective families. This matter, the existence of this
Settlement Agreement and its terms are strictly confidential.

NOW, THEREFORE, the Parties adopt the foregoing recitals as a statement of their
intent and in consideration of the promises and covenants contained herein, and further agree as
follows:

///

///

///


PP

Page 1


DD

**3.0    SETTLEMENT TERMS**

### 3.0.1.1 EC, LLC SHALL PAY TO PP $130,000.00 U.S.D. AS FOLLOWS:

3.0.1.1.1    $130,000.00 USD shall be wired into PP's Attorney's Attorney Client Trust Account on or before 1600 hrs. PST on 10/27/16.(Hereinafter "Gross Settlement Amount"). PP's Attorney's Wiring Instructions are:

| | |
|---|---|
| Bank Name: | City National Bank |
| Bank Address: | 8641 Wilshire Blvd. |
| | Beverly Hills, CA 90211 |
| ABA Routing No: | 122016066 |
| Beneficiary Account Name: | Keith M. Davidson & Associates, PLC, Attorney Client Trust Account |
| Beneficiary Account No: | 600106201 |
| Beneficiary Address: | 8383 Wilshire Blvd. Suite 510 |
| | Beverly Hills, CA 90211 |
| SWIFT Code: | CINA US6L |

3.0.1.1.2    Keith M. Davidson, Esq. shall receive the Gross Settlement Amount in Trust. No portion of the Gross Settlement Amount shall be disbursed by Attorney for PP unless and until PP executes all required Settlement Documents.

3.1    Undertakings & Obligations by PP.  PP will do each of the following by 11/01/16:

(a)    PP shall execute this Agreement and return a signed copy to DD:

(b)    PP shall transfer and/or assign any and all rights in and to the Property to DD (as set forth hereinbelow), and execute an Assignment & Transfer of Copyright, in the form attached hereto, and return a signed copy of same to DD's counsel;

(c)    PP shall deliver to DD every existing copy of all tangible Property.  PP shall completely divest herself of any and all artistic media, impressions, paintings, video images, still images, e-mail messages, text messages, Instagram message, facebook posting or any other type of creation by DD. PP shall transfer all physical, ownership and intellectual property rights to DD;

(1)    PP shall deliver to DD any and all non-privileged correspondence concerning or related to DD between PP and any 3rd party.

(d)    PP shall not, at any time from the date of this Agreement forward, directly or indirectly disclose or disseminate any of the Property or any Confidential Information (including confirmation of the fact that it exists or ever existed, and/or confirming any rumors as to any such existence) to any third party, as more fully provided herein.

(e)    PP shall provide to DD (to the extent not already done so and set forth in paragraph 4.2 hereinbelow), summary details disclosing to whom PP (or anyone else on PP's behalf) disclosed, displayed to, disseminated, transferred to, provided a copy to, and/or

PP

Page **2**


DD

distributed, sold, licensed or otherwise sought to have commercially exploit, the Images and/or Property and/or any Confidential Information.

      (f)     PP shall provide to DD's counsel the names and contact information of each and any persons or entities who: (1) PP has provided to or who otherwise obtained possession of the original and/or any copies of any of the Images and/or any Property, if any, (ii) to whom PP has scanned the Images and/or any Property at any time, and (iii) to whom PP knows had, has or may potentially have possession of a copy of the Images and/or any Property at any time, including but not limited to the present time (and specify with detail to which of the referenced categories (i.e., possession, shown, past, present, etc.) any name corresponds, the name so relates).

      (g)     PP shall provide to DD's counsel copies of any agreements and/or other documentation in PP's possession, custody or control, if any, regarding (e) and/or (f) above, that evidences who has or may have been provided a copy of any of the Property.

    3.2    <u>Transfer of Property Rights to DD</u>.  In further consideration for the promises, covenants and consideration herein, PP hereby transfers and conveys to DD all of PP's respective rights, title and interest in and to the Property, and any and all physical and intellectual property rights related thereto.  Without limiting the generality of the foregoing, PP does hereby sell, assign, and transfer to DD, his successors and assigns, throughout the universe in perpetuity, all of PP's entire right, title, and interest (including, without limitation, all copyrights and all extensions and renewals of copyrights), of whatever kind or nature in and to the Property, without reservation, condition or limitation, whether or not such rights are now known, recognized or contemplated, and the complete, unconditional and unencumbered ownership and all possessory interest and rights in and to the Property, which includes, but is not limited to the originals, copies, negatives, prints, positive, proof sheets, CD-roms, DVD-roms, duplicates, outtake and the results of any other means of exhibiting, reproducing, storing, recording and/or archiving any of the Property or related material, together with all rights of action and claims for damages and benefits arising because of any infringement of the copyright to the Property, and assigns and releases to DD any and all other proprietary rights and usage rights PP may own or hold in the copyright and/or Property, or any other right in or to the Property.  PP assigns and transfers to DD all of the rights herein granted, without reservation, condition or limitation, and agrees that PP reserves no right of any kind, nature or description related to the Property and contents therein.  Notwithstanding the foregoing, if any of the rights herein granted are subject to termination under section 203 of the Copyright Act, or any similar provisions of the Act or subsequent amendments thereof, PP hereby agrees to re-grant such rights to DD immediately upon such termination.  All rights granted herein or agreed to be granted hereunder shall vest in DD immediately and shall remain vested in perpetuity.  DD shall have the right to freely assign, sell, transfer or destroy the Property as he desires.  DD shall have the right to register sole copyright in and to any of the Property with the US Copyright Office.  DD shall also have the right, in respect to the Property, to add to, subtract from, change, arrange, revise, adapt, into any and all form of expression or tangible communication, and the right to combine any of the Property with any other works of any kind and/or to create derivative works with any of the Property, and to do with it as she so deems.  To the fullest extent allowable under the applicable law, PP shall irrevocably waive and assign to DD any of PP's so-called "moral rights" or "droit moral" (laws for the protection of copyrights outside of the United States), if any, or any similar rights under any principles of law which PP may now have or later have in the Property.  With respect to and in furtherance of the above, PP agrees to and shall execute and deliver to DD an

PP

Page **3**


DD

"Assignment & Transfer of Copyright", in the form attached hereto as Exhibit "B". For greater certainty the foregoing assignment shall be applicable worldwide.

      3.2.1   Notwithstanding the foregoing paragraph 3.2, and without in anyway limiting or diminishing from the full transfer and assignment of rights therein without reservation, the Parties understand the purpose of the transfer of rights is to provide DD the fullest possible ability and remedies to prevent and protect against any publication and/or dissemination of the Property.

      3.3    Delivery of the Property to DD.  Concurrently upon execution of this Agreement, PP, as applicable, shall deliver to DD, by delivery to his counsel herein, all of the Property which is embodied in tangible form (all originals and duplicates), whether documents, canvasses, paper art, digital copies, letters, prints, electronic data, films, tapes, CD-Roms, DVD-Roms, Images recording tapes, photographs, negatives, originals, duplicates, contact sheets, audio recordings, Images recordings, magnetic data, computerized data, digital recordings, or other recorded medium or any other format of embodying information or data. Without limiting the generality of the foregoing, such tangible Property shall include all documents as defined by California Evidence Code §250 which contain any of the Property. PP represents and warrants that the materials delivered pursuant to the terms of this Paragraph 3.3 comprise the totality of all existing originals and duplicates of all Property in any tangible form, whether within their possession, custody or control, and including otherwise (and that PP knows of no other copies or possible or potential copies not in PP's possession and control and delivered pursuant to this paragraph), and that upon such delivery to DD, PP shall not maintain possession, custody or control of any copy of all or any portion of any tangible Property. The Property Delivered under this Paragraph shall become Exhibit 1 to the Side Letter Agreement. For avoidance of any doubt, PP, nor her attorney are entitled to retain possession of said Property after execution of this Agreement. The retention of said Property by PP is a material breach of this agreement.

      3.3.1   This Agreement is conditioned on PP's compliance with each and every term of the Settlement Agreement including Paragraph 3.3 and the personal verification by DD or his attorney of the Images and that the Images are comprised of and captures the content previously represented to his counsel to exist and be captured therein (i.e., text messages between PP and DD)), all of which terms are essential and material.

## 4.0   CONFIDENTIALITY & REPRESENTATIONS & WARRANTIES.

      4.1    Definition of Confidential Information.  "Confidential Information" means and includes each and all of the following:

      (a)    All *intangible* information pertaining to DD and/or his family, (including but not limited to his children or any alleged children or any of his alleged sexual partners, alleged sexual actions or alleged sexual conduct or related matters ),and/or friends learned, obtained, or acquired by PP, including without limitation information contained in letters, e-mails, text messages, agreements, documents, audio or Images recordings, electronic data, and photographs;

      (b)    All *intangible* information pertaining to the existence and content of the Property;


PP


DD

(c)     All *intangible* private information (*i.e.*, information not generally available to and/or known by the general public) relating and/or pertaining to DD, including without limitation DD's business information, familial information, any of his alleged sexual partners, alleged sexual actions or alleged sexual conduct,  related matters  or paternity information, legal matters, contractual information, personal information, private social life, lifestyle, private conduct, (all information/items in 4.1 "(a)", "(b)" and "(c)" are sometimes collectively referred to as, "Intangible Confidential Information");

(d)     All *tangible* materials of any kind containing information pertaining to DD learned, obtained, participated or acquired by PP, including without limitation letters, agreements, documents, audio or Images recordings, electronic data, and photographs, canvas art, paper art, or art in any other form on any media. The Images and Photos and all information/items in 4.1(d) are collectively referred to as, the "Property" and/or the "Tangible Confidential Information");

4.2     <u>PP's Representations & Warranties Regarding Prior Disclosures of Tangible Confidential Information</u>.  PP represents and warrants that prior to entry into this Agreement, PP has directly or indirectly disclosed any *Tangible* an/or Intangible Confidential Information (i.e., any of the Property), to any Third Party, including without limitation disclosure or indirect disclosure of the content of such Confidential Information in tangible form, other than the following persons or entities to whom PP has made such prior disclosures (herein "PP Disclosed Individuals/Entities"):

a)  *Mike Mosney*

b)  *Angel Ryan*

c)  *Gina Rodriguez*

d)  *Keith Munyan*

e)  _____

f)  _____

g)  _____

h)  _____

i)  _____

PP shall not be responsible for any subsequent public disclosure of any of the Confidential Information (a) attributable <u>directly</u> to each of them; and/or (b) not disclosed hereinabove as a previously disclosed PP Disclosed Individuals/Entities, and any such disclosure shall be deemed a breach of this Agreement by PP. For greater clarity, PP must not induce, promote or actively inspire anyone  to disclose Confidential Information.

**PP**

**DD**

4.3     Representations & Warranties and Agreements.

(a)     Representations & Warranties and Agreements By DD.  The following agreements, warranties and representations are made by DD as material inducements to PP to enter into this Agreement, and each Party acknowledges that she/he is executing this Agreement in reliance thereon:

(b)     DD warrants and represents that, as relates to or in connection with any of PP's attempts to sell, exploit and/or disseminate the Property prior to the date of this Agreement, DD and his counsel will refrain (i) from pursuing any civil action against PP, and/or (ii) absent a direct inquiry from law enforcement, from disclosing PP's name to the authorities. Notwithstanding the foregoing, if DD is informed that or should or if it is believed that either of PP has possession, custody and/or control of any of the Property after the date of this Agreement and/or transferred any copies to any Third Party, and/or it is believed that any of PP, whether directly or indirectly, intends the release, use, display, dissemination, disclosure or exploitation, whether actual, threatened or rumored, of any for the Property, then DD and his counsel shall be entitled to, at DD's sole discretion, (i) contact the respective member of PP, including with legal demands and related statements of liability and legal action, and/or (ii) advance a civil action against the respective member of PP, and/or (iii) disclose any of PP's name to the authorities.

4.3.2   Representations & Warranties and Agreements By PP.  The following agreements, warranties and representations are made by PP as material inducements to DD to enter into this Agreement, without which DD would not enter into this Agreement and without which DD would not agree to pay any monies whatsoever hereunder, and with the express acknowledgment that DD is executing this Agreement in reliance on the agreements, warranties, and representations herein which are at the essence of this Agreement, including, the following:

(a)     PP agrees and warrants and represents that PP will permanently cease and desist from any efforts to and/or attempting to and/or engaging in and/or arranging the use, License, distribution, dissemination or sale of any of the Confidential Information and/or Property, including any Tangible and/or Intangible Confidential information created by or relating to DD;

(b)     PP agrees and warrants and represents that PP will permanently cease and desist from any posting or dissemination or display of the Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD and/or Property, including the Images (including, but not limited to, to any form media outlet, on any blog or posting board, on the Internet, or otherwise);

(c)     PP agrees and warrants and represents that PP will permanently cease and desist from using or disseminating or disclosing any information to any Third Persons (including, but not limited to, to any media outlet, on any blog or posting board, on the Internet, or otherwise) about any details of or as to the contents of the Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD and/or Property, including any Text Messages, and/or as to any other personal details of or about or pertaining to DD and/or his family and/or friends and/or social interactions;

(d)     PP agrees and warrants and represents that PP will permanently cease and desist from and will not, at any time, make any use of or reference to the name, image or likeness


PP

Page 6


DD

of DD in any manner whatsoever, including without limitation, through any print or electronic media of any kind or nature for any purpose, including, but not limited to, on any websites;

(e)     PP agrees and warrants and represents that any and all existing copies of the Images, Text Messages and any Property (other than as expressly specified in paragraphs 3.2 and 3.3 herein) have been turned over and provided to counsel; and PP further warrants and represents that the only copy of the Images and Property that has ever existed, at any time, has been turned over to DD's counsel pursuant to this Agreement, and the Images and any Property has never been transferred to or existed in any other form, including not in electronic form, nor on any computer, or electronic device and other storage media;

(f)     PP warrants and represents that PP has not provided any copies, whether hard-copy or electronic copies, of the Property to anyone other than as specified in paragraph 4.2 herein);

(g)     PP warrants and represents that the information PP is obligated to provide pursuant to the terms herein will be complete and truthful;

(h)     PP warrants and represents that PP has not omitted or withheld any information that PP is obligated to provide pursuant to the terms herein;

(i)     PP warrants and represents that PP has not contracted to earn and/or collect any monies as compensation from the sell, license and/or any other exploitation of the Images and/or any Property and/or any Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD nor any monies as compensation or an advance for any efforts to sell, license and/or any other exploitation of the Images and/or any Property and/or any Confidential Information or any Tangible and/or Intangible Confidential information created by or relating to DD;

(j)     PP warrants and represents that PP has not assigned nor transferred, either in whole or in part, any purported rights in or to the Images and/or any Property to any other person or entity, other than to DD pursuant to this Agreement.

4.3.3     Agreement By PP Not to Disclose/Use Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD. As further material inducements for DD to enter into this Agreement, PP agrees, represents and warrants that she shall not directly or indirectly, verbally or otherwise, publish, disseminate, disclose, post or cause to be published, disseminated, disclosed, or posted (herein "disclose"), any Confidential Information or Tangible and/or Intangible Confidential information created by or relating to DD to any person, group, firm or entity whatsoever, including, but not limited to, family members, friends, associates, journalists, media organizations, newspapers, magazines, publications, television or radio stations, publishers, databases, blogs, websites, posting boards, and any other enterprise involved in the print, wire or electronic media, including individuals working directly or indirectly for, or on behalf of, any of said persons or entities ("Third Parties" and/or Third Party"). In no event shall PP be relieved of such party's confidentiality obligations herein by virtue of any breach or alleged breach of this Agreement. In no event shall any dispute in connection with this Agreement relieve PP of her confidentiality obligations arising pursuant to this Agreement, and any disclosure of Confidential Information and/or Tangible and/or Intangible Confidential information created by or relating to DD in connection with any such

Page 7



proceeding or dispute shall constitute a breach of this Agreement. PP shall use their best efforts to prevent the unauthorized disclosure of Confidential Information in connection with any such proceeding or dispute.

4.3.4    Any direct or indirect disclosure of Confidential Information or Tangible and/or Intangible Confidential information created by or relating to DD to any Third Party by PP and/or any of her representatives, heirs, agents, children, family members, relatives , confidents, advisors, employees, attorneys, transferors, transferees, successors or assigns, and/or any friend of any of PP (collectively "PP Group"), after the date of this Agreement, shall be deemed a disclosure by PP in breach of the terms of this Agreement, entitling the non-breaching Party to all rights and remedies set forth herein.

4.3.5    PP separately and further warrants and represent that, prior to entering into this Agreement, that she has not written, published, caused to be published, or authorized the writing, publication, broadcast, transmission or public dissemination of any interview, article, essay, book, memoir, story, photograph, film, script, Images tape, biography, documentary, whether written, oral, digital or visual, whether fictionalized or not, about the opposing Party to this Agreement or their family, whether truthful, laudatory, defamatory, disparaging, deprecating or neutral, which discloses any Confidential Information and/or which includes any description or depiction of any kind whatsoever whether fictionalized or not, about any Party to this agreement or their respective family, other than as expressly disclosed by PP hereto in writing and as set forth herein in paragraph 4.2 above.

4.3.6    Agreement By PP Not to Disparage DD.  PP hereby irrevocably agrees and covenants that she shall not, directly or indirectly, publicly disparage DD, nor write, publish, cause to be published, or authorize, consult about or with or otherwise be involved in the writing, publication, broadcast, transmission or dissemination of any book, memoir, letter, story, photograph, film, script, Images, interview, article, essay, biography, diary, journal, documentary, or other written, oral, digital or visual account or description or depiction of any kind whatsoever whether fictionalized or not, about DD or his family, whether truthful, laudatory, defamatory, disparaging, deprecating or neutral.  PP further warrants and represents that PP has not and will not enter into any written or oral agreement with any third party purportedly requiring or obligating PP to do so. Fore greater clarity PP will never discuss with anyone the contents of this Settlement Agreement, nor will she voluntarily confirm the existence of this Settlement Agreement.

4.4    Disclosure Of Confidential Information Is Prohibited:  The Parties to this Agreement hereby recognize and agree that substantial effort and expense have been dedicated to limit the efforts of the press, other media, and the public to learn of personal and business affairs involving DD.  PP further acknowledges that any future disclosure of Confidential Information to any Third Party would constitute a serious and material breach of the terms of this Agreement, and shall constitute a breach of trust and confidence, invasion of privacy, and a misappropriation of exclusive property rights, and may also constitute fraud and deceit.  Some of the Confidential Information may also constitute and include proprietary business information and trade secrets which have independent economic value.  The Parties hereto acknowledge that any unauthorized use, dissemination or disclosure of Confidential Information, or the fabrication and dissemination of false and/or misleading information, about DD would result in irreparable injury to him, and would be injurious to a reasonable person, and/or would constitute an injurious violation of the right of privacy or publicity, and/or would be injurious to his business,

PP

Page 8


DD

profession, person, family and/or career. The Parties acknowledge that substantial and valuable property rights and other proprietary interests in the exclusive possession, ownership and use of Confidential Information, and recognizes and acknowledges that such Confidential Information is a proprietary, valuable, special and unique asset which belongs to DD and to which the PP has no claim of ownership or other interest.

       4.4.1   <u>Disclosures Permitted By PP</u>. Notwithstanding the foregoing, PP shall only be permitted to disclose Confidential Information to another person or entity only if compelled to do so by valid legal process, including without limitation a subpoena duces tecum or similar legal compulsion, provided that PP shall not make any such disclosure unless PP has first provided DD with notice of such order or legal process not less than ten (10) days in advance of the required date of disclosure pursuant to the Written Notice provisions set forth hereinbelow, providing DD with an opportunity to intervene and with full and complete cooperation should she choose to oppose such disclosure. PP agrees that if the valid legal process can be stopped by her consent or at her behest then PP shall agree to use best efforts to avoid the disclosure of the Confidential Information.

## 5.0   **REMEDIES**

    5.1   <u>DD's Remedies for Breach of Agreement</u>. Each breach or threatened breach (*e.g.*, conduct by PP reflecting that said person intends to breach the Agreement), including without limitation by breach of any representation or warranty, by failing to deliver to DD all tangible Property as required, by the disclosure or threatened disclosure of any Confidential Information to any Third Party by PP (herein "Prohibited Communication"), or otherwise, shall render PP liable to DD for any and all damages and injuries incurred as a result thereof, including but not limited to the following, all of which rights and remedies shall be cumulative:

       5.1.1   <u>Disgorgement of Monies</u>: In the event an Arbitrator determines there has been a breach or threatened breach of this Agreement by PP, PP shall be obligated to account to, and to disgorge and turn over to DD any and all monies, profits, or other consideration, or benefits, which PP, or anyone on PP's behalf or at PP's direction, directly or indirectly derive from any disclosure or exploitation of any of the Confidential Information; <u>and</u>

       5.1.2   <u>Liquidated Damages</u>: PP agrees that any breach or violation of this Settlement Agreement by either of PP individually or the PP Group by his/her/their unauthorized disclosure of any of the Confidential Information (as defined in paragraphs 4.1(a), (b), (c), and (d)) to any Third Party, and/or any unauthorized exploitation or prohibited use of the same, and/or by the breach of and/or by any false representations and warranties set forth in this Agreement, and/or any public disparagement of DD by PP (collectively, the "LD Breach Terms"), shall result in substantial damages and injury to DD, the precise amount of which would be extremely difficult or impracticable to determine, even after the Parties have made a reasonable endeavor to estimate fair compensation for such potential losses and damages to DD. Therefore, in addition to disgorgement of the full amount of all monies or other consideration pursuant to paragraph 5.1.2, in the event an Arbitrator determines there has been a breach of the LD Breach Terms of this Agreement by PP individually or the PP Group, PP shall also be obligated to pay, and agree to pay to DD the sum of One-Million Dollars ($1,000,000.00 as a reasonable and fair amount of liquidated damages to compensate DD for any loss or damage


**PP**

Page **9**


**DD**

resulting from each breach, it being understood that the Liquidated damages calculation is on a per item basis. The Parties agree that such sum bears a reasonable and proximate relationship to the actual damages which DD will or might suffer from each breach of the terms of this Agreement and that this amount is not a penalty. Alternatively, at DD's sole discretion, DD may seek to recover actual damages proximately caused by each such breach, according to proof. Any other breaches not a LD Breach Terms shall be subject to a claim for actual damages according to proof; furthermore, any monies held in Trust by PP's Attorney shall be frozen and shall not be disbursed to PP until the Arbitrator finally resolves the allegation of Breach.

      5.1.3   Injunctive Relief. PP acknowledges and agrees that any unauthorized disclosure to Third Parties of any Confidential Information will cause irreparable harm to DD, which damages and injuries will most likely not be measurable or susceptible to calculation. PP further acknowledges and agrees that any breach or threatened breach of this Agreement due to the unauthorized disclosure or threatened disclosure by PP to Third Parties, of any Confidential Information shall entitle DD to immediately obtain, either from the Arbitrator and/ or from any other court of competent jurisdiction, an *ex parte* issuance of a restraining order and preliminary injunction or other similar relief (herein "Injunctive Relief") without advance notice to any of PP, preventing the disclosure or any further disclosure of Confidential Information protected by the terms hereof, pending the decision of the Arbitrator or Court. The Parties further acknowledge and agree that in connection with any such proceeding, any Party may obtain from the Court or Arbitrator on an ex parte application or noticed motion without opposition, an order sealing the file in any such proceeding, and the Parties stipulate to the factual and legal basis for issuance of an order sealing the file in any such proceedings. The rights and remedies set forth in this Injunctive Relief Section are without prejudice to any other rights or remedies, legal or equitable, that the Parties may have as a result of any breach of this Agreement.

      5.2   Dispute Resolution. In recognition of the mutual benefits to DD and PP of a voluntary system of alternative dispute resolution which involves binding confidential arbitration of all disputes which may arise between them, it is their intention and agreement that any and all claims or controversies arising between DD on the one hand, and PP on the other hand, shall be resolved by binding confidential Arbitration to the greatest extent permitted by law. Arbitration shall take place before JAMS ENDISPUTE ("JAMS") pursuant to JAMS Comprehensive Arbitration Rules and Procedures (including Interim Measures) ("JAMS Rules") and the law selected by DD, (such selection shall be limited to either, California, Nevada or Arizona), or before ACTION DISPUTE RESOLUTION SERVICES ("ADRS") pursuant to the ADRS Rules (including Interim Measures) and the law selected by DD (whichever the claimant elects upon filing an arbitration), in a the location selected by DD, and will be heard and decided by a sole, neutral arbitrator ("Arbitrator") selected either by agreement of the Parties, or if the Parties are unable to agree, then selected under the Rules of the selected arbitration service. The costs and fees associated with any Arbitrator and/or Arbitration service shall be split equally among the parties to any such dispute. The Parties shall have the right to conduct discovery in accordance with the California Code of Civil Procedure Section 1283.05 *et. seq.* or any similar provision existing in the jurisdiction selected by DD and the written discovery requests and results of discovery shall be deemed to constitute Confidential Information. The Arbitrator shall have the right to impose all legal and equitable remedies that would be available to any Party before any governmental dispute resolution forum or court of competent jurisdiction, including without limitation temporary, preliminary and permanent injunctive relief, compensatory damages, liquidated damages, accounting, disgorgement, specific performance, attorneys fees and costs,



PP

Page **10**



**DD**

and punitive damages. It is understood and agreed that each of the Parties shall bear his/its own attorneys' fees, expert fees, consulting fees, and other litigation costs (if any) ordinarily associated with legal proceedings taking place in a judicial forum, subject to the Arbitrator's reassessment in favor of the prevailing party to the extent permitted by law. **Each of the Parties understands, acknowledges and agrees that by agreeing to arbitration as provided herein, each of the Parties is giving up any right that he/she/it may have to a trial by judge or jury with regard to the matters which are required to be submitted to mandatory and binding Arbitration pursuant to the terms hereof. Each of the Parties further understands, acknowledges and agrees that there is no right to an appeal or a review of an Arbitrator's award as there would be a right of appeal or review of a judge or jury's decision.**

### 6.0   MUTUAL RELEASES

6.1     Except for the rights and obligations of the Parties set forth in this Agreement, DD, for himself, and each of his representatives, agents, assigns, heirs, partners, companies, affiliated companies, employees, insurers and attorneys, absolutely and forever releases and discharges PP, individually, and all of PP's heirs, and PP's attorneys, and each of them ("PP Releasees"), of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorney's fees), expenses, liens, actions and causes of actions of every kind and nature whatsoever, whether known or unknown, from the beginning of time to the effective date of this Agreement, including without limitation any and all matters, facts, claims and/or defenses asserted or which could have been asserted in the Matter, or which could have been asserted in any other legal action or proceeding, except as may be provided herein (the "DD Released Claims").

6.2     Except for the rights and obligations of the Parties set forth in this Agreement, PP, for herself, and her representatives, agents, assigns, heirs, partners, companies, affiliated companies, employees, insurers and attorneys, absolutely and forever release and discharge DD, individually, and each of his representatives, agents, assigns, heirs, partners, companies, affiliated companies, subsidiaries, employees, attorneys, successors, insurers, and each of them ("DD Releasees"), of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorney's fees), expenses, liens, actions and causes of actions of every kind and nature whatsoever, whether known or unknown, from the beginning of time to the date of this Agreement, including without limitation any and all matters, facts, claims and/or defenses asserted or which could have been asserted in the Action, or which could have been asserted in any other legal action or proceeding (the "PP Released Claims").

6.3     The subject matter referred to in paragraphs 6.1 and 6.2, above (i.e., the DD Released Claims and PP Released Claims), are collectively referred to as the "Released Matters."

6.4     The Parties hereto, and each of them, hereby warrant, represent and agree that each of them is fully aware of §1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."





The Parties, and each of them, voluntarily waive the provisions of California <u>Civil Code</u> § 1542, and any other similar federal and state law as to any and all claims, demands, causes of action, or charges of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected.

        6.4.1    For avoidance of any doubt, by virtue of this Settlement and this Settlement Agreement, the parties hereby waive any unknown claims against each other individually, and each of their representatives, agents, assigns, heirs, partners, companies, affiliated companies, subsidiaries, employees, attorneys, successors, insurers, and each of them.

    6.5    Each of the Parties hereto acknowledges and agrees that this Agreement constitutes a settlement and compromise of claims and defenses in dispute, and shall not be construed in any fashion as an admission of liability by any party hereto.

### 7.0   <u>CONFIDENTIALITY OF THIS AGREEMENT</u>

    7.1    The Parties, respectively, shall not to disclose the terms of this Agreement, either directly or indirectly, to the media or to anyone else other than their respective attorneys and representatives and/or as may be required by law.  PP may not comment or make any press releases or otherwise discuss the resolution of the subject of this Agreement.

### 8.0   <u>MISCELLANEOUS TERMS</u>

    8.1    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement and understanding concerning the Released Matters hereof between the Parties hereto and supersedes any and all prior negotiations and proposed agreement and/or agreements, written and/or oral, between the Parties.  Each of the Parties hereto acknowledges that neither they, nor any other party, nor any agent or attorney of any other party has made any promise, representation, or warranty whatsoever, expressed or implied, written or oral, which is not contained herein, concerning the subject matter hereof, to induce it to execute this Agreement, and each of the Parties hereto acknowledges that she/he has not executed this Agreement in reliance on any promise, representation, and/or warranty not contained herein.  This Agreement shall be binding on and inure to the benefit of the Parties, the Releasees, and each of their respective successors and assigns and designees.

    8.2    <u>DD's Election of either California, Nevada or Arizona Law & Venue</u>.  This Agreement and any dispute or controversy relating to this Agreement, shall in all respects be construed, interpreted, enforced and governed by the laws of the State of California, Arizona or Nevada at DD's election.  <u>Attorneys' Fees in the case of a Dispute</u>.  In the event of any dispute, action, proceeding or controversy regarding the existence, validity, interpretation, performance, enforcement, claimed breach or threatened breach of this Agreement, the prevailing party in any resulting arbitration proceeding and/or court proceeding shall be entitled to recover as an element of such Party's costs of suit, and not as damages, all attorneys' fees, costs and expenses incurred or sustained by such prevailing Party in connection with such action, including, without limitation, legal fees and costs.



**DD**

8.3     Attorney Fees and Costs in Formation of this Agreement. The Parties shall each bear their own costs, expert fees, attorneys' fees and other fees incurred in connection with the creation this Settlement Agreement.

8.4     Waivers; Modification. This Agreement cannot be modified or changed except by written instrument signed by all of the Parties hereto. No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

8.5     Scope of Provisions/Severability/Headings. None of the Parties hereto shall be deemed to be the drafter of this Agreement, but it shall be deemed that this Agreement was jointly drafted by each of the Parties hereto. Should any provision of this Agreement be found to be ambiguous in any way, such ambiguity shall not be resolved by construing this Agreement in favor of or against any party herein, but rather construing the terms of this Agreement as a whole according to their fair meaning. In the event that any provision hereof is deemed to be illegal or unenforceable, such a determination shall not affect the validity or enforceability of the remaining provisions thereof, all of which shall remain in full force and effect. Notwithstanding the foregoing, if a provision is deemed to be illegal the Parties agree to waive any defense on said grounds. In the event that such any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope or breadth permitted by law. The captions appearing at the commencement of certain paragraphs herein are descriptive only and for convenience of reference. Should there be any conflict between any such caption or heading and the paragraph at the caption of which it appears, the paragraph, and not such caption, shall control and govern.

8.6     Advice of Counsel and Understanding of this Binding Agreement. Each of the Parties represents, acknowledges, and declares that she/he has received the advice of legal counsel of his/her own choosing regarding the form, substance, and effect of this Agreement. Each of the Parties represents, acknowledges, and declares that she/he has carefully read this Agreement, knows and understands this Agreement's contents, and signs this Agreement freely, voluntarily, and without either coercion or duress. Each of the Parties represents and warrants that she/he is fully competent to manage his/her business affairs, and that she/he has full power and authority to execute this Agreement, and to do any and all of the things reasonably required hereunder; and that this Agreement, when signed by all Parties, is a valid and binding agreement, enforceable in accordance with its terms.

8.7     Further Execution. In order to carry out the terms and conditions of this Agreement, PP agrees to promptly execute, upon reasonable request, any and all documents and instruments necessary to effectuate the terms of this Agreement.

8.8     Notice Provisions. Any notice, demand or request that one Party desires, or is required to give (including service of any subpoena, court pleadings, summons and/or complaint), to the other Party must be promptly communicated to the other Party by using their respective contact information below, by both (i) e-mail or facsimile; *and* (ii) telephone. Either Party may change his or her contact information by notifying the other Party of said change(s) pursuant to the applicable terms herein.



Page **13**

<span style="float:right">ƏC
**DD**</span>

8.8.1   To DD as follows:

*Essential Consultants, LLC*
*c/o: Michael Cohen, Esq.*
*502 Park Avenue #2A*
*New York, NY 10022*

8.8.2   To PP, as follows:

C/O KEITH M. DAVIDSON, ESQ.
8383 Wilshire Boulevard, Suite 510
Beverly Hills, CA 90211
tel. 323.658.5444
fax. 323-658-5444
e-mail: keith@KmdLaw.com

8.9 . This Agreement may be executed with one or more separate counterparts, each of which, when so executed shall be deemed to be an original and, together shall constitute and be one and the same instrument.  Any executed copies or signed counterparts of this Agreement, the Declaration, and any other documentation may be executed by scanned/printed pdf copies of signatures and/or facsimile signatures, which shall be deemed to have the same force and effect as if they were original signatures.

**IN WITNESS WHEREOF,** by their signatures below, the Parties each have approved and executed this Agreement as of the effective date first set forth above.

DATED: _____, 2016

**DD**

DATED: _Oct 28_____, 2016

**PP**

ERICA JACKSON
Notary Public, State of Texas
Comm. Expires 01-04-2020
Notary ID 130483626

DATED: _10/28_____, 2016

*E C, LLC*

**PP**

Page 14

**EC**
**DD**

DATED: _10/31/16_, 2016

As to Form:

_____
Keith M. Davidson, Esq., Attorney for PP


DATED: _____, 2016

As to Form:

_____

Attorney for DD


DATED: _10/28____, 2016

As to Form:

_____
MICHAEL D. COHEN, ESQ.
Attorney for ████
ESSENTIAL CONSULTANTS, LLC

Page **15**

# Exhibit 2

# EXHIBIT "A" TO THE **CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE; ASSIGNMENT OF COPYRIGHT AND NON-DISPARAGMENT AGREEMENT**

## SIDE LETTER AGREEMENT

## DATED _／𝐷_ / _2𝒳_ / 2016.

To Whom It May Concern:

    This Side Letter agreement is entered into by and on behalf of the Parties with respect to the Confidential Settlement Agreement and Mutual Release entered into by and between them on or about _𝒟𝒸𝒻  2 𝒳_ , 2016 ("Settlement Agreement"), in which Stephanie Gregory Clifford a.k.a. Stormy Daniels, is referred to by the pseudonym, "PEGGY PETERSON," and ▮▮▮▮▮▮▮▮▮▮ , is referred to by the pseudonym "DAVID DENNISON."

    It is understood and agreed that the true name and identity of the person referred to as " PEGGY PETERSON " in the Settlement Agreement is Stephanie Gregory Clifford a.k.a. Stormy Daniels and that any reference or designation to PEGGY PETERSON shall be deemed the same thing as referring to Stephanie Gregory Clifford a.k.a. Stormy Daniels by her true name as identified herein.

    It is understood and agreed that the true name and identity of the person referred to as "DAVID DENNISON" in the Settlement Agreement is ▮▮▮▮▮▮▮▮▮ , and that any reference or designation to DAVID DENNISON shall be deemed the same thing as referring to ▮▮▮▮▮▮▮▮ , by his true name as identified herein.

    It is understood and agreed that the true name and identity of the entity referred to as "EC, LLC" in the Settlement Agreement is ▮▮▮▮▮▮▮▮▮▮ _LLC_ and that any reference or designation to EC, LLC  shall be deemed the same thing as referring to ▮▮▮▮▮▮▮▮▮▮ _LLC_ , by ~~his~~ true name as identified herein. _its_

    It is further acknowledged and agreed by the parties that notwithstanding the provisions of Paragraph 7.1 of the Settlement Agreement (which provides that the Settlement Agreement constitutes the entire agreement between the Parties with respect to the matters herein and in supersedes all prior and contemporaneous oral and written agreements and discussions pertaining to the matters herein), this Side Letter agreement shall be deemed part of the agreement between the Parties. Accordingly, Paragraph 7.1 of the Settlement Agreement is hereby amended via supplanting to provide as follows:

        "**7.1.1 Integration.** The Side Letter agreement entered into by the Parties concurrently with their entry into this Agreement shall be deemed part of this Agreement, and this Agreement and the Side Letter agreement together constitute the entire agreement between the Parties with

respect to the matters herein and supersedes all prior
and contemporaneous oral and written agreements and
discussions pertaining to the matters herein."

For avoidance of doubt, it is further agreed that this Side Letter agreement shall
constitute Confidential Information as defined in the Settlement Agreement, that neither
this Side Letter agreement nor any portion hereof may be disclosed to anyone except as
and to the extent expressly provided in the Settlement Agreement, and that any
unauthorized disclosure or use of this Side Letter agreement or any portion hereof shall
constitute a material breach of the confidentiality provisions of the Settlement
Agreement.

It is further agreed that neither party shall keep a copy of this document, and that
only Keith M. Davidson, Esq. AND ████████████████ counsel for the parties
herein), shall maintain possession of it or access to this Side Letter agreement. FOR
AVOIDANCE OF DOUBT, THE PARTIES HERETO AGREE AND CONFIRM THAT
THIS SIDE LETTER AGREEMENT IS DEEMED "ATTORNEY'S EYES ONLY."

This Side Letter agreement may be executed in counterparts and when each Party
has signed and delivered one such counterpart to the other Party, each counterpart shall
be deemed an original, and all counterparts taken together shall constitute one and the
same Agreement, which shall be binding and effective as to the Parties. The Agreement
may be executed by facsimile or electronic PDF signatures, which shall have the same
force and effect as if they were originals.

By signing below, each of the Parties signifies their agreement to the terms hereof
and each of their respective counsel signify their approval as to the form of this letter
agreement.

_____          10/28/16
PEGGY PETERSON a.k.a. Stephanie Gregory          date
Clifford a.k.a. Stormy Daniels

ERICA JACKSON
Notary Public, State of Texas
Comm. Expires 01-04-2020
Notary ID 130483626

_____          _____
DAVID DENNISON a.k.a. _____          date

_____          10/31/16
Keith M. Davidson, Esq.          date

_____, Esq.          10/28/16
████████████████████████          date

# Exhibit 2

Michael J. Avenatti, Bar No. 206929
AVENATTI & ASSOCIATES, APC
mavenatti@eoalaw.com
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660
Tel:   (949) 706-7000
Fax:   (949) 706-7050

Attorneys for Plaintiff Stephanie Clifford
a.k.a. Stormy Daniels a.k.a. Peggy Peterson

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS a.k.a. PEGGY PETERSON, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> DONALD J. TRUMP a.k.a. DAVID DENNISON, an individual, ESSENTIAL CONSULTANTS, LLC, a Delaware Limited Liability Company, MICHAEL COHEN, an individual, and DOES 1 through 10, inclusive <br><br> Defendants. | Case No. 2:18-CV-02217-SJO-FFM <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> **(1) DECLARATORY RELIEF/JUDGMENT; AND** <br><br> **(2) DEFAMATION** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Stephanie Clifford a.k.a. Stormy Daniels a.k.a. Peggy Peterson ("Ms. Clifford" or "Plaintiff") hereby alleges the following:

## THE PARTIES

1.      Plaintiff Ms. Clifford, an individual, is a resident of the State of Texas.

2.      Defendant Donald J. Trump a.k.a. David Dennison ("Mr. Trump"), an individual, is a resident of the District of Columbia (among other places).

3.      Defendant Essential Consultants, LLC ("EC") is a Delaware limited liability company formed on October 17, 2016.

4.      Defendant Michael Cohen ("Mr. Cohen"), an individual, is a resident of the State of New York.

5.      Mr. Trump, EC, and Mr. Cohen together shall be referred to hereafter as "Defendants."

6.      The true names and capacities of the defendants DOES 1 through 10, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will seek leave of court to amend this Complaint to show the true names and capacities of defendants DOES 1 through 10, inclusive, when the same have been ascertained.

7.      Plaintiff is also informed and believe and thereon alleges that DOES 1 to 10 were the agents, principals, and/or alter egos of Defendants, at all times herein relevant, and that they are therefore liable for the acts and omissions of Defendants.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction over Plaintiff's claims based on the parties' diversity of citizenship and because the amount in controversy exceeds $75,000.

**FIRST AMENDED COMPLAINT**

9.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391, and this Court has personal jurisdiction over Defendants and each of them, by reason of the fact that, among other things, (a) the alleged agreement that is at issue in this Complaint was purportedly made and negotiated, at least in substantial part, in the County of Los Angeles, and (b) many of the events giving rise to this action arose in California, including within the County of Los Angeles.

## FACTUAL BACKGROUND

10.     Ms. Clifford began an intimate relationship with Mr. Trump in the summer of 2006 in Lake Tahoe and continued her relationship with Mr. Trump well into the year 2007.  This relationship included, among other things, at least one "meeting" with Mr. Trump in a bungalow at the Beverly Hills Hotel located within Los Angeles County.

11.     In 2015, Mr. Trump announced his candidacy for President of the United States.

12.     On July 19, 2016, Mr. Trump secured the Republican Party nomination for President.

13.     On October 7, 2016, the Washington Post published a video, now infamously known as the *Access Hollywood Tape*, depicting Mr. Trump making lewd remarks about women.  In it, Mr. Trump described his attempt to seduce a married woman and how he may start kissing a woman that he and his companion were about to meet.  He then added: "I don't even wait.  And when you're a star, they let you do it, you can do anything . . ."

14.     Within days of the publication of the *Access Hollywood Tape*, several women came forward publicly to tell their personal stories about their sexual encounters with Mr. Trump.

15.     Around this time, Ms. Clifford likewise sought to share details concerning her relationship and encounters with Mr. Trump with various media outlets.

16.     As a result of Ms. Clifford's efforts aimed at publicly disclosing her story and her communications with various media outlets, Ms. Clifford's plans came to the attention of Mr. Trump and his campaign, including Mr. Michael Cohen, an attorney licensed in the State of New York. Mr. Cohen worked as the "top attorney" at the Trump Organization from 2007 until after the election and presently serves as Mr. Trump's personal attorney. He is also generally referred to as Mr. Trump's "fixer."

17.     After discovering Ms. Clifford's plans, Mr. Trump, with the assistance of his attorney Mr. Cohen, aggressively sought to silence Ms. Clifford as part of an effort to avoid her telling the truth, thus helping to ensure he won the Presidential Election. Mr. Cohen subsequently prepared a draft non-disclosure agreement and presented it to Ms. Clifford and her attorney (the "Hush Agreement"). Ms. Clifford at the time was represented by counsel in California whose office is located in Beverly Hills, California within the County of Los Angeles.

18.     The parties named in the Hush Agreement were Ms. Clifford, Mr. Trump, and Essential Consultants LLC. As noted above, Essential Consultants LLC ("EC") was formed on October 17, 2016, just weeks before the 2016 presidential election. On information and belief, EC was created by Mr. Cohen with Mr. Trump's knowledge for one purpose – to hide the true source of funds to be used to pay Ms. Clifford, thus further insulating Mr. Trump from later discovery and scrutiny.

19.     By design of Mr. Cohen, the Hush Agreement used aliases to refer to Ms. Clifford and Mr. Trump. Specifically, Ms. Clifford was referred to by the alias "Peggy Peterson" or "PP." Mr. Trump, on the other hand, was referred to by the alias "David Dennison" or "DD."

20.     Attached hereto as Exhibit 1 is a true and correct copy of the Hush Agreement, titled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-Disparagment [sic] Agreement. Exhibit 1 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

**FIRST AMENDED COMPLAINT**

21.     Attached hereto as Exhibit 2 is a true and correct copy of the draft Side Letter Agreement, which was Exhibit A to the Hush Agreement.  Exhibit 2 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

22.     Importantly, the Hush Agreement imposed various conditions and obligations not only on Ms. Clifford, but also on Mr. Trump.  The agreement also required the signature of all parties to the agreement, including that of Mr. Trump.  Moreover, as is customary, it was widely understood at all times that unless all of the parties signed the documents as required, the Hush Agreement, together with all of its terms and conditions, was null and void.

23.     On or about October 28, 2016, only days before the election, two of the parties signed the Hush Agreement - Ms. Clifford and Mr. Cohen (on behalf of EC).  Mr. Trump, however, did not sign the agreement, thus rendering it legally null and void and of no consequence.  On information and belief, despite having detailed knowledge of the Hush Agreement and its terms, including the proposed payment of monies to Ms. Clifford and the routing of those monies through EC, Mr. Trump purposely did not sign the agreement so he could later, if need be, publicly disavow any knowledge of the Hush Agreement and Ms. Clifford.

24.     Despite Mr. Trump's failure to sign the Hush Agreement, Mr. Cohen proceeded to cause $130,000.00 to be wired to the trust account of Ms. Clifford's attorney.  He did so even though there was no legal agreement and thus no written nondisclosure agreement whereby Ms. Clifford was restricted from disclosing the truth about Mr. Trump.

25.     Mr. Trump was elected President of the United States on November 8, 2016.

26.     In January 2018, certain details of the draft Hush Agreement emerged in the news media, including, among other things, the existence of the draft agreement, the parties to the draft agreement, and the $130,000.00 payment provided for under the

draft agreement. Also in January 2018, and concerned the truth would be disclosed, Mr. Cohen, through intimidation and coercive tactics, forced Ms. Clifford into signing a false statement wherein she stated that reports of her relationship with Mr. Trump were false.

27. On or about February 13, 2018, Mr. Cohen issued a public statement regarding Ms. Clifford, the existence of the Hush Agreement, details concerning the Hush Agreement, and an attack on Ms. Clifford's truthfulness. He did so without any consent by Ms. Clifford, thus evidencing Mr. Cohen's apparent position (at least in that context) that no binding agreement was in place. Among other things, Mr. Cohen stated: "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford. Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly." Mr. Cohen concluded his statement by stating: "Just because something isn't true doesn't mean that it can't cause you harm or damage. *I will always protect Mr. Trump.*" (emphasis added). This statement was made in writing by Mr. Cohen and released by Mr. Cohen to the media with the intent that it be widely disseminated and repeated throughout the United States. Attached hereto as Exhibit 3 is a true and correct copy of Mr. Cohen's statement. Exhibit 3 is incorporated herein by this reference and made a part of this Complaint as if fully set forth herein.

28. Importantly, at no time did Mr. Cohen make a direct assertion that Ms. Clifford did not have an intimate relationship with Mr. Trump. Indeed, were he to make such a statement, it would be patently false. Mr. Cohen's statement was not a mere statement of opinion, but rather has been reasonably understood to be a factual statement implying or insinuating that Ms. Clifford was not being truthful in claiming that she had an intimate relationship with Mr. Trump.

29. Because the agreement was never formed and/or is null and void, no contractual obligations were imposed on any of the parties to the agreement, including

any obligations to keep information confidential. Moreover, to the extent any such obligations did exist, they were breached and/or excused by Mr. Cohen and his public statements to the media.

30. To be clear, the attempts to intimidate Ms. Clifford into silence and "shut her up" in order to "protect Mr. Trump" continue unabated. For example, only days ago on or about February 27, 2018, Mr. Trump's attorney Mr. Cohen surreptitiously initiated a bogus arbitration proceeding against Ms. Clifford in Los Angeles. Remarkably, he did so without even providing Ms. Clifford with notice of the proceeding and basic due process.

31. Put simply, considerable steps have been taken by Mr. Cohen in the last week to silence Ms. Clifford through the use of an improper and procedurally defective arbitration proceeding hidden from public view. The extent of Mr. Trump's involvement in these efforts is presently unknown, but it strains credibility to conclude that Mr. Cohen is acting on his own accord without the express approval and knowledge of his client Mr. Trump.

32. Indeed, Rule 1.4 of the New York Rules of Professional Conduct governing attorneys has required Mr. Cohen *at all times* to promptly communicate all material information relating to the matter to Mr. Trump, including but not limited to "any decision or circumstance with respect to which [Mr. Trump's] informed consent [was] required" and "material developments in the matter including settlement or plea offers." Moreover, this same Rule required Mr. Cohen *at all times* to "reasonably consult with [Mr. Trump] about the means by which [his] objectives are to be accomplished" and to "keep [Mr. Trump] reasonably informed about the status of the matter."

33. Further, Rule 1.8(e) of the New York Rules of Professional Conduct provides that attorneys "shall not advance or guarantee financial assistance to the client[.]" Although the Rule provides for certain exceptions, such as permitting lawyers to pay court costs and expenses for indigent clients, plainly, none of these exceptions

apply to Mr. Cohen's purported financial assistance of $130,000 on behalf of his client, Mr. Trump.

34.     Accordingly, unless Mr. Cohen flagrantly violated his ethical obligations and the most basic rules governing his license to practice law (which is highly unlikely), there can be no doubt that Mr. Trump *at all times* has been fully aware of the negotiations with Ms. Clifford, the existence and terms of the Hush Agreement, the payment of the $130,000.00, the use of EC as a conduit, and the recent attempts to intimidate and silence Ms. Clifford by way of the bogus arbitration proceeding.

35.     Because there was never a valid agreement and thus, no agreement to arbitrate, any subsequent order obtained by Mr. Cohen and/or Mr. Trump in arbitration is of no consequence or effect.

## **FIRST CAUSE OF ACTION**
### **Declaratory Relief/Judgment**
### **(Against Defendants Mr. Trump and EC)**

36.     Plaintiff restates and re-alleges each and every allegation in Paragraphs 1 through 35 above as if fully set forth herein.

37.     This action concerns the legal significance, if any, of the documents attached hereto as Exhibit 1, entitled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-Disparagment [sic] Agreement, and Exhibit 2, entitled Side Letter Agreement.

38.     California Code of Civil Procedure § 1060 authorizes declaratory relief for any person who desires a declaration of rights or duties with respect to one another.  In cases of actual controversy relating to the legal rights and duties of the respective parties, such a person may seek a judicial declaration of his or her rights and duties relative to an instrument or contract, or alleged contract, including a determination of any question of construction or validity arising under the instrument or contract, or alleged contract.  This includes a determination of whether a contract was ever formed.

**FIRST AMENDED COMPLAINT**

39.     28 U.S.C. § 2201 creates a remedy for the entry of a declaratory judgment in cases of "actual controversy", whereby the court may declare the rights and other legal relations of any interested party seeking such declaration.  Any such declaration shall have the force and effect of a final judgment or decree.

40.     An actual controversy exists between Plaintiff and Defendants as to their rights and duties to each other.  Accordingly, a declaration is necessary and proper at this time.

**A.     No Agreement Was Formed – Lack of Signature, Consideration, or Consent**

41.     Specifically, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 between Plaintiff and Defendants were never formed, and therefore do not exist, because, among other things, Mr. Trump never signed the agreements (which was an express condition of the Hush Agreement that had to occur for the formation of a valid and binding agreement).  Nor did Mr. Trump provide any other valid consideration.  He thus never assented to the duties, obligations, and conditions the agreements purportedly imposed upon him, which included express obligations imposed on Mr. Trump to provide Plaintiff with releases, a covenant not to sue, and representations and warranties (all of which were separate and apart from the $130,000 payment).  Plaintiff contends that, as a result, no agreement was ever formed or ever existed and, consequently, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2.  Moreover, as a further result, there is no agreement to arbitrate between the parties.

**B.     The Agreement Is Unconscionable**

42.     In the alternative, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable, and/or void under the doctrine of unconscionability.  By way of example only (and not limitation), the Hush Agreement contains a "Liquidated Damages" provision in favor of

"DD" (Mr. Trump) purporting to require Plaintiff to pay $1 Million for "<u>each</u> breach" calculated on a "per item basis." However, $1 Million for "<u>each</u> breach" bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. Instead, the liquidated damages clause was intended to inflict a penalty designed to intimidate and financially cripple Plaintiff. It is therefore void as a matter of law.

43. By way of further example, while on the one hand, the Hush Agreement purports to impose astonishingly broad restrictions on speech and disclosure upon Plaintiff (including prohibiting disclosure of matters that are of public record), on the other hand, Defendants, with few exceptions, have no such restrictions imposed upon them and are thus permitted to disclose matters covered by the Agreement, and publicly disparage Plaintiff and impugn her credibility. As but one illustration of the one-sided nature of the Hush Agreement, EC, through Mr. Cohen, violated paragraph 7.1 of the Agreement by disclosing terms of the Agreement to the *Wall Street Journal* on or about January 12, 2018. Although the Agreement attempts to impose astonishingly Draconian consequences and penalties upon Plaintiff for a breach of the Agreement, no such remedies are available to Plaintiff for Defendants' breach of the Agreement. An agreement that sanctions such overly-harsh, one-sided results without any justification and which allocates risks of the bargain in such an objectively unreasonable and unexpected manner is unconscionable as a matter of law. Plaintiff contends that, as a result, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2. Moreover, as a further result, there is no agreement to arbitrate between the parties.

## C. The Agreement Is Void *Ab Initio* Because It Is Illegal and Violates Public Policy

44. In the further alternative, Plaintiff seeks an order of this Court declaring that the agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable,

and/or void because they are illegal, or that they violate public policy. Essential to the "*existence*" of a contract is that the contract have a "lawful object" or lawful purpose. See, e.g., Cal. Civ. Code § 1550. No such lawful purpose existed in the Hush Agreement for at least the following reasons.

45. *First*, the Hush Agreement was entered with the illegal aim, design, and purpose of circumventing federal campaign finance law under the Federal Election Campaign Act (FECA), 52 U.S.C. §§ 30101, *et seq.*, and Federal Election Commission (FEC) regulations. The purposes and aims of the FECA include the promotion of transparency, the complete and accurate disclosure of the contributors who finance federal elections, and the restriction on the influence of political war chests funneled through the corporate form.

46. In order to effectuate these purposes, FECA imposes various contribution limits, and reporting and public disclosure requirements, on candidates for Federal office, including the office of President of the United States. With regards to the 2016 Presidential Election, FECA required that the maximum any "person"—defined to include "an individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons" —was permitted to contribute to any candidate was $2,700. 52 U.S.C. §§ 30101(11); 30116(a)(1)(A), (c); see also FEC, Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 82 Fed. Reg. 10904, 10906 (Feb. 16, 2017). Mr. Trump and his campaign for the presidency were subject to FECA and its contribution limit at all relevant times.

47. The term "contribution" is defined broadly to include "any gift, subscription, loan, advance, or deposit of money *or anything of value* made by any person *for the purpose of influencing any election for Federal office*[.]" 52 U.S.C. § 30101(8)(A) (emphasis added); see also 11 C.F.R. §§ 100.51-100.56. The phrase "anything of value" includes "all in-kind contributions." 11 C.F.R. § 100.52(d)(1). In other words, "the provision of any goods or services without charge or at a charge that

**FIRST AMENDED COMPLAINT**

is less than the usual and normal charge for such goods or services is a contribution." Id.

48.     In addition, under FECA, Mr. Trump and his campaign for the presidency were required to report the identification of each person who made a contribution to his campaign with an aggregate value in excess of $200 within an election cycle.  52 U.S.C. § 30104(b)(3)(A).  Mr. Trump and his campaign for the presidency were also required to report the name and address of each person *to whom* an expenditure in an aggregate amount in excess of $200 within the calendar year was made by his campaign committee.

49.  FECA also imposes similar requirements on the reporting of "expenditures."  52 U.S.C. § 30104(b)(4)-(5).  The term "expenditure" includes "(i) any purchase, payment, distribution, loan, advance, deposit, or gift of money *or anything of value*, made by any person *for the purpose of influencing any election for Federal office*; and (ii) a written contract, promise, or agreement to make an expenditure."  52 U.S.C. § 30101(9) (emphasis added).  As with "contributions," the phrase "anything of value" in the context of "expenditures" includes "all in-kind contributions."  11 C.F.R. § 100.111(e)(1).

50.     Moreover, "contributions from the candidate" or "expenditures" from the candidate must also be reported.  11 C.F.R. § 104.3(a)(3)(ii); see also, e.g., FEC Advisory Opinion 1990-09.

51.     Here, the Hush Agreement did not have a lawful object or purpose.  The Hush Agreement, and the $130,000 payment made pursuant to the agreement, was for the "purpose of influencing" the 2016 presidential election by silencing Plaintiff from speaking openly and publicly about Mr. Trump just weeks before the 2016 election. Defendants plainly intended to prevent American voters from hearing Plaintiff speak about Mr. Trump.  This $130,000 payment was a thing "of value" and an "in-kind" contribution exceeding the contribution limits in violation of FECA and FEC regulations.  It was also a violation of FECA and FEC regulations because it was not

-11-

publicly reported as a contribution. Further, it was a violation of FECA and FEC regulations because it was a thing "of value" and an "in-kind" expenditure that was required to be reported as such. Therefore, because the Hush Agreement did not have a lawful object or purpose, the Agreement was void *ab initio*. Plaintiff contends that, as a result, she is not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2. Moreover, as a further result, there is no agreement to arbitrate between the parties.

52.     *Second*, the Hush Agreement is also void *ab initio* because it violates public policy by suppressing speech on a matter of public concern about a candidate for President of the United States, mere weeks before the election. Agreements to suppress evidence are void as against public policy, both in California and in most common law jurisdictions. "A bargain that has for its consideration the nondisclosure of discreditable facts, or of facts that the promisee is under a fiduciary duty not to disclose, is illegal." Restatement (First) of Contracts § 557 (1932). Remarkably, illustration 1 in the official comments to section 557 provides the following example of a bargain that is illegal:

> 1. A, a candidate for political office, and as such advocating certain principles, had previously written letters to B, taking a contrary position. B is about to publish the letters, and A fearing that the publication will cost him his election, agrees to pay $1000 for the suppression of the letters. The bargain is *illegal*.

Restatement (First) of Contracts § 557, Illustration 1 (1932)(emphasis added).

53.     *Third*, the Hush Agreement is also without a lawful object or purpose and thus void *ab initio* based on illegality because it was entered for the purpose of covering-up adulterous conduct, a crime in New York, Mr. Trump's home state at the time of the Hush Agreement and at the time of the intimate relationship between Plaintiff and Mr. Trump. N.Y. Penal Law § 255.17 ("A person is guilty of adultery

when he engages in sexual intercourse with another person at a time when he has a living spouse, or the other person has a living spouse. Adultery is a class B misdemeanor.").

54. *Fourth*, the Hush Agreement is also without a lawful object or purpose and thus void *ab initio* based on illegality because it was entered into by Defendant EC at the behest of Defendant Cohen, a New York attorney then subject to the New York Rules of Professional Conduct. If Mr. Cohen's public statements are true (which is unlikely), he violated Rule 1.4 of the New York Rules of Professional Conduct by entering into an agreement on his client Mr. Trump's behalf without notifying him of the agreement, including, among other things, the fact that the agreement required a payment of $130,000 to be made, that he was making the payment for Mr. Trump on Mr. Trump's behalf, that Mr. Trump was being encumbered with various duties and obligations under the Agreement, that the Agreement and $130,000 payment would possibly subject Mr. Trump to violations of federal campaign finance laws, and that the Agreement would raise questions about whether he had an adulterous affair that Mr. Trump apparently now denies ever occurred.

55. Moreover, if Mr. Cohen's public statements are true, he also violated Rule 1.8(e) of the New York Rules of Professional Conduct by advancing or guaranteeing financial assistance to a client by paying $130,000 from his own personal funds to benefit his client Mr. Trump.

### D. <u>There Was No Agreement to Arbitrate Between Plaintiff and EC</u>

56. Separate and apart from Plaintiff's request for an order declaring that no agreement was ever formed between the parties, or that the entirety of the Hush Agreement be declared void *ab initio*, all as set forth above, Plaintiff alternatively seeks an order of this Court declaring that no agreement to arbitrate exists between Plaintiff and EC. Under paragraph 5.2 of the Hush Agreement, entitled "<u>Dispute Resolution</u>," only those "claims and controversies arising between DD [Mr. Trump] on the one hand,

and PP [i.e., Plaintiff] on the other hand" are subject to arbitration. To be clear, there is not presently nor has there ever been any agreement to arbitrate between Plaintiff and EC.

**E.     The Arbitration Clause Is Void *Ab Initio* Because It Is Unconscionable, Illegal, and Violates Public Policy**

57.     Moreover, also separate and apart from Plaintiff's request for an order declaring that no agreement was ever formed between the parties, or that the entirety of the Hush Agreement be declared void *ab initio* (as set forth above), Plaintiff alternatively seeks an order of this Court declaring that no agreement to arbitrate exists because no agreement was formed (see Complaint, ¶41, supra), and further, that no agreement to arbitrate exists because paragraphs 5.2 of the Agreement (which contains the arbitration clause) along with various parts of paragraph 5.1 of the Agreement (describing "DD's" remedies that Defendants would presumably argue are available to them in a confidential arbitration proceeding) are void *ab initio* because they unconscionable, illegal, and violates public policy.

58.     *First*, the arbitration clause is unconscionable, particularly when combined with the remedies section of the Agreement. The clause is extremely one-sided by conferring significant rights exclusively to Mr. Trump (as "DD" referred to in the Agreement), provided he is a party to the agreement. Among other things, (a) Mr. Trump is given the right to seek injunctive relief *either* in court or arbitration, while Defendants contend Plaintiff must pursue all rights in arbitration, (b) Mr. Trump is given the exclusive right to elect which state's laws will apply to the arbitration (California, Nevada, or Arizona) and he is not required to provide notice of which state's laws he elects will be applied until after he has filed an arbitration proceeding, and (c) Mr. Trump is given the exclusive right to choose venue in *any* location (i.e., anywhere in the country) he selects and is permitted to elect which of two arbitration

**FIRST AMENDED COMPLAINT**

agencies the arbitration proceeding may be initiated in (either JAMS or Action Dispute Resolution Services).

59. *Second,* the arbitration clause is illegal and without lawful object or purpose because it was entered with the purpose of keeping facts concerning federal campaign contributions and expenditures secret and hidden from public view by using a confidential arbitration proceeding in violation of FECA's mandates to publicly report campaign contributions and expenditures. In other words, the principal aim and design of the arbitration clause is to keep confidential that which, by law, must be publicly disclosed. Indeed, the clause plainly is designed to prevent the public disclosure of an illegal campaign contribution by mandating that disputes between Plaintiff and Mr. Trump be resolved in a confidential arbitration proceeding shielded from public scrutiny.

60. *Third*, the arbitration clause is void because it violates public policy by suppressing speech on a matter of enormous public concern about a candidate for President of the United States mere weeks before the election. See Restatement (First) of Contracts § 557.

61. *Fourth,* the arbitration clause is illegal and without lawful object or purpose because it was designed to cover up adulterous conduct, a crime in New York, Mr. Trump's home state at the time of the Hush Agreement and at the time of Plaintiff and Mr. Trump's intimate relationship. N.Y. Penal Law § 255.17. It is also illegal and without lawful object or purpose because it was designed to cover up Mr. Cohen's ethical violations, including his violations of Rule 1.4 and 1.8(e) of the New York Rules of Professional Conduct.

62. Defendants dispute all of the foregoing contentions.

63. Accordingly, Ms. Clifford desires a judicial determination of her rights and duties with respect to the alleged agreements in the forms set out in Exhibits 1 and 2.

**FIRST AMENDED COMPLAINT**

## **SECOND CAUSE OF ACTION**

### **Defamation**

### **(Against Defendant Mr. Cohen)**

64.     Plaintiff restates and re-alleges each and every allegation in Paragraphs 1 through 64 above as if fully set forth herein.

65.     On or about February 13, 2018, Mr. Cohen issued a public statement.  The entirety of the statement is attached hereto as Exhibit 3.  In it, he states in part:  "*Just because something isn't true* doesn't mean that it can't cause you harm or damage.  I will always protect Mr. Trump." (emphasis added).  Mr. Cohen's statement was made in writing and released by Mr. Cohen to the media with the intent that it be widely disseminated and repeated throughout California and across the country (and the world) on television, on the radio, in newspapers, and on the Internet.

66.     It was reasonably understood by those who read or heard the statement that Mr. Cohen's defamatory statement was about Ms. Clifford.

67.     Both on its face, and because of the facts and circumstances known to persons who read or heard the statement, it was reasonably understood Mr. Cohen meant to convey that Ms. Clifford is a liar, someone who should not be trusted, and that her claims about her relationship with Mr. Trump is "something [that] isn't true."   Mr. Cohen's statement exposed Mr. Clifford to hatred, contempt, ridicule, and shame, and discouraged others from associating or dealing with her.

68.     Mr. Cohen's defamatory statement was false.

69.     Mr. Cohen made the statement knowing it was false or had serious doubts about the truth of the statements.

70.     As a result, Plaintiff Ms. Clifford has suffered damages in an amount to be proven at trial according to proof, including but not limited to, harm to her reputation, emotional harm, exposure to contempt, ridicule, and shame, and physical threats of violence to her person and life.

71.    In making the defamatory statement identified above, Mr. Cohen acted with malice, oppression, or fraud, and is thus responsible for punitive damages in an amount to be proven at trial according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, declaring that no agreement was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void *ab initio*, invalid, or otherwise unenforceable.

## **ON THE FIRST CAUSE OF ACTION (DECLARATORY RELIEF/JUDGMENT)**

1.    For a judgment declaring that no agreement was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable;

2.    For a judgment declaring that no agreement to arbitrate was formed between the parties, or in the alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable;

3.    For costs of suit; and

4.    For such other and further relief as the Court may deem just and proper.

## **ON THE SECOND CAUSE OF ACTION (DEFAMATION)**

1.    For damages in an amount to be proven at trial;

2.    For punitive damages;

3.    For pre-judgment and post-judgment interest;

4.    For costs of suit; and

5.    For such other and further relief as the Court may deem just and proper.

**FIRST AMENDED COMPLAINT**

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all causes so triable.  Said demand includes a demand, pursuant to 9 U.S.C. § 4, for a trial by jury concerning whether the parties entered into the agreement at issue by which EC, Mr. Trump, or both, will seek to compel arbitration.

DATED:  March 26, 2018                    AVENATTI & ASSOCIATES, APC


                                         /s/ Michael J. Avenatti
                                        MICHAEL J. AVENATTI
                                        Attorneys for Plaintiff

**FIRST AMENDED COMPLAINT**

EXHIBIT 1

# CONFIDENTIAL SETTLEMENT AGREEMENT
# AND MUTUAL RELEASE; ASSIGNMENT OF
# COPYRIGHT AND NON-DISPARAGMENT
# AGREEMENT

## 1.0   THE PARTIES

1.1   This Settlement Agreement and Mutual Release (hereinafter, this "Agreement") is made and deemed effective as of the ___ day of October, 2016, by and between "**EC, LLC**" and/or **DAVID DENNISON**, (DD), on the one part, and **PEGGY PETERSON**, (PP), on the other part. ("EC, LLC," "DD" and "PP" are pseudonyms whose true identity will be acknowledged in a Side Letter Agreement attached hereto as "**EXHIBIT A**") This Agreement is entered into with reference to the facts and circumstances contained in the following recitals.

## 2.0   RECITALS

2.1   Prior to entering into this Agreement, PP came into possession of certain "Confidential Information" pertaining to DD, as more fully defined below, only some of which is in tangible form, which includes, but is not limited to information, certain still images and/or text messages which were authored by or relate to DD (collectively the "Property", each as more fully defined below but which all are included and attached hereto as Exhibit "1" to the Side Letter Agreement).

2.2   (a)   PP claims that she has been damaged by DD's alleged actions against her, including but not limited to tort claims proximately causing injury to her person and other related claims. DD denies all such claims. (Hereinafter "PP Claims").

(b)   DD claims that he has been damaged by PP's alleged actions against him, including but not limited to the alleged threatened selling, transferring, licensing, publicly disseminating and/or exploiting the Images and/or Property and/or other Confidential Information relating to DD, all without the knowledge, consent or authorization of DD.  PP denies all such claims. (Hereinafter "DD Claims").

(c)   The PP Claims and the DD Claims are hereinafter collectively referred to as "The Released Claims."

2.3   DD desires to acquire, and PP desires to sell, transfer and turn-over to DD, any and all tangible copies of the Property and any and all physical and intellectual property rights in and to all of the Property.  As a condition of DD releasing any claims against PP related to this matter, PP agrees to sell and transfer to DD all and each of her rights in and to such Property.  PP agrees to deliver each and every existing copy of all tangible Property to DD (and permanently delete any electronic copies that can not be transferred), and agrees that she shall not possess, nor directly nor indirectly disclose convey, transfer or assign Property or any Confidential Information to any Third Party, as more fully provided herein.

2.4   It is the intention of the Parties that Confidential Information, as defined herein, shall remain confidential as expressly provided hereinbelow.  The Parties expressly acknowledge, agree and understand that the Confidentiality provisions herein and the



Page **0**



representations and warranties made by PP herein and the execution by her of the Assignment & Transfer of Copyright are at the essence of this Settlement Agreement and are a material inducement to DD's entry into this Agreement, absent which DD would not enter into this Agreement. DD expects and requires that PP never communicate with him or his family for any reason whatsoever.

2.5    The Parties wish to avoid the time, expense, and inconvenience of potential litigation, and to resolve any and all disputes and potential legal claims which exist or may exist between them, as of the date of this Agreement including but not limited to the PP Claims and/or the DD Claims. The Parties agree that the claims released include but are not limited to DD's Claims against PP  as relates to PP having allowed, whether intentionally, unintentionally or negligently, anyone else other than those listed in section 4.2 herein below to become aware of the existence of and content of the Property, to have gained possession of the Property, and to PP's having allegedly engaged in efforts to disclose, disseminate and/or commercially exploit the Images and/or Property and/or Confidential Information, and any harm suffered by DD therefrom. The Parties agree that the claims released include but are not limited to PP's Claims against DD  as relates to DD having allowed, whether intentionally, unintentionally or negligently, anyone else to have interfered with PP's right to privacy or any other right that PP may possess.

2.6    These Recitals are essential, integral and material terms of this Agreement, and this Agreement shall be construed with respect thereto.  The Parties enter into this Agreement in consideration of the promises, covenants and conditions set forth herein, and for good and valuable consideration, the receipt of which is hereby acknowledged. It is an essential element of this Settlement Agreement that the Parties shall never directly or indirectly communicate with each other or attempt to contact their respective families. This matter, the existence of this Settlement Agreement and its terms are strictly confidential.

NOW, THEREFORE, the Parties adopt the foregoing recitals as a statement of their intent and in consideration of the promises and covenants contained herein, and further agree as follows:

///

///

///



Page 1



## 3.0 SETTLEMENT TERMS

### 3.0.1.1 EC, LLC SHALL PAY TO PP $130,000.00 U.S.D. AS FOLLOWS:

3.0.1.1.1 $130,000.00 USD shall be wired into PP's Attorney's Attorney Client Trust Account on or before 1600 hrs. PST on 10/27/16. (Hereinafter "Gross Settlement Amount"). PP's Attorney's Wiring Instructions are:

| | |
|---|---|
| Bank Name: | City National Bank |
| Bank Address: | 8641 Wilshire Blvd. |
| | Beverly Hills, CA 90211 |
| ABA Routing No: | 122016066 |
| Beneficiary Account Name: | Keith M. Davidson & Associates, |
| | PLC, Attorney Client Trust Account |
| Beneficiary Account No: | 600106201 |
| Beneficiary Address: | 8383 Wilshire Blvd. Suite 510 |
| | Beverly Hills, CA 90211 |
| SWIFT Code: | CINA US6L |

3.0.1.1.2 Keith M. Davidson, Esq. shall receive the Gross Settlement Amount in Trust. No portion of the Gross Settlement Amount shall be disbursed by Attorney for PP unless and until PP executes all required Settlement Documents.

3.1 Undertakings & Obligations by PP. PP will do each of the following by 11/01/16:

(a) PP shall execute this Agreement and return a signed copy to DD:

(b) PP shall transfer and/or assign any and all rights in and to the Property to DD (as set forth hereinbelow), and execute an Assignment & Transfer of Copyright, in the form attached hereto, and return a signed copy of same to DD's counsel;

(c) PP shall deliver to DD every existing copy of all tangible Property. PP shall completely divest herself of any and all artistic media, impressions, paintings, video images, still images, e-mail messages, text messages, Instagram message, facebook posting or any other type of creation by DD. PP shall transfer all physical, ownership and intellectual property rights to DD;

(1) PP shall deliver to DD any and all non-privileged correspondence concerning or related to DD between PP and any 3rd party.

(d) PP shall not, at any time from the date of this Agreement forward, directly or indirectly disclose or disseminate any of the Property or any Confidential Information (including confirmation of the fact that it exists or ever existed, and/or confirming any rumors as to any such existence) to any third party, as more fully provided herein.

(c) PP shall provide to DD (to the extent not already done so and set forth in paragraph 4.2 hereinbelow), summary details disclosing to whom PP (or anyone else on PP's behalf) disclosed, displayed to, disseminated, transferred to, provided a copy to, and/or

PP

DD

distributed, sold, licensed or otherwise sought to have commercially exploit, the Images and/or Property and/or any Confidential Information.

      (f)    PP shall provide to DD's counsel the names and contact information of each and any persons or entities who: (1) PP has provided to or who otherwise obtained possession of the original and/or any copies of any of the Images and/or any Property, if any, (ii) to whom PP has scanned the Images and/or any Property at any time, and (iii) to whom PP knows had, has or may potentially have possession of a copy of the Images and/or any Property at any time, including but not limited to the present time (and specify with detail to which of the referenced categories (i.e., possession, shown, past, present, etc.) any name corresponds, the name so relates).

      (g)    PP shall provide to DD's counsel copies of any agreements and/or other documentation in PP's possession, custody or control, if any, regarding (e) and/or (f) above, that evidences who has or may have been provided a copy of any of the Property.

    3.2    <u>Transfer of Property Rights to DD</u>.  In further consideration for the promises, covenants and consideration herein, PP hereby transfers and conveys to DD all of PP's respective rights, title and interest in and to the Property, and any and all physical and intellectual property rights related thereto.  Without limiting the generality of the foregoing, PP does hereby sell, assign, and transfer to DD, his successors and assigns, throughout the universe in perpetuity, all of PP's entire right, title, and interest (including, without limitation, all copyrights and all extensions and renewals of copyrights), of whatever kind or nature in and to the Property, without reservation, condition or limitation, whether or not such rights are now known, recognized or contemplated, and the complete, unconditional and unencumbered ownership and all possessory interest and rights in and to the Property, which includes, but is not limited to the originals, copies, negatives, prints, positive, proof sheets, CD-roms, DVD-roms, duplicates, outtake and the results of any other means of exhibiting, reproducing, storing, recording and/or archiving any of the Property or related material, together with all rights of action and claims for damages and benefits arising because of any infringement of the copyright to the Property, and assigns and releases to DD any and all other proprietary rights and usage rights PP may own or hold in the copyright and/or Property, or any other right in or to the Property.  PP assigns and transfers to DD all of the rights herein granted, without reservation, condition or limitation, and agrees that PP reserves no right of any kind, nature or description related to the Property and contents therein.  Notwithstanding the foregoing, if any of the rights herein granted are subject to termination under section 203 of the Copyright Act, or any similar provisions of the Act or subsequent amendments thereof, PP hereby agrees to re-grant such rights to DD immediately upon such termination.  All rights granted herein or agreed to be granted hereunder shall vest in DD immediately and shall remain vested in perpetuity.  DD shall have the right to freely assign, sell, transfer or destroy the Property as he desires.  DD shall have the right to register sole copyright in and to any of the Property with the US Copyright Office.  DD shall also have the right, in respect to the Property, to add to, subtract from, change, arrange, revise, adapt, into any and all form of expression or tangible communication, and the right to combine any of the Property with any other works of any kind and/or to create derivative works with any of the Property, and to do with it as she so deems.  To the fullest extent allowable under the applicable law, PP shall irrevocably waive and assign to DD any of PP's so-called "moral rights" or "droit moral" (laws for the protection of copyrights outside of the United States), if any, or any similar rights under any principles of law which PP may now have or later have in the Property.  With respect to and in furtherance of the above, PP agrees to and shall execute and deliver to DD an

PP

Page **3**


DD

"Assignment & Transfer of Copyright", in the form attached hereto as Exhibit "B". For greater certainty the foregoing assignment shall be applicable worldwide.

       3.2.1  Notwithstanding the foregoing paragraph 3.2, and without in anyway limiting or diminishing from the full transfer and assignment of rights therein without reservation, the Parties understand the purpose of the transfer of rights is to provide DD the fullest possible ability and remedies to prevent and protect against any publication and/or dissemination of the Property.

     3.3    <u>Delivery of the Property to DD</u>.  Concurrently upon execution of this Agreement, PP, as applicable, shall deliver to DD, by delivery to his counsel herein, all of the Property which is embodied in tangible form (all originals and duplicates), whether documents, canvasses, paper art, digital copies, letters, prints, electronic data, films, tapes, CD-Roms, DVD-Roms, Images recording tapes, photographs, negatives, originals, duplicates, contact sheets, audio recordings, Images recordings, magnetic data, computerized data, digital recordings, or other recorded medium or any other format of embodying information or data. Without limiting the generality of the foregoing, such tangible Property shall include all documents as defined by California Evidence Code §250 which contain any of the Property. PP represents and warrants that the materials delivered pursuant to the terms of this Paragraph 3.3 comprise the totality of all existing originals and duplicates of all Property in any tangible form, whether within their possession, custody or control, and including otherwise (and that PP knows of no other copies or possible or potential copies not in PP's possession and control and delivered pursuant to this paragraph), and that upon such delivery to DD, PP shall not maintain possession, custody or control of any copy of all or any portion of any tangible Property. The Property Delivered under this Paragraph shall become Exhibit 1 to the Side Letter Agreement. For avoidance of any doubt, PP, nor her attorney are entitled to retain possession of said Property after execution of this Agreement. The retention of said Property by PP is a material breach of this agreement.

       3.3.1  This Agreement is conditioned on PP's compliance with each and every term of the Settlement Agreement including Paragraph 3.3 <u>and</u> the personal verification by DD or his attorney of the Images and that the Images are comprised of and captures the content previously represented to his counsel to exist and be captured therein (i.e., text messages between PP and DD)), all of which terms are essential and material.

    **4.0**    **CONFIDENTIALITY & REPRESENTATIONS & WARRANTIES.**

    4.1    <u>Definition of Confidential Information</u>.  "Confidential Information" means and includes each and all of the following:

       (a)    All *intangible* information pertaining to DD and/or his family, (including but not limited to his children or any alleged children or any of his alleged sexual partners, alleged sexual actions or alleged sexual conduct or related matters ),and/or friends learned, obtained, or acquired by PP, including without limitation information contained in letters, e-mails, text messages, agreements, documents, audio or Images recordings, electronic data, and photographs;

       (b)    All *intangible* information pertaining to the existence and content of the Property;


PP

Page **4**


DD

(c)     All *intangible* private information (*i.e.*, information not generally available to and/or known by the general public) relating and/or pertaining to DD, including without limitation DD's business information, familial information, any of his alleged sexual partners, alleged sexual actions or alleged sexual conduct, related matters or paternity information, legal matters, contractual information, personal information, private social life, lifestyle, private conduct, (all information/items in 4.1 "(a)", "(b)" and "(c)" are sometimes collectively referred to as, "Intangible Confidential Information");

(d)     All *tangible* materials of any kind containing information pertaining to DD learned, obtained, participated or acquired by PP, including without limitation letters, agreements, documents, audio or Images recordings, electronic data, and photographs, canvas art, paper art, or art in any other form on any media. The Images and Photos and all information/items in 4.1(d) are collectively referred to as, the "Property" and/or the "Tangible Confidential Information");

4.2     PP's Representations & Warranties Regarding Prior Disclosures of Tangible Confidential Information. PP represents and warrants that prior to entry into this Agreement, PP has directly or indirectly disclosed any *Tangible* an/or Intangible Confidential Information (i.e., any of the Property), to any Third Party, including without limitation disclosure or indirect disclosure of the content of such Confidential Information in tangible form, other than the following persons or entities to whom PP has made such prior disclosures (herein "PP Disclosed Individuals/Entities"):

a)     Mike Mosney

b)     Angel Ryan

c)     Gina Rodriguez

d)     Keith Munyan

e)     _____

f)     _____

g)     _____

h)     _____

i)     _____

PP shall not be responsible for any subsequent public disclosure of any of the Confidential Information (a) attributable directly to each of them; and/or (b) not disclosed hereinabove as a previously disclosed PP Disclosed Individuals/Entities, and any such disclosure shall be deemed a breach of this Agreement by PP. For greater clarity, PP must not induce, promote or actively inspire anyone to disclose Confidential Information.


PP


DD

4.3     Representations & Warranties and Agreements.

(a)     Representations & Warranties and Agreements By DD. The following agreements, warranties and representations are made by DD as material inducements to PP to enter into this Agreement, and each Party acknowledges that she/he is executing this Agreement in reliance thereon:

(b)     DD warrants and represents that, as relates to or in connection with any of PP's attempts to sell, exploit and/or disseminate the Property prior to the date of this Agreement, DD and his counsel will refrain (i) from pursuing any civil action against PP, and/or (ii) absent a direct inquiry from law enforcement, from disclosing PP's name to the authorities. Notwithstanding the foregoing, if DD is informed that or should or if it is believed that either of PP has possession, custody and/or control of any of the Property after the date of this Agreement and/or transferred any copies to any Third Party, and/or it is believed that any of PP, whether directly or indirectly, intends the release, use, display, dissemination, disclosure or exploitation, whether actual, threatened or rumored, of any for the Property, then DD and his counsel shall be entitled to, at DD's sole discretion, (i) contact the respective member of PP, including with legal demands and related statements of liability and legal action, and/or (ii) advance a civil action against the respective member of PP, and/or (iii) disclose any of PP's name to the authorities.

4.3.2   Representations & Warranties and Agreements By PP. The following agreements, warranties and representations are made by PP as material inducements to DD to enter into this Agreement, without which DD would not enter into this Agreement and without which DD would not agree to pay any monies whatsoever hereunder, and with the express acknowledgment that DD is executing this Agreement in reliance on the agreements, warranties, and representations herein which are at the essence of this Agreement, including, the following:

(a)     PP agrees and warrants and represents that PP will permanently cease and desist from any efforts to and/or attempting to and/or engaging in and/or arranging the use, License, distribution, dissemination or sale of any of the Confidential Information and/or Property, including any Tangible and/or Intangible Confidential information created by or relating to DD;

(b)     PP agrees and warrants and represents that PP will permanently cease and desist from any posting or dissemination or display of the Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD and/or Property, including the Images (including, but not limited to, to any form media outlet, on any blog or posting board, on the Internet, or otherwise);

(c)     PP agrees and warrants and represents that PP will permanently cease and desist from using or disseminating or disclosing any information to any Third Persons (including, but not limited to, to any media outlet, on any blog or posting board, on the Internet, or otherwise) about any details of or as to the contents of the Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD and/or Property, including any Text Messages, and/or as to any other personal details of or about or pertaining to DD and/or his family and/or friends and/or social interactions;

(d)     PP agrees and warrants and represents that PP will permanently cease and desist from and will not, at any time, make any use of or reference to the name, image or likeness



Page **6**



of DD in any manner whatsoever, including without limitation, through any print or electronic media of any kind or nature for any purpose, including, but not limited to, on any websites;

(e) PP agrees and warrants and represents that any and all existing copies of the Images, Text Messages and any Property (other than as expressly specified in paragraphs 3.2 and 3.3 herein) have been turned over and provided to counsel; and PP further warrants and represents that the only copy of the Images and Property that has ever existed, at any time, has been turned over to DD's counsel pursuant to this Agreement, and the Images and any Property has never been transferred to or existed in any other form, including not in electronic form, nor on any computer, or electronic device and other storage media;

(f) PP warrants and represents that PP has not provided any copies, whether hard-copy or electronic copies, of the Property to anyone other than as specified in paragraph 4.2 herein);

(g) PP warrants and represents that the information PP is obligated to provide pursuant to the terms herein will be complete and truthful;

(h) PP warrants and represents that PP has not omitted or withheld any information that PP is obligated to provide pursuant to the terms herein;

(i) PP warrants and represents that PP has not contracted to earn and/or collect any monies as compensation from the sell, license and/or any other exploitation of the Images and/or any Property and/or any Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD nor any monies as compensation or an advance for any efforts to sell, license and/or any other exploitation of the Images and/or any Property and/or any Confidential Information or any Tangible and/or Intangible Confidential information created by or relating to DD;

(j) PP warrants and represents that PP has not assigned nor transferred, either in whole or in part, any purported rights in or to the Images and/or any Property to any other person or entity, other than to DD pursuant to this Agreement.

4.3.3 Agreement By PP Not to Disclose/Use Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD. As further material inducements for DD to enter into this Agreement, PP agrees, represents and warrants that she shall not directly or indirectly, verbally or otherwise, publish, disseminate, disclose, post or cause to be published, disseminated, disclosed, or posted (herein "disclose"), any Confidential Information or Tangible and/or Intangible Confidential information created by or relating to DD to any person, group, firm or entity whatsoever, including, but not limited to, family members, friends, associates, journalists, media organizations, newspapers, magazines, publications, television or radio stations, publishers, databases, blogs, websites, posting boards, and any other enterprise involved in the print, wire or electronic media, including individuals working directly or indirectly for, or on behalf of, any of said persons or entities ("Third Parties" and/or Third Party"). In no event shall PP be relieved of such party's confidentiality obligations herein by virtue of any breach or alleged breach of this Agreement. In no event shall any dispute in connection with this Agreement relieve PP of her confidentiality obligations arising pursuant to this Agreement, and any disclosure of Confidential Information and/or Tangible and/or Intangible Confidential information created by or relating to DD in connection with any such

PP

Page 7

DD

proceeding or dispute shall constitute a breach of this Agreement. PP shall use their best efforts to prevent the unauthorized disclosure of Confidential Information in connection with any such proceeding or dispute.

        4.3.4   Any direct or indirect disclosure of Confidential Information or Tangible and/or Intangible Confidential information created by or relating to DD to any Third Party by PP and/or any of her representatives, heirs, agents, children, family members, relatives , confidents, advisors, employees, attorneys, transferors, transferees, successors or assigns, and/or any friend of any of PP (collectively "PP Group"), after the date of this Agreement, shall be deemed a disclosure by PP in breach of the terms of this Agreement, entitling the non-breaching Party to all rights and remedies set forth herein.

        4.3.5   PP separately and further warrants and represent that, prior to entering into this Agreement, that she has not written, published, caused to be published, or authorized the writing, publication, broadcast, transmission or public dissemination of any interview, article, essay, book, memoir, story, photograph, film, script, Images tape, biography, documentary, whether written, oral, digital or visual, whether fictionalized or not, about the opposing Party to this Agreement or their family, whether truthful, laudatory, defamatory, disparaging, deprecating or neutral, which discloses any Confidential Information and/or which includes any description or depiction of any kind whatsoever whether fictionalized or not, about any Party to this agreement or their respective family, other than as expressly disclosed by PP hereto in writing and as set forth herein in paragraph 4.2 above.

        4.3.6   <u>Agreement By PP Not to Disparage DD</u>. PP hereby irrevocably agrees and covenants that she shall not, directly or indirectly, publicly disparage DD, nor write, publish, cause to be published, or authorize, consult about or with or otherwise be involved in the writing, publication, broadcast, transmission or dissemination of any book, memoir, letter, story, photograph, film, script, Images, interview, article, essay, biography, diary, journal, documentary, or other written, oral, digital or visual account or description or depiction of any kind whatsoever whether fictionalized or not, about DD or his family, whether truthful, laudatory, defamatory, disparaging, deprecating or neutral. PP further warrants and represents that PP has not and will not enter into any written or oral agreement with any third party purportedly requiring or obligating PP to do so. Fore greater clarity PP will never discuss with anyone the contents of this Settlement Agreement, nor will she voluntarily confirm the existence of this Settlement Agreement.

    4.4   <u>Disclosure Of Confidential Information Is Prohibited</u>: The Parties to this Agreement hereby recognize and agree that substantial effort and expense have been dedicated to limit the efforts of the press, other media, and the public to learn of personal and business affairs involving DD. PP further acknowledges that any future disclosure of Confidential Information to any Third Party would constitute a serious and material breach of the terms of this Agreement, and shall constitute a breach of trust and confidence, invasion of privacy, and a misappropriation of exclusive property rights, and may also constitute fraud and deceit. Some of the Confidential Information may also constitute and include proprietary business information and trade secrets which have independent economic value. The Parties hereto acknowledge that any unauthorized use, dissemination or disclosure of Confidential Information, or the fabrication and dissemination of false and/or misleading information, about DD would result in irreparable injury to him, and would be injurious to a reasonable person, and/or would constitute an injurious violation of the right of privacy or publicity, and/or would be injurious to his business,

PP

DD

profession, person, family and/or career. The Parties acknowledge that substantial and valuable property rights and other proprietary interests in the exclusive possession, ownership and use of Confidential Information, and recognizes and acknowledges that such Confidential Information is a proprietary, valuable, special and unique asset which belongs to DD and to which the PP has no claim of ownership or other interest.

      4.4.1   <u>Disclosures Permitted By PP</u>. Notwithstanding the foregoing, PP shall only be permitted to disclose Confidential Information to another person or entity only if compelled to do so by valid legal process, including without limitation a subpoena duces tecum or similar legal compulsion, provided that PP shall not make any such disclosure unless PP has first provided DD with notice of such order or legal process not less than ten (10) days in advance of the required date of disclosure pursuant to the Written Notice provisions set forth hereinbelow, providing DD with an opportunity to intervene and with full and complete cooperation should she choose to oppose such disclosure. PP agrees that if the valid legal process can be stopped by her consent or at her behest then PP shall agree to use best efforts to avoid the disclosure of the Confidential Information.

## 5.0   <u>REMEDIES</u>

     5.1   <u>DD's Remedies for Breach of Agreement</u>. Each breach or threatened breach (*e.g.*, conduct by PP reflecting that said person intends to breach the Agreement), including without limitation by breach of any representation or warranty, by failing to deliver to DD all tangible Property as required, by the disclosure or threatened disclosure of any Confidential Information to any Third Party by PP (herein "Prohibited Communication"), or otherwise, shall render PP liable to DD for any and all damages and injuries incurred as a result thereof, including but not limited to the following, all of which rights and remedies shall be cumulative:

      5.1.1   <u>Disgorgement of Monies</u>: In the event an Arbitrator determines there has been a breach or threatened breach of this Agreement by PP, PP shall be obligated to account to, and to disgorge and turn over to DD any and all monies, profits, or other consideration, or benefits, which PP, or anyone on PP's behalf or at PP's direction, directly or indirectly derive from any disclosure or exploitation of any of the Confidential Information; <u>and</u>

      5.1.2   <u>Liquidated Damages</u>: PP agrees that any breach or violation of this Settlement Agreement by either of PP individually or the PP Group by his/her/their unauthorized disclosure of any of the Confidential Information (as defined in paragraphs 4.1(a), (b), (c), and (d)) to any Third Party, and/or any unauthorized exploitation or prohibited use of the same, and/or by the breach of and/or by any false representations and warranties set forth in this Agreement, and/or any public disparagement of DD by PP (collectively, the "LD Breach Terms"), shall result in substantial damages and injury to DD, the precise amount of which would be extremely difficult or impracticable to determine, even after the Parties have made a reasonable endeavor to estimate fair compensation for such potential losses and damages to DD. Therefore, in addition to disgorgement of the full amount of all monies or other consideration pursuant to paragraph 5.1.2, in the event an Arbitrator determines there has been a breach of the LD Breach Terms of this Agreement by PP individually or the PP Group, PP shall also be obligated to pay, and agree to pay to DD the sum of One-Million Dollars ($1,000,000.00 as a reasonable and fair amount of liquidated damages to compensate DD for any loss or damage





resulting from each breach, it being understood that the Liquidated damages calculation is on a per item basis. The Parties agree that such sum bears a reasonable and proximate relationship to the actual damages which DD will or might suffer from each breach of the terms of this Agreement and that this amount is not a penalty. Alternatively, at DD's sole discretion, DD may seek to recover actual damages proximately caused by each such breach, according to proof. Any other breaches not a LD Breach Terms shall be subject to a claim for actual damages according to proof; furthermore, any monies held in Trust by PP's Attorney shall be frozen and shall not be disbursed to PP until the Arbitrator finally resolves the allegation of Breach.

      5.1.3   Injunctive Relief. PP acknowledges and agrees that any unauthorized disclosure to Third Parties of any Confidential Information will cause irreparable harm to DD, which damages and injuries will most likely not be measurable or susceptible to calculation. PP further acknowledges and agrees that any breach or threatened breach of this Agreement due to the unauthorized disclosure or threatened disclosure by PP to Third Parties, of any Confidential Information shall entitle DD to immediately obtain, either from the Arbitrator and/ or from any other court of competent jurisdiction, an *ex parte* issuance of a restraining order and preliminary injunction or other similar relief (herein "Injunctive Relief") without advance notice to any of PP, preventing the disclosure or any further disclosure of Confidential Information protected by the terms hereof, pending the decision of the Arbitrator or Court. The Parties further acknowledge and agree that in connection with any such proceeding, any Party may obtain from the Court or Arbitrator on an ex parte application or noticed motion without opposition, an order sealing the file in any such proceeding, and the Parties stipulate to the factual and legal basis for issuance of an order sealing the file in any such proceedings. The rights and remedies set forth in this Injunctive Relief Section are without prejudice to any other rights or remedies, legal or equitable, that the Parties may have as a result of any breach of this Agreement.

      5.2   Dispute Resolution. In recognition of the mutual benefits to DD and PP of a voluntary system of alternative dispute resolution which involves binding confidential arbitration of all disputes which may arise between them, it is their intention and agreement that any and all claims or controversies arising between DD on the one hand, and PP on the other hand, shall be resolved by binding confidential Arbitration to the greatest extent permitted by law. Arbitration shall take place before JAMS ENDISPUTE ("JAMS") pursuant to JAMS Comprehensive Arbitration Rules and Procedures (including Interim Measures) ("JAMS Rules") and the law selected by DD, (such selection shall be limited to either, California, Nevada or Arizona), or before ACTION DISPUTE RESOLUTION SERVICES ("ADRS") pursuant to the ADRS Rules (including Interim Measures) and the law selected by DD (whichever the claimant elects upon filing an arbitration), in a the location selected by DD, and will be heard and decided by a sole, neutral arbitrator ("Arbitrator") selected either by agreement of the Parties, or if the Parties are unable to agree, then selected under the Rules of the selected arbitration service. The costs and fees associated with any Arbitrator and/or Arbitration service shall be split equally among the parties to any such dispute. The Parties shall have the right to conduct discovery in accordance with the California Code of Civil Procedure Section 1283.05 *et. seq.* or any similar provision existing in the jurisdiction selected by DD and the written discovery requests and results of discovery shall be deemed to constitute Confidential Information. The Arbitrator shall have the right to impose all legal and equitable remedies that would be available to any Party before any governmental dispute resolution forum or court of competent jurisdiction, including without limitation temporary, preliminary and permanent injunctive relief, compensatory damages, liquidated damages, accounting, disgorgement, specific performance, attorneys fees and costs,


**PP**

Page **10**


**DD**

and punitive damages. It is understood and agreed that each of the Parties shall bear his/its own attorneys' fees, expert fees, consulting fees, and other litigation costs (if any) ordinarily associated with legal proceedings taking place in a judicial forum, subject to the Arbitrator's reassessment in favor of the prevailing party to the extent permitted by law. **Each of the Parties understands, acknowledges and agrees that by agreeing to arbitration as provided herein, each of the Parties is giving up any right that he/she/it may have to a trial by judge or jury with regard to the matters which are required to be submitted to mandatory and binding Arbitration pursuant to the terms hereof. Each of the Parties further understands, acknowledges and agrees that there is no right to an appeal or a review of an Arbitrator's award as there would be a right of appeal or review of a judge or jury's decision.**

### 6.0     MUTUAL RELEASES

6.1     Except for the rights and obligations of the Parties set forth in this Agreement, DD, for himself, and each of his representatives, agents, assigns, heirs, partners, companies, affiliated companies, employees, insurers and attorneys, absolutely and forever releases and discharges PP, individually, and all of PP's heirs, and PP's attorneys, and each of them ("PP Releasees"), of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorney's fees), expenses, liens, actions and causes of actions of every kind and nature whatsoever, whether known or unknown, from the beginning of time to the effective date of this Agreement, including without limitation any and all matters, facts, claims and/or defenses asserted or which could have been asserted in the Matter, or which could have been asserted in any other legal action or proceeding, except as may be provided herein (the "DD Released Claims").

6.2     Except for the rights and obligations of the Parties set forth in this Agreement, PP, for herself, and her representatives, agents, assigns, heirs, partners, companies, affiliated companies, employees, insurers and attorneys, absolutely and forever release and discharge DD, individually, and each of his representatives, agents, assigns, heirs, partners, companies, affiliated companies, subsidiaries, employees, attorneys, successors, insurers, and each of them ("DD Releasees"), of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorney's fees), expenses, liens, actions and causes of actions of every kind and nature whatsoever, whether known or unknown, from the beginning of time to the date of this Agreement, including without limitation any and all matters, facts, claims and/or defenses asserted or which could have been asserted in the Action, or which could have been asserted in any other legal action or proceeding (the "PP Released Claims").

6.3     The subject matter referred to in paragraphs 6.1 and 6.2, above (i.e., the DD Released Claims and PP Released Claims), are collectively referred to as the "Released Matters."

6.4     The Parties hereto, and each of them, hereby warrant, represent and agree that each of them is fully aware of §1542 of the <u>Civil Code</u> of the State of California, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."


PP


DD

The Parties, and each of them, voluntarily waive the provisions of California <u>Civil Code</u> § 1542, and any other similar federal and state law as to any and all claims, demands, causes of action, or charges of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected.

      6.4.1    For avoidance of any doubt, by virtue of this Settlement and this Settlement Agreement, the parties hereby waive any unknown claims against each other individually, and each of their representatives, agents, assigns, heirs, partners, companies, affiliated companies, subsidiaries, employees, attorneys, successors, insurers, and each of them.

    6.5    Each of the Parties hereto acknowledges and agrees that this Agreement constitutes a settlement and compromise of claims and defenses in dispute, and shall not be construed in any fashion as an admission of liability by any party hereto.

## 7.0   <u>CONFIDENTIALITY OF THIS AGREEMENT</u>

    7.1    The Parties, respectively, shall not to disclose the terms of this Agreement, either directly or indirectly, to the media or to anyone else other than their respective attorneys and representatives and/or as may be required by law. PP may not comment or make any press releases or otherwise discuss the resolution of the subject of this Agreement.

## 8.0   <u>MISCELLANEOUS TERMS</u>

    8.1    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement and understanding concerning the Released Matters hereof between the Parties hereto and supersedes any and all prior negotiations and proposed agreement and/or agreements, written and/or oral, between the Parties. Each of the Parties hereto acknowledges that neither they, nor any other party, nor any agent or attorney of any other party has made any promise, representation, or warranty whatsoever, expressed or implied, written or oral, which is not contained herein, concerning the subject matter hereof, to induce it to execute this Agreement, and each of the Parties hereto acknowledges that she/he has not executed this Agreement in reliance on any promise, representation, and/or warranty not contained herein. This Agreement shall be binding on and inure to the benefit of the Parties, the Releasees, and each of their respective successors and assigns and designees.

    8.2    <u>DD's Election of either California, Nevada or Arizona Law & Venue</u>. This Agreement and any dispute or controversy relating to this Agreement, shall in all respects be construed, interpreted, enforced and governed by the laws of the State of California, Arizona or Nevada at DD's election. <u>Attorneys' Fees in the case of a Dispute</u>. In the event of any dispute, action, proceeding or controversy regarding the existence, validity, interpretation, performance, enforcement, claimed breach or threatened breach of this Agreement, the prevailing party in any resulting arbitration proceeding and/or court proceeding shall be entitled to recover as an element of such Party's costs of suit, and not as damages, all attorneys' fees, costs and expenses incurred or sustained by such prevailing Party in connection with such action, including, without limitation, legal fees and costs.





**8.3**    Attorney Fees and Costs in Formation of this Agreement.  The Parties shall each bear their own costs, expert fees, attorneys' fees and other fees incurred in connection with the creation this Settlement Agreement.

**8.4**    Waivers; Modification.  This Agreement cannot be modified or changed except by written instrument signed by all of the Parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

**8.5**    Scope of Provisions/Severability/Headings.  None of the Parties hereto shall be deemed to be the drafter of this Agreement, but it shall be deemed that this Agreement was jointly drafted by each of the Parties hereto.  Should any provision of this Agreement be found to be ambiguous in any way, such ambiguity shall not be resolved by construing this Agreement in favor of or against any party herein, but rather construing the terms of this Agreement as a whole according to their fair meaning.  In the event that any provision hereof is deemed to be illegal or unenforceable, such a determination shall not affect the validity or enforceability of the remaining provisions thereof, all of which shall remain in full force and effect.  Notwithstanding the foregoing, if a provision is deemed to be illegal the Parties agree to waive any defense on said grounds.  In the event that such any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope or breadth permitted by law.  The captions appearing at the commencement of certain paragraphs herein are descriptive only and for convenience of reference.  Should there be any conflict between any such caption or heading and the paragraph at the caption of which it appears, the paragraph, and not such caption, shall control and govern.

**8.6**    Advice of Counsel and Understanding of this Binding Agreement.  Each of the Parties represents, acknowledges, and declares that she/he has received the advice of legal counsel of his/her own choosing regarding the form, substance, and effect of this Agreement.  Each of the Parties represents, acknowledges, and declares that she/he has carefully read this Agreement, knows and understands this Agreement's contents, and signs this Agreement freely, voluntarily, and without either coercion or duress.  Each of the Parties represents and warrants that she/he is fully competent to manage his/her business affairs, and that she/he has full power and authority to execute this Agreement, and to do any and all of the things reasonably required hereunder; and that this Agreement, when signed by all Parties, is a valid and binding agreement, enforceable in accordance with its terms.

**8.7**    Further Execution.  In order to carry out the terms and conditions of this Agreement, PP agrees to promptly execute, upon reasonable request, any and all documents and instruments necessary to effectuate the terms of this Agreement.

**8.8**    Notice Provisions.  Any notice, demand or request that one Party desires, or is required to give (including service of any subpoena, court pleadings, summons and/or complaint), to the other Party must be promptly communicated to the other Party by using their respective contact information below, by both (i) e-mail or facsimile; _and_ (ii) telephone.  Either Party may change his or her contact information by notifying the other Party of said change(s) pursuant to the applicable terms herein.


PP

Page **13**


DD

8.8.1 **To DD as follows:**

*ESSENTIAL CONSULTANTS, LLC*
*C/O: MICHAEL COHEN, ESQ.*
*502 PARK AVENUE #4A*
*NEW YORK, NY 10022*

8.8.2 **To PP, as follows:**

C/O KEITH M. DAVIDSON, ESQ.
8383 Wilshire Boulevard, Suite 510
Beverly Hills, CA 90211
tel. 323.658.5444
fax. 323-658-5444
e-mail: keith@KmdLaw.com

8.9 · This Agreement may be executed with one or more separate counterparts, each of which, when so executed shall be deemed to be an original and, together shall constitute and be one and the same instrument. Any executed copies or signed counterparts of this Agreement, the Declaration, and any other documentation may be executed by scanned/printed pdf copies of signatures and/or facsimile signatures, which shall be deemed to have the same force and effect as if they were original signatures.

**IN WITNESS WHEREOF**, by their signatures below, the Parties each have approved and executed this Agreement as of the effective date first set forth above.

DATED: _____, 2016

**DD**

DATED: _Oct 28_, 2016

**PP**

ERICA JACKSON
Notary Public, State of Texas
Comm. Expires 01-04-2020
Notary ID 130483626

DATED: _10/28_, 2016

EC,

**PP**

Page **14**

EC
DD

DATED: __10/31/16__, 2016

As to Form: _____

Keith M. Davidson, Esq., Attorney for PP

DATED: _____, 2016

As to Form:

_____

Attorney for DD

DATED: __10/28__, 2016

As to Form:

_____

MICHAEL D. COHEN, ESQ.
Attorney for ■■
ESSENTIAL CONSULTANTS, LLC

P a g e **15**



EXHIBIT 2

# EXHIBIT "A" TO THE **CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE; ASSIGNMENT OF COPYRIGHT AND NON-DISPARAGMENT AGREEMENT**

## SIDE LETTER AGREEMENT

## DATED _10_ / _28_ / 2016.

To Whom It May Concern:

This Side Letter agreement is entered into by and on behalf of the Parties with respect to the Confidential Settlement Agreement and Mutual Release entered into by and between them on or about _Oct 28_ , 2016 ("Settlement Agreement"), in which Stephanie Gregory Clifford a.k.a. Stormy Daniels, is referred to by the pseudonym, "PEGGY PETERSON," and ▮▮▮▮▮▮▮▮▮▮ is referred to by the pseudonym "DAVID DENNISON."

It is understood and agreed that the true name and identity of the person referred to as " PEGGY PETERSON " in the Settlement Agreement is Stephanie Gregory Clifford a.k.a. Stormy Daniels and that any reference or designation to PEGGY PETERSON shall be deemed the same thing as referring to Stephanie Gregory Clifford a.k.a. Stormy Daniels by her true name as identified herein.

It is understood and agreed that the true name and identity of the person referred to as "DAVID DENNISON" in the Settlement Agreement is ▮▮▮▮▮▮▮ , and that any reference or designation to DAVID DENNISON shall be deemed the same thing as referring to ▮▮▮▮▮▮▮ , by his true name as identified herein.

It is understood and agreed that the true name and identity of the entity referred to as "EC, LLC" in the Settlement Agreement is ▮▮▮▮▮▮▮ LLC and that any reference or designation to EC, LLC shall be deemed the same thing as referring to ▮▮▮▮▮▮▮▮▮▮▮ LLC , by his true name as identified herein.

It is further acknowledged and agreed by the parties that notwithstanding the provisions of Paragraph 7.1 of the Settlement Agreement (which provides that the Settlement Agreement constitutes the entire agreement between the Parties with respect to the matters herein and in supersedes all prior and contemporaneous oral and written agreements and discussions pertaining to the matters herein), this Side Letter agreement shall be deemed part of the agreement between the Parties. Accordingly, Paragraph 7.1 of the Settlement Agreement is hereby amended via supplanting to provide as follows:

> "**7.1.1 Integration.** The Side Letter agreement entered into by the Parties concurrently with their entry into this Agreement shall be deemed part of this Agreement, and this Agreement and the Side Letter agreement together constitute the entire agreement between the Parties with

respect to the matters herein and supersedes all prior and contemporaneous oral and written agreements and discussions pertaining to the matters herein."

For avoidance of doubt, it is further agreed that this Side Letter agreement shall constitute Confidential Information as defined in the Settlement Agreement, that neither this Side Letter agreement nor any portion hereof may be disclosed to anyone except as and to the extent expressly provided in the Settlement Agreement, and that any unauthorized disclosure or use of this Side Letter agreement or any portion hereof shall constitute a material breach of the confidentiality provisions of the Settlement Agreement.

It is further agreed that neither party shall keep a copy of this document, and that only Keith M. Davidson, Esq. AND ███████████████ counsel for the parties herein), shall maintain possession of it or access to this Side Letter agreement. FOR AVOIDANCE OF DOUBT, THE PARTIES HERETO AGREE AND CONFIRM THAT THIS SIDE LETTER AGREEMENT IS DEEMED "ATTORNEY'S EYES ONLY."

This Side Letter agreement may be executed in counterparts and when each Party has signed and delivered one such counterpart to the other Party, each counterpart shall be deemed an original, and all counterparts taken together shall constitute one and the same Agreement, which shall be binding and effective as to the Parties. The Agreement may be executed by facsimile or electronic PDF signatures, which shall have the same force and effect as if they were originals.

By signing below, each of the Parties signifies their agreement to the terms hereof and each of their respective counsel signify their approval as to the form of this letter agreement.

PEGGY PETERSON a.k.a. Stephanie Gregory
Clifford a.k.a. Stormy Daniels

10/28/16
date

ERICA JACKSON
Notary Public, State of Texas
Comm. Expires 01-04-2020
Notary ID 130483626

DAVID DENNISON a.k.a. _____

date

Keith M. Davidson, Esq.

10/31/16
date

_____, Esq.

10/28/16
date

EXHIBIT 3

"In late January 2018, I received a copy of a complaint filed at the Federal Election Commission (FEC) by Common Cause. The complaint alleges that I somehow violated campaign finance laws by facilitating an excess, in-kind contribution. The allegations in the complaint are factually unsupported and without legal merit, and my counsel has submitted a response to the FEC.

I am Mr. Trump's longtime special counsel and I have proudly served in that role for more than a decade. In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford. Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly. The payment to Ms. Clifford was lawful, and was not a campaign contribution or a campaign expenditure by anyone.

I do not plan to provide any further comment on the FEC matter or regarding Ms. Clifford."

"Just because something isn't true doesn't mean that it can't cause you harm or damage. I will always protect Mr. Trump."

# Exhibit 3

## CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE; ASSIGNMENT OF COPYRIGHT AND NON-DISPARAGMENT AGREEMENT

### 1.0    THE PARTIES

1.1    This Settlement Agreement and Mutual Release (hereinafter, this "Agreement") is made and deemed effective as of the ⟶ ⟋⟍ day of October, 2016, by and between "**EC, LLC**" and/or **DAVID DENNISON**, (DD), on the one part, and **PEGGY PETERSON**, (PP), on the other part. ("EC, LLC," "DD" and "PP" are pseudonyms whose true identity will be acknowledged in a Side Letter Agreement attached hereto as "EXHIBIT A") This Agreement is entered into with reference to the facts and circumstances contained in the following recitals.

### 2.0    RECITALS

2.1    Prior to entering into this Agreement, PP came into possession of certain "Confidential Information" pertaining to DD, as more fully defined below, only some of which is in tangible form, which includes, but is not limited to information, certain still images and/or text messages which were authored by or relate to DD (collectively the "Property"), each as more fully defined below but which all are included and attached hereto as Exhibit "1" to the Side Letter Agreement).

2.2    (a)    PP claims that she has been damaged by DD's alleged actions against her, including but not limited to tort claims proximately causing injury to her person and other related claims. DD denies all such claims. (Hereinafter "PP Claims").

(b)    DD claims that he has been damaged by PP's alleged actions against him, including but not limited to the alleged threatened selling, transferring, licensing, publicly disseminating and/or exploiting the Images and/or Property and/or other Confidential Information relating to DD, all without the knowledge, consent or authorization of DD. PP denies all such claims. (Hereinafter "DD Claims").

(c)    The PP Claims and the DD Claims are hereinafter collectively referred to as "The Released Claims."

2.3    DD desires to acquire, and PP desires to sell, transfer and turn-over to DD, any and all tangible copies of the Property and any and all physical and intellectual property rights in and to all of the Property. As a condition of DD releasing any claims against PP related to this matter, PP agrees to sell and transfer to DD all and each of her rights in and to such Property. PP agrees to deliver each and every existing copy of all tangible Property to DD (and permanently delete any electronic copies that can not be transferred), and agrees that she shall not possess, nor directly nor indirectly disclose convey, transfer or assign Property or any Confidential Information to any Third Party, as more fully provided herein.

2.4    It is the intention of the Parties that Confidential Information, as defined herein, shall remain confidential as expressly provided hereinbelow. The Parties expressly acknowledge, agree and understand that the Confidentiality provisions herein and the



P a g e  0



representations and warranties made by PP herein and the execution by her of the Assignment &
Transfer of Copyright are at the essence of this Settlement Agreement and are a material
inducement to DD's entry into this Agreement, absent which DD would not enter into this
Agreement. DD expects and requires that PP never communicate with him or his family for any
reason whatsoever.

2.5     The Parties wish to avoid the time, expense, and inconvenience of potential
litigation, and to resolve any and all disputes and potential legal claims which exist or may exist
between them, as of the date of this Agreement including but not limited to the PP Claims and/or
the DD Claims. The Parties agree that the claims released include but are not limited to DD's
Claims against PP  as relates to PP having allowed, whether intentionally, unintentionally or
negligently, anyone else other than those listed in section 4.2 herein below to become aware of
the existence of and content of the Property, to have gained possession of the Property, and to
PP's having allegedly engaged in efforts to disclose, disseminate and/or commercially exploit the
Images and/or Property and/or Confidential Information, and any harm suffered by DD
therefrom. The Parties agree that the claims released include but are not limited to PP's Claims
against DD  as relates to DD having allowed, whether intentionally, unintentionally or
negligently, anyone else to have interfered with PP's right to privacy or any other right that PP
may possess.

2.6     These Recitals are essential, integral and material terms of this Agreement, and
this Agreement shall be construed with respect thereto.  The Parties enter into this Agreement in
consideration of the promises, covenants and conditions set forth herein, and for good and
valuable consideration, the receipt of which is hereby acknowledged. It is an essential element of
this Settlement Agreement that the Parties shall never directly or indirectly communicate with
each other or attempt to contact their respective families. This matter, the existence of this
Settlement Agreement and its terms are strictly confidential.

NOW, THEREFORE, the Parties adopt the foregoing recitals as a statement of their
intent and in consideration of the promises and covenants contained herein, and further agree as
follows:

///

///

///


**PP**


**DD**

### 3.0    SETTLEMENT TERMS

#### 3.0.1.1 EC, LLC SHALL PAY TO PP $130,000.00 U.S.D. AS FOLLOWS:

3.0.1.1.1    $130,000.00 USD shall be wired into PP's Attorney's Attorney Client Trust Account on or before 1600 hrs. PST on 10/27/16.(Hereinafter "Gross Settlement Amount"). PP's Attorney's Wiring Instructions are:

| | |
|---|---|
| Bank Name: | City National Bank |
| Bank Address: | 8641 Wilshire Blvd. |
| | Beverly Hills, CA 90211 |
| ABA Routing No: | 122016066 |
| Beneficiary Account Name: | Keith M. Davidson & Associates, PLC, Attorney Client Trust Account |
| Beneficiary Account No: | 600106201 |
| Beneficiary Address: | 8383 Wilshire Blvd. Suite 510 |
| | Beverly Hills, CA 90211 |
| SWIFT Code: | CINA US6L |

3.0.1.1.2    Keith M. Davidson, Esq. shall receive the Gross Settlement Amount in Trust. No portion of the Gross Settlement Amount shall be disbursed by Attorney for PP unless and until PP executes all required Settlement Documents.

### 3.1    Undertakings & Obligations by PP.  PP will do each of the following by 11/01/16:

(a)    PP shall execute this Agreement and return a signed copy to DD:

(b)    PP shall transfer and/or assign any and all rights in and to the Property to DD (as set forth hereinbelow), and execute an Assignment & Transfer of Copyright, in the form attached hereto, and return a signed copy of same to DD's counsel;

(c)    PP shall deliver to DD every existing copy of all tangible Property.  PP shall completely divest herself of any and all artistic media, impressions, paintings, video images, still images, e-mail messages, text messages, Instagram message, facebook posting or any other type of creation by DD. PP shall transfer all physical, ownership and intellectual property rights to DD;

(1)    PP shall deliver to DD any and all non-privileged correspondence concerning or related to DD between PP and any 3rd party.

(d)    PP shall not, at any time from the date of this Agreement forward, directly or indirectly disclose or disseminate any of the Property or any Confidential Information (including confirmation of the fact that it exists or ever existed, and/or confirming any rumors as to any such existence) to any third party, as more fully provided herein.

(e)    PP shall provide to DD (to the extent not already done so and set forth in paragraph 4.2 hereinbelow), summary details disclosing to whom PP (or anyone else on PP's behalf) disclosed, displayed to, disseminated, transferred to, provided a copy to, and/or

PP _____ 


DD

distributed, sold, licensed or otherwise sought to have commercially exploit, the Images and/or Property and/or any Confidential Information.

(f)  PP shall provide to DD's counsel the names and contact information of each and any persons or entities who: (1) PP has provided to or who otherwise obtained possession of the original and/or any copies of any of the Images and/or any Property, if any, (ii) to whom PP has scanned the Images and/or any Property at any time, and (iii) to whom PP knows had, has or may potentially have possession of a copy of the Images and/or any Property at any time, including but not limited to the present time (and specify with detail to which of the referenced categories (i.e., possession, shown, past, present, etc.) any name corresponds, the name so relates).

(g)  PP shall provide to DD's counsel copies of any agreements and/or other documentation in PP's possession, custody or control, if any, regarding (e) and/or (f) above, that evidences who has or may have been provided a copy of any of the Property.

3.2   Transfer of Property Rights to DD.  In further consideration for the promises, covenants and consideration herein, PP hereby transfers and conveys to DD all of PP's respective rights, title and interest in and to the Property, and any and all physical and intellectual property rights related thereto.  Without limiting the generality of the foregoing, PP does hereby sell, assign, and transfer to DD, his successors and assigns, throughout the universe in perpetuity, all of PP's entire right, title, and interest (including, without limitation, all copyrights and all extensions and renewals of copyrights), of whatever kind or nature in and to the Property, without reservation, condition or limitation, whether or not such rights are now known, recognized or contemplated, and the complete, unconditional and unencumbered ownership and all possessory interest and rights in and to the Property, which includes, but is not limited to the originals, copies, negatives, prints, positive, proof sheets, CD-roms, DVD-roms, duplicates, outtake and the results of any other means of exhibiting, reproducing, storing, recording and/or archiving any of the Property or related material, together with all rights of action and claims for damages and benefits arising because of any infringement of the copyright to the Property, and assigns and releases to DD any and all other proprietary rights and usage rights PP may own or hold in the copyright and/or Property, or any other right in or to the Property.  PP assigns and transfers to DD all of the rights herein granted, without reservation, condition or limitation, and agrees that PP reserves no right of any kind, nature or description related to the Property and contents therein.  Notwithstanding the foregoing, if any of the rights herein granted are subject to termination under section 203 of the Copyright Act, or any similar provisions of the Act or subsequent amendments thereof, PP hereby agrees to re-grant such rights to DD immediately upon such termination.  All rights granted herein or agreed to be granted hereunder shall vest in DD immediately and shall remain vested in perpetuity.  DD shall have the right to freely assign, sell, transfer or destroy the Property as he desires.  DD shall have the right to register sole copyright in and to any of the Property with the US Copyright Office.  DD shall also have the right, in respect to the Property, to add to, subtract from, change, arrange, revise, adapt, into any and all form of expression or tangible communication, and the right to combine any of the Property with any other works of any kind and/or to create derivative works with any of the Property, and to do with it as she so deems.  To the fullest extent allowable under the applicable law, PP shall irrevocably waive and assign to DD any of PP's so-called "moral rights" or "droit moral" (laws for the protection of copyrights outside of the United States), if any, or any similar rights under any principles of law which PP may now have or later have in the Property.  With respect to and in furtherance of the above, PP agrees to and shall execute and deliver to DD an

PP

Page 3


DD

"Assignment & Transfer of Copyright", in the form attached hereto as <u>Exhibit "B"</u>. For greater certainty the foregoing assignment shall be applicable worldwide.

        3.2.1   Notwithstanding the foregoing paragraph 3.2, and without in anyway limiting or diminishing from the full transfer and assignment of rights therein without reservation, the Parties understand the purpose of the transfer of rights is to provide DD the fullest possible ability and remedies to prevent and protect against any publication and/or dissemination of the Property.

    3.3    <u>Delivery of the Property to DD</u>.  Concurrently upon execution of this Agreement, PP, as applicable, shall deliver to DD, by delivery to his counsel herein, all of the Property which is embodied in tangible form (all originals and duplicates), whether documents, canvasses, paper art, digital copies, letters, prints, electronic data, films, tapes, CD-Roms, DVD-Roms, Images recording tapes, photographs, negatives, originals, duplicates, contact sheets, audio recordings, Images recordings, magnetic data, computerized data, digital recordings, or other recorded medium or any other format of embodying information or data.  Without limiting the generality of the foregoing, such tangible Property shall include all documents as defined by California Evidence Code §250 which contain any of the Property.  PP represents and warrants that the materials delivered pursuant to the terms of this Paragraph 3.3 comprise the totality of all existing originals and duplicates of all Property in any tangible form, whether within their possession, custody or control, and including otherwise (and that PP knows of no other copies or possible or potential copies not in PP's possession and control and delivered pursuant to this paragraph), and that upon such delivery to DD, PP shall not maintain possession, custody or control of any copy of all or any portion of any tangible Property. The Property Delivered under this Paragraph shall become Exhibit 1 to the Side Letter Agreement. For avoidance of any doubt, PP, nor her attorney are entitled to retain possession of said Property after execution of this Agreement. The retention of said Property by PP is a material breach of this agreement.

        3.3.1   This Agreement is conditioned on PP's compliance with each and every term of the Settlement Agreement including Paragraph 3.3 <u>and</u> the personal verification by DD or his attorney of the Images and that the Images are comprised of and captures the content previously represented to his counsel to exist and be captured therein (i.e., text messages between PP and DD)), all of which terms are essential and material.

## 4.0    <u>CONFIDENTIALITY & REPRESENTATIONS & WARRANTIES.</u>

    4.1   <u>Definition of Confidential Information</u>.  "Confidential Information" means and includes each and all of the following:

        (a)    All *intangible* information pertaining to DD and/or his family, (including but not limited to his children or any alleged children or any of his alleged sexual partners, alleged sexual actions or alleged sexual conduct or related matters ),and/or friends learned, obtained, or acquired by PP, including without limitation information contained in letters, e-mails, text messages, agreements, documents, audio or Images recordings, electronic data, and photographs;

        (b)    All *intangible* information pertaining to the existence and content of the Property;


PP

Page **4**


DD

(c)    All *intangible* private information (*i.e.*, information not generally available to and/or known by the general public) relating and/or pertaining to DD, including without limitation DD's business information, familial information, any of his alleged sexual partners, alleged sexual actions or alleged sexual conduct, related matters or paternity information, legal matters, contractual information, personal information, private social life, lifestyle, private conduct, (all information/items in 4.1 "(a)", "(b)" and "(c)" are sometimes collectively referred to as, "Intangible Confidential Information");

(d)    All *tangible* materials of any kind containing information pertaining to DD learned, obtained, participated or acquired by PP, including without limitation letters, agreements, documents, audio or Images recordings, electronic data, and photographs, canvas art, paper art, or art in any other form on any media. The Images and Photos and all information/items in 4.1(d) are collectively referred to as, the "Property" and/or the "Tangible Confidential Information");

4.2    PP's Representations & Warranties Regarding Prior Disclosures of Tangible Confidential Information.  PP represents and warrants that prior to entry into this Agreement, PP has directly or indirectly disclosed any *Tangible* an/or Intangible Confidential Information (i.e., any of the Property), to any Third Party, including without limitation disclosure or indirect disclosure of the content of such Confidential Information in tangible form, other than the following persons or entities to whom PP has made such prior disclosures (herein "PP Disclosed Individuals/Entities"):

a)    *Mike Mosher*

b)    *Angel Ryan*

c)    *Gina Rodriguez*

d)    *Keith Munyan*

e)    _____

f)    _____

g)    _____

h)    _____

i)    _____

PP shall not be responsible for any subsequent public disclosure of any of the Confidential Information (a) attributable <u>directly</u> to each of them; and/or (b) not disclosed hereinabove as a previously disclosed PP Disclosed Individuals/Entities, and any such disclosure shall be deemed a breach of this Agreement by PP. For greater clarity, PP must not induce, promote or actively inspire anyone to disclose Confidential Information.

**PP**

P a g e **5**

**DD**

4.3    Representations & Warranties and Agreements.

(a)    Representations & Warranties and Agreements By DD.  The following agreements, warranties and representations are made by DD as material inducements to PP to enter into this Agreement, and each Party acknowledges that she/he is executing this Agreement in reliance thereon:

(b)    DD warrants and represents that, as relates to or in connection with any of PP's attempts to sell, exploit and/or disseminate the Property prior to the date of this Agreement, DD and his counsel will refrain (i) from pursuing any civil action against PP, and/or (ii) absent a direct inquiry from law enforcement, from disclosing PP's name to the authorities. Notwithstanding the foregoing, if DD is informed that or should or if it is believed that either of PP has possession, custody and/or control of any of the Property after the date of this Agreement and/or transferred any copies to any Third Party, and/or it is believed that any of PP, whether directly or indirectly, intends the release, use, display, dissemination, disclosure or exploitation, whether actual, threatened or rumored, of any for the Property, then DD and his counsel shall be entitled to, at DD's sole discretion, (i) contact the respective member of PP, including with legal demands and related statements of liability and legal action, and/or (ii) advance a civil action against the respective member of PP, and/or (iii) disclose any of PP's name to the authorities.

4.3.2    Representations & Warranties and Agreements By PP.  The following agreements, warranties and representations are made by PP as material inducements to DD to enter into this Agreement, without which DD would not enter into this Agreement and without which DD would not agree to pay any monies whatsoever hereunder, and with the express acknowledgment that DD is executing this Agreement in reliance on the agreements, warranties, and representations herein which are at the essence of this Agreement, including, the following:

(a)    PP agrees and warrants and represents that PP will permanently cease and desist from any efforts to and/or attempting to and/or engaging in and/or arranging the use, License, distribution, dissemination or sale of any of the Confidential Information and/or Property, including any Tangible and/or Intangible Confidential information created by or relating to DD;

(b)    PP agrees and warrants and represents that PP will permanently cease and desist from any posting or dissemination or display of the Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD and/or Property, including the Images (including, but not limited to, to any form media outlet, on any blog or posting board, on the Internet, or otherwise);

(c)    PP agrees and warrants and represents that PP will permanently cease and desist from using or disseminating or disclosing any information to any Third Persons (including, but not limited to, to any media outlet, on any blog or posting board, on the Internet, or otherwise) about any details of or as to the contents of the Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD and/or Property, including any Text Messages, and/or as to any other personal details of or about or pertaining to DD and/or his family and/or friends and/or social interactions;

(d)    PP agrees and warrants and represents that PP will permanently cease and desist from and will not, at any time, make any use of or reference to the name, image or likeness


PP

Page 6


DD

of DD in any manner whatsoever, including without limitation, through any print or electronic media of any kind or nature for any purpose, including, but not limited to, on any websites;

(e)     PP agrees and warrants and represents that any and all existing copies of the Images, Text Messages and any Property (other than as expressly specified in paragraphs 3.2 and 3.3 herein) have been turned over and provided to counsel; and PP further warrants and represents that the only copy of the Images and Property that has ever existed, at any time, has been turned over to DD's counsel pursuant to this Agreement, and the Images and any Property has never been transferred to or existed in any other form, including not in electronic form, nor on any computer, or electronic device and other storage media;

(f)     PP warrants and represents that PP has not provided any copies, whether hard-copy or electronic copies, of the Property to anyone other than as specified in paragraph 4.2 herein);

(g)     PP warrants and represents that the information PP is obligated to provide pursuant to the terms herein will be complete and truthful;

(h)     PP warrants and represents that PP has not omitted or withheld any information that PP is obligated to provide pursuant to the terms herein;

(i)     PP warrants and represents that PP has not contracted to earn and/or collect any monies as compensation from the sell, license and/or any other exploitation of the Images and/or any Property and/or any Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD nor any monies as compensation or an advance for any efforts to sell, license and/or any other exploitation of the Images and/or any Property and/or any Confidential Information or any Tangible and/or Intangible Confidential information created by or relating to DD;

(j)     PP warrants and represents that PP has not assigned nor transferred, either in whole or in part, any purported rights in or to the Images and/or any Property to any other person or entity, other than to DD pursuant to this Agreement.

4.3.3     Agreement By PP Not to Disclose/Use Confidential Information, Tangible and/or Intangible Confidential information created by or relating to DD. As further material inducements for DD to enter into this Agreement, PP agrees, represents and warrants that she shall not directly or indirectly, verbally or otherwise, publish, disseminate, disclose, post or cause to be published, disseminated, disclosed, or posted (herein "disclose"), any Confidential Information or Tangible and/or Intangible Confidential information created by or relating to DD to any person, group, firm or entity whatsoever, including, but not limited to, family members, friends, associates, journalists, media organizations, newspapers, magazines, publications, television or radio stations, publishers, databases, blogs, websites, posting boards, and any other enterprise involved in the print, wire or electronic media, including individuals working directly or indirectly for, or on behalf of, any of said persons or entities ("Third Parties" and/or Third Party"). In no event shall PP be relieved of such party's confidentiality obligations herein by virtue of any breach or alleged breach of this Agreement. In no event shall any dispute in connection with this Agreement relieve PP of her confidentiality obligations arising pursuant to this Agreement, and any disclosure of Confidential Information and/or Tangible and/or Intangible Confidential information created by or relating to DD in connection with any such

Page 7



proceeding or dispute shall constitute a breach of this Agreement. PP shall use their best efforts to prevent the unauthorized disclosure of Confidential Information in connection with any such proceeding or dispute.

4.3.4   Any direct or indirect disclosure of Confidential Information or  Tangible and/or Intangible Confidential information created by or relating to DD to any Third Party by PP and/or any of her representatives, heirs, agents, children, family members, relatives , confidents, advisors, employees, attorneys, transferors, transferees, successors or assigns, and/or any friend of any of PP (collectively "PP Group"), after the date of this Agreement, shall be deemed a disclosure by PP in breach of the terms of this Agreement, entitling the non-breaching Party to all rights and remedies set forth herein.

4.3.5   PP separately and further warrants and represent that, prior to entering into this Agreement, that she has not written, published, caused to be published, or authorized the writing, publication, broadcast, transmission or public dissemination of any interview, article, essay, book, memoir, story, photograph, film, script, Images tape, biography, documentary, whether written, oral, digital or visual, whether fictionalized or not, about the opposing Party to this Agreement or their family, whether truthful, laudatory, defamatory, disparaging, deprecating or neutral, which discloses any Confidential Information and/or which includes any description or depiction of any kind whatsoever whether fictionalized or not, about any Party to this agreement or their respective family, other than as expressly disclosed by PP hereto in writing and as set forth herein in paragraph 4.2 above.

4.3.6   Agreement By PP Not to Disparage DD.  PP hereby irrevocably agrees and covenants that she shall not, directly or indirectly, publicly disparage DD, nor write, publish, cause to be published, or authorize, consult about or with or otherwise be involved in the writing, publication, broadcast, transmission or dissemination of any book, memoir, letter, story, photograph, film, script, Images, interview, article, essay, biography, diary, journal, documentary, or other written, oral, digital or visual account or description or depiction of any kind whatsoever whether fictionalized or not, about DD or his family, whether truthful, laudatory, defamatory, disparaging, deprecating or neutral.  PP further warrants and represents that PP has not and will not enter into any written or oral agreement with any third party purportedly requiring or obligating PP to do so. Fore greater clarity PP will never discuss with anyone the contents of this Settlement Agreement, nor will she voluntarily confirm the existence of this Settlement Agreement.

4.4   Disclosure Of Confidential Information Is Prohibited:  The Parties to this Agreement hereby recognize and agree that substantial effort and expense have been dedicated to limit the efforts of the press, other media, and the public to learn of personal and business affairs involving DD.  PP further acknowledges that any future disclosure of Confidential Information to any Third Party would constitute a serious and material breach of the terms of this Agreement, and shall constitute a breach of trust and confidence, invasion of privacy, and a misappropriation of exclusive property rights, and may also constitute fraud and deceit.  Some of the Confidential Information may also constitute and include proprietary business information and trade secrets which have independent economic value.  The Parties hereto acknowledge that any unauthorized use, dissemination or disclosure of Confidential Information, or the fabrication and dissemination of false and/or misleading information, about DD would result in irreparable injury to him, and would be injurious to a reasonable person, and/or would constitute an injurious violation of the right of privacy or publicity, and/or would be injurious to his business,

PP   Page 8   
DD

profession, person, family and/or career. The Parties acknowledge that substantial and valuable property rights and other proprietary interests in the exclusive possession, ownership and use of Confidential Information, and recognizes and acknowledges that such Confidential Information is a proprietary, valuable, special and unique asset which belongs to DD and to which the PP has no claim of ownership or other interest.

4.4.1   Disclosures Permitted By PP.  Notwithstanding the foregoing, PP shall only be permitted to disclose Confidential Information to another person or entity only if compelled to do so by valid legal process, including without limitation a subpoena duces tecum or similar legal compulsion, provided that PP shall not make any such disclosure unless PP has first provided DD with notice of such order or legal process not less than ten (10) days in advance of the required date of disclosure pursuant to the Written Notice provisions set forth hereinbelow, providing DD with an opportunity to intervene and with full and complete cooperation should she choose to oppose such disclosure. PP agrees that if the valid legal process can be stopped by her consent or at her behest then PP shall agree to use best efforts to avoid the disclosure of the Confidential Information.

## 5.0   **REMEDIES**

5.1   DD's Remedies for Breach of Agreement.  Each breach or threatened breach (*e.g.*, conduct by PP reflecting that said person intends to breach the Agreement), including without limitation by breach of any representation or warranty, by failing to deliver to DD all tangible Property as required, by the disclosure or threatened disclosure of any Confidential Information to any Third Party by PP (herein "Prohibited Communication"), or otherwise, shall render PP liable to DD for any and all damages and injuries incurred as a result thereof, including but not limited to the following, all of which rights and remedies shall be cumulative:

5.1.1   Disgorgement of Monies:  In the event an Arbitrator determines there has been a breach or threatened breach of this Agreement by PP, PP shall be obligated to account to, and to disgorge and turn over to DD any and all monies, profits, or other consideration, or benefits, which PP, or anyone on PP's behalf or at PP's direction, directly or indirectly derive from any disclosure or exploitation of any of the Confidential Information; and

5.1.2   Liquidated Damages:  PP agrees that any breach or violation of this Settlement Agreement by either of PP individually or the PP Group by his/her/their unauthorized disclosure of any of the Confidential Information (as defined in paragraphs 4.1(a), (b), (c), and (d)) to any Third Party, and/or any unauthorized exploitation or prohibited use of the same, and/or by the breach of and/or by any false representations and warranties set forth in this Agreement, and/or any public disparagement of DD by PP (collectively, the "LD Breach Terms"), shall result in substantial damages and injury to DD, the precise amount of which would be extremely difficult or impracticable to determine, even after the Parties have made a reasonable endeavor to estimate fair compensation for such potential losses and damages to DD. Therefore, in addition to disgorgement of the full amount of all monies or other consideration pursuant to paragraph 5.1.2, in the event an Arbitrator determines there has been a breach of the LD Breach Terms of this Agreement by PP individually or the PP Group, PP shall also be obligated to pay, and agree to pay to DD the sum of One-Million Dollars ($1,000,000.00 as a reasonable and fair amount of liquidated damages to compensate DD for any loss or damage



**PP**

Page **9**



**DD**

resulting from each breach, it being understood that the Liquidated damages calculation is on a per item basis. The Parties agree that such sum bears a reasonable and proximate relationship to the actual damages which DD will or might suffer from each breach of the terms of this Agreement and that this amount is not a penalty. Alternatively, at DD's sole discretion, DD may seek to recover actual damages proximately caused by each such breach, according to proof. Any other breaches not a LD Breach Terms shall be subject to a claim for actual damages according to proof; furthermore, any monies held in Trust by PP's Attorney shall be frozen and shall not be disbursed to PP until the Arbitrator finally resolves the allegation of Breach.

       5.1.3   Injunctive Relief. PP acknowledges and agrees that any unauthorized disclosure to Third Parties of any Confidential Information will cause irreparable harm to DD, which damages and injuries will most likely not be measurable or susceptible to calculation. PP further acknowledges and agrees that any breach or threatened breach of this Agreement due to the unauthorized disclosure or threatened disclosure by PP to Third Parties, of any Confidential Information shall entitle DD to immediately obtain, either from the Arbitrator and/ or from any other court of competent jurisdiction, an *ex parte* issuance of a restraining order and preliminary injunction or other similar relief (herein "Injunctive Relief") without advance notice to any of PP, preventing the disclosure or any further disclosure of Confidential Information protected by the terms hereof, pending the decision of the Arbitrator or Court. The Parties further acknowledge and agree that in connection with any such proceeding, any Party may obtain from the Court or Arbitrator on an ex parte application or noticed motion without opposition, an order sealing the file in any such proceeding, and the Parties stipulate to the factual and legal basis for issuance of an order sealing the file in any such proceedings. The rights and remedies set forth in this Injunctive Relief Section are without prejudice to any other rights or remedies, legal or equitable, that the Parties may have as a result of any breach of this Agreement.

       5.2   Dispute Resolution. In recognition of the mutual benefits to DD and PP of a voluntary system of alternative dispute resolution which involves binding confidential arbitration of all disputes which may arise between them, it is their intention and agreement that any and all claims or controversies arising between DD on the one hand, and PP on the other hand, shall be resolved by binding confidential Arbitration to the greatest extent permitted by law. Arbitration shall take place before JAMS ENDISPUTE ("JAMS") pursuant to JAMS Comprehensive Arbitration Rules and Procedures (including Interim Measures) ("JAMS Rules") and the law selected by DD, (such selection shall be limited to either, California, Nevada or Arizona), or before ACTION DISPUTE RESOLUTION SERVICES ("ADRS") pursuant to the ADRS Rules (including Interim Measures) and the law selected by DD (whichever the claimant elects upon filing an arbitration), in a the location selected by DD, and will be heard and decided by a sole, neutral arbitrator ("Arbitrator") selected either by agreement of the Parties, or if the Parties are unable to agree, then selected under the Rules of the selected arbitration service. The costs and fees associated with any Arbitrator and/or Arbitration service shall be split equally among the parties to any such dispute. The Parties shall have the right to conduct discovery in accordance with the California Code of Civil Procedure Section 1283.05 *et. seq.* or any similar provision existing in the jurisdiction selected by DD and the written discovery requests and results of discovery shall be deemed to constitute Confidential Information. The Arbitrator shall have the right to impose all legal and equitable remedies that would be available to any Party before any governmental dispute resolution forum or court of competent jurisdiction, including without limitation temporary, preliminary and permanent injunctive relief, compensatory damages, liquidated damages, accounting, disgorgement, specific performance, attorneys fees and costs,



**PP**

**DD**

and punitive damages. It is understood and agreed that each of the Parties shall bear his/its own attorneys' fees, expert fees, consulting fees, and other litigation costs (if any) ordinarily associated with legal proceedings taking place in a judicial forum, subject to the Arbitrator's reassessment in favor of the prevailing party to the extent permitted by law. **Each of the Parties understands, acknowledges and agrees that by agreeing to arbitration as provided herein, each of the Parties is giving up any right that he/she/it may have to a trial by judge or jury with regard to the matters which are required to be submitted to mandatory and binding Arbitration pursuant to the terms hereof. Each of the Parties further understands, acknowledges and agrees that there is no right to an appeal or a review of an Arbitrator's award as there would be a right of appeal or review of a judge or jury's decision.**

### 6.0   MUTUAL RELEASES

6.1     Except for the rights and obligations of the Parties set forth in this Agreement, DD, for himself, and each of his representatives, agents, assigns, heirs, partners, companies, affiliated companies, employees, insurers and attorneys, absolutely and forever releases and discharges PP, individually, and all of PP's heirs, and PP's attorneys, and each of them ("PP Releasees"), of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorney's fees), expenses, liens, actions and causes of actions of every kind and nature whatsoever, whether known or unknown, from the beginning of time to the effective date of this Agreement, including without limitation any and all matters, facts, claims and/or defenses asserted or which could have been asserted in the Matter, or which could have been asserted in any other legal action or proceeding, except as may be provided herein (the "DD Released Claims").

6.2     Except for the rights and obligations of the Parties set forth in this Agreement, PP, for herself, and her representatives, agents, assigns, heirs, partners, companies, affiliated companies, employees, insurers and attorneys, absolutely and forever release and discharge DD, individually, and each of his representatives, agents, assigns, heirs, partners, companies, affiliated companies, subsidiaries, employees, attorneys, successors, insurers, and each of them ("DD Releasees"), of and from any and all claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs (including attorney's fees), expenses, liens, actions and causes of actions of every kind and nature whatsoever, whether known or unknown, from the beginning of time to the date of this Agreement, including without limitation any and all matters, facts, claims and/or defenses asserted or which could have been asserted in the Action, or which could have been asserted in any other legal action or proceeding (the "PP Released Claims").

6.3     The subject matter referred to in paragraphs 6.1 and 6.2, above (i.e., the DD Released Claims and PP Released Claims), are collectively referred to as the "Released Matters."

6.4     The Parties hereto, and each of them, hereby warrant, represent and agree that each of them is fully aware of §1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims which the creditor
> does not know or suspect to exist in his favor at the time of
> executing the release, which if known by him must have materially
> affected his settlement with the debtor."





Page **11**

The Parties, and each of them, voluntarily waive the provisions of California <u>Civil Code</u> § 1542, and any other similar federal and state law as to any and all claims, demands, causes of action, or charges of every kind and nature whatsoever, whether known or unknown, suspected or unsuspected.

   6.4.1  For avoidance of any doubt, by virtue of this Settlement and this Settlement Agreement, the parties hereby waive any unknown claims against each other individually, and each of their representatives, agents, assigns, heirs, partners, companies, affiliated companies, subsidiaries, employees, attorneys, successors, insurers, and each of them.

  6.5  Each of the Parties hereto acknowledges and agrees that this Agreement constitutes a settlement and compromise of claims and defenses in dispute, and shall not be construed in any fashion as an admission of liability by any party hereto.

### 7.0  <u>CONFIDENTIALITY OF THIS AGREEMENT</u>

  7.1  The Parties, respectively, shall not to disclose the terms of this Agreement, either directly or indirectly, to the media or to anyone else other than their respective attorneys and representatives and/or as may be required by law. PP may not comment or make any press releases or otherwise discuss the resolution of the subject of this Agreement.

### 8.0  <u>MISCELLANEOUS TERMS</u>

  8.1  <u>Entire Agreement</u>. This Agreement constitutes the entire agreement and understanding concerning the Released Matters hereof between the Parties hereto and supersedes any and all prior negotiations and proposed agreement and/or agreements, written and/or oral, between the Parties. Each of the Parties hereto acknowledges that neither they, nor any other party, nor any agent or attorney of any other party has made any promise, representation, or warranty whatsoever, expressed or implied, written or oral, which is not contained herein, concerning the subject matter hereof, to induce it to execute this Agreement, and each of the Parties hereto acknowledges that she/he has not executed this Agreement in reliance on any promise, representation, and/or warranty not contained herein. This Agreement shall be binding on and inure to the benefit of the Parties, the Releasees, and each of their respective successors and assigns and designees.

  8.2  <u>DD's Election of either California, Nevada or Arizona Law & Venue</u>. This Agreement and any dispute or controversy relating to this Agreement, shall in all respects be construed, interpreted, enforced and governed by the laws of the State of California, Arizona or Nevada at DD's election. <u>Attorneys' Fees in the case of a Dispute</u>. In the event of any dispute, action, proceeding or controversy regarding the existence, validity, interpretation, performance, enforcement, claimed breach or threatened breach of this Agreement, the prevailing party in any resulting arbitration proceeding and/or court proceeding shall be entitled to recover as an element of such Party's costs of suit, and not as damages, all attorneys' fees, costs and expenses incurred or sustained by such prevailing Party in connection with such action, including, without limitation, legal fees and costs.


PP

EC
**DD**

8.3     Attorney Fees and Costs in Formation of this Agreement. The Parties shall each bear their own costs, expert fees, attorneys' fees and other fees incurred in connection with the creation this Settlement Agreement.

8.4     Waivers: Modification. This Agreement cannot be modified or changed except by written instrument signed by all of the Parties hereto. No waiver of any of the provisions of this Agreement shall be deemed to constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the party making the waiver.

8.5     Scope of Provisions/Severability/Headings. None of the Parties hereto shall be deemed to be the drafter of this Agreement, but it shall be deemed that this Agreement was jointly drafted by each of the Parties hereto. Should any provision of this Agreement be found to be ambiguous in any way, such ambiguity shall not be resolved by construing this Agreement in favor of or against any party herein, but rather construing the terms of this Agreement as a whole according to their fair meaning. In the event that any provision hereof is deemed to be illegal or unenforceable, such a determination shall not affect the validity or enforceability of the remaining provisions thereof, all of which shall remain in full force and effect. Notwithstanding the foregoing, if a provision is deemed to be illegal the Parties agree to waive any defense on said grounds. In the event that such any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope or breadth permitted by law. The captions appearing at the commencement of certain paragraphs herein are descriptive only and for convenience of reference. Should there be any conflict between any such caption or heading and the paragraph at the caption of which it appears, the paragraph, and not such caption, shall control and govern.

8.6     Advice of Counsel and Understanding of this Binding Agreement. Each of the Parties represents, acknowledges, and declares that she/he has received the advice of legal counsel of his/her own choosing regarding the form, substance, and effect of this Agreement. Each of the Parties represents, acknowledges, and declares that she/he has carefully read this Agreement, knows and understands this Agreement's contents, and signs this Agreement freely, voluntarily, and without either coercion or duress. Each of the Parties represents and warrants that she/he is fully competent to manage his/her business affairs, and that she/he has full power and authority to execute this Agreement, and to do any and all of the things reasonably required hereunder; and that this Agreement, when signed by all Parties, is a valid and binding agreement, enforceable in accordance with its terms.

8.7     Further Execution. In order to carry out the terms and conditions of this Agreement, PP agrees to promptly execute, upon reasonable request, any and all documents and instruments necessary to effectuate the terms of this Agreement.

8.8     Notice Provisions. Any notice, demand or request that one Party desires, or is required to give (including service of any subpoena, court pleadings, summons and/or complaint), to the other Party must be promptly communicated to the other Party by using their respective contact information below, by both (i) e-mail or facsimile; *and* (ii) telephone. Either Party may change his or her contact information by notifying the other Party of said change(s) pursuant to the applicable terms herein.


PP

Page 13

DD

8.8.1   To DD as follows:

*Essential Consultants, LLC*
*c/o: Michael Cohen, Esq.*
*502 Park Avenue #2A*
*New York, NY 10022*

8.8.2   To PP, as follows:

C/O KEITH M. DAVIDSON, ESQ.
8383 Wilshire Boulevard, Suite 510
Beverly Hills, CA 90211
tel. 323.658.5444
fax. 323-658-5444
e-mail: keith@KmdLaw.com

8.9  .   This Agreement may be executed with one or more separate counterparts, each of which, when so executed shall be deemed to be an original and, together shall constitute and be one and the same instrument.  Any executed copies or signed counterparts of this Agreement, the Declaration, and any other documentation may be executed by scanned/printed pdf copies of signatures and/or facsimile signatures, which shall be deemed to have the same force and effect as if they were original signatures.

**IN WITNESS WHEREOF,** by their signatures below, the Parties each have approved and executed this Agreement as of the effective date first set forth above.

DATED: _____, 2016

**DD**

DATED: _Oct 28_, 2016

**PP**

ERICA JACKSON
Notary Public, State of Texas
Comm. Expires 01-04-2020
Notary ID 130483626

DATED: _10/28_, 2016

*E C, LLC*

_____
**PP**

P a g e **14**

**EC**
**DD**

DATED: _10/31/16_ , 2016

As to Form:

_____
Keith M. Davidson, Esq., Attorney for PP


DATED: _____ , 2016

As to Form:

_____

Attorney for DD


DATED: _10/28_ , 2016

As to Form:

_____
MICHAEL D. COHEN, ESQ.
Attorney for DD
        ESSENTIAL CONSULTANTS, LLC

Page **15**

# Exhibit 4

1  BLAKELY LAW GROUP
2  BRENT H. BLAKELY (CA Bar No. 157292)
   1334 Parkview Avenue, Suite 280
3  Manhattan Beach, California 90266
   Telephone:   (310) 546-7400
4  Facsimile:    (310) 546-7401
5  Email:        BBlakely@BlakelyLawGroup.com

6
   Attorneys for Defendant
7  ESSENTIAL CONSULTANTS, LLC

8                  UNITED STATES DISTRICT COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10

11  STEPHANIE CLIFFORD a.k.a.        Case No. 2:18-CV-02217-SJO-FFM
12  STORMY DANIELS a.k.a. PEGGY
    PETERSON, an individual,          **DEFENDANT ESSENTIAL
13                                     CONSULTANT, LLC'S
                 Plaintiff,            NOTICE OF MOTION AND
14                                     MOTION TO COMPEL
         v.                            ARBITRATION**
15
16                                     Assigned for All Purposes to the
    DONALD J. TRUMP a.k.a. DAVID       Hon. S. James Otero
17  DENNISON, an individual,
    ESSENTIAL CONSULTANTS, LLC, a      **Date:        April 30, 2018**
18  Delaware Limited Liability Company, **Time:        10:00 a.m.**
19  and DOES 1 through 10, inclusive,   **Location:    350 West 1st Street**
                                                        **Courtroom 10C, 10th Floor**
20                                                      **Los Angeles, CA 90012**
                 Defendants.
21
22                                     Action Filed:  March 6, 2018

23

24

25

26

27

28

───────────────────────────────────────────
NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO THE COURT, ALL PARTIES AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on April 30, 2018, at 10:00 a.m. or as soon thereafter as the matter may be heard in Courtroom 10C, located at the United States District Court, 350 West 1st Street, Los Angeles, California 90012, the Honorable S. James Otero presiding, Defendant Essential Consultants, LLC ("EC") will move and hereby does move for an order compelling Plaintiff Stephanie Clifford a.k.a. Stormy Daniels a.k.a. Peggy Peterson ("Clifford" or "Plaintiff") to arbitrate any and all disputes arising under the written *Confidential Settlement Agreement and Mutual Release* entered into by EC and Clifford on or about October 28, 2016 (the "Settlement Agreement"), including but not limited to the first cause of action pleaded in Plaintiff's First Amended Complaint ("FAC") in this action.  Such arbitration should be ordered to occur in the currently pending arbitration between the parties with ADR Services, Inc. ("ADRS") in Los Angeles, California, pursuant to the written agreements of the parties.  EC will also move and hereby does move for an order staying the first cause of action in the FAC pending the outcome of the arbitration.

This motion will be and is based on this Notice, the accompanying Memorandum of Points and Authorities, the accompanying Declarations of Michael D. Cohen and Brent H. Blakely (with exhibits), the anticipated reply papers, all other papers on file in this action, all materials that may be properly considered in connection with this motion, and oral argument at the hearing.  This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on March 21, 2018.

Dated: April 2, 2018                       BLAKELY LAW GROUP


                                          By:  */s/ Brent H. Blakely*
                                          BRENT H. BLAKELY
                                          *Attorneys for Defendant ESSENTIAL CONSULTANTS, LLC*

BLAKELY LAW GROUP
BRENT H. BLAKELY (CA Bar No. 157292)
1334 Parkview Avenue, Suite 280
Manhattan Beach, California 90266
Telephone:   (310) 546-7400
Facsimile:   (310) 546-7401
Email:      BBlakely@BlakelyLawGroup.com

Attorneys for Defendant
ESSENTIAL CONSULTANTS, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS a.k.a. PEGGY PETERSON, an individual,<br><br>              Plaintiff,<br><br>       v.<br><br>DONALD J. TRUMP a.k.a. DAVID DENNISON, an individual, ESSENTIAL CONSULTANTS, LLC, a Delaware Limited Liability Company, and DOES 1 through 10, inclusive,<br><br>              Defendants. | Case No. 2:18-CV-02217-SJO-FFM<br><br>**DEFENDANT ESSENTIAL CONSULTANT, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION**<br><br>Assigned for All Purposes to the Hon. S. James Otero<br><br>**Date:       April 30, 2018**<br>**Time:      10:00 a.m.**<br>**Location:  350 West 1st Street**<br>**            Courtroom 10C, 10th Floor**<br>**            Los Angeles, CA 90012**<br><br>Action Filed:  March 6, 2018 |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................6

II.     FACTUAL BACKGROUND ...................................................................8

III.    CLIFFORD'S FIRST CAUSE OF ACTION FOR DECLARATORY
        RELIEF SHOULD BE COMPELLED TO ARBITRATION .....................10

        a.    The Federal Arbitration Act Establishes A Liberal Policy Favoring
              The Enforcement Of Arbitration Agreements ......................................11

        b.    Clifford Entered Into A Valid Arbitration Agreement ........................12

              1.    Clifford's Agreement To Arbitrate Is Enforceable
                    Regardless Of Whether DD Also Signed The Agreement .........13

              2.    Clifford Received Adequate Consideration Under The
                    Settlement Agreement ..............................................................15

        c.    Clifford's Challenges To The Contract As A Whole Should Be
              Decided By The Arbitrator, Not The Court ........................................16

        d.    The "Crux Of The Complaint" Is A Challenge To The Settlement
              Agreement As A Whole, Not The Arbitration Provision ....................17

              1.    The Authorities Relied Upon By Clifford To Argue That
                    The Court Should Decide "Formation" Are Highly
                    Distinguishable ........................................................................19

              2.    The Arbitration Provision Is Not Unconscionable ....................22

        e.    The Newly Added Second Cause Of Action Against Michael
              Cohen Does Not Prevent Arbitration Of The First Cause Of Action ...24

IV.     THE COURT SHOULD STAY THIS ACTION PENDING THE
        OUTCOME OF THE ARBITRATION ......................................................25

V.      CONCLUSION .......................................................................................25

MEMORANDUM OF POINTS AND AUTHORITIES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

### CASES

*Abers v. Rounsavell*,
    189 Cal.App.4th 348 (2010)....................................................................15, 16

*Angell v. Rowlands*,
    85 Cal.App.3d 536 (1978)............................................................................13

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ....................................................................................22

*Barham v. Barham*,
    33 Cal.2d 416 (1949)...................................................................................14

*Beab, Inc. v. First Western Bank & Tr. Co.*,
    204 Cal.App.2d 680 (1962).........................................................................15

*Borgarding v. JP Morgan Chase Bank*,
    2016 WL 8904413 (C.D. Cal. Oct. 31, 2016) ..............................................24

*Brawley v. Crosby Research Found.*,
    73 Cal.App.2d 103 (1946)...........................................................................16

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*,
    622 F.3d 996 (9th Cir. 2010)....................................................................8, 18

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440, 444 (2006) ...................................................................7, 17, 18

*Chalk v. T-Mobile USA, Inc.*,
    560 F.3d 1087 (9th Cir. 2009).....................................................................23

*Comedy Club, Inc. v. Improv W. Assocs.*,
    553 F.3d 1277 (9th Cir. 2009).....................................................................20

*Crestview Cemetery Ass'n v. Dieden*,
    54 Cal.2d 744 (1960)...................................................................................14

*Daily Transit Mix, LLC v. Daily Transit Mix Corp.*,
    2011 WL 5416188 (Cal. Ct. App. Nov. 9, 2011)..........................................16

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) ..............................................................................12, 24

MEMORANDUM OF POINTS AND AUTHORITIES

*Doherty v. Barclays Bank Delaware*,
   No. 16-CV-01131-AJB-NLS, 2017 WL 588446 (S.D. Cal. Feb. 14, 2017)...21

*Encore Prods., Inc. v. Promise Keepers*,
   53 F.Supp.2d 1101 (D. Colo. 1999) ..............................................................25

*Goldman, Sachs & Co. v. City of Reno*,
   747 F.3d 733, 741 (9th Cir. 2014)................................................................20

*Goldman, Sachs & Co. v. City of Reno, supra*,
   747 F.3d (9th Cir. 2014)................................................................................13

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
   561 U.S. 287 (2010) .....................................................................................20

*Guadagno v. E*Trade Bank*,
   592 F.Supp.2d 1263 (C.D. Cal. 2008)......................................................12, 17

*Hilti, Inc. v. Oldach*,
   392 F.2d 368 (1st Cir. 1968) .......................................................................25

*Kaneko v. Okuda*,
   195 Cal.App.2d 217 (1961)..........................................................................13

*KPMG LLP v. Cocchi*,
   565 U.S. 18 (2011) .......................................................................................24

*Mentor Capital, Inc. v. Bhang Chocolate Co.*,
   No. 3:14-CV-3630 LB, 2014 WL 6485666 (N.D. Cal. Nov. 19, 2014) .........17

*Mohamed v. Uber Technologies, Inc.*,
   848 F.3d 1201 (9th Cir. 2016)..................................................................22, 24

*Mortensen v. Bresnan Comm., LLC*,
   722 F.3d 1151 (9th Cir. 2013).......................................................................12

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ....................................................................................11, 12

*Nagrampa v. MailCoups, Inc.*,
   469 F.3d 1257 (9th Cir. 2006).......................................................................18

*Preston v. Ferrer*,
   552 U.S. 346 (2008) ...............................................................................11, 17

-4-

MEMORANDUM OF POINTS AND AUTHORITIES

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967) ................................................................17, 21

*Republic of Nicaragua v. Standard Fruit Co.*,
    937 F.2d 469 (9th Cir. 1991) ..............................................12

*San Diego City Firefighters, Local 145, AFL-CIO v. Bd. of Admin. of San Diego City Employees' Ret. Sys.*,
    206 Cal.App.4th 594 (2012) ................................................16

*Sanford v. MemberWorks, Inc.*,
    483 F.3d 956 (9th Cir. 2007) ..............................................19

*Steinberg & Lyman v. Takacs*,
    774 F.Supp. 885 (S.D.N.Y.1991) ........................................25

*Switch, LLC v. Ixmation, Inc.*,
    No. 15-CV-01637-MEJ, 2015 WL 4463672 (N.D. Cal. July 21, 2015).........21

*Teledyne, Inc. v. Kone Corp.*,
    892 F.2d 1404 (9th Cir. 1989) ............................................21

*Tennant v. Wilde*,
    98 Cal.App. 437 (1929) .....................................................16

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
    925 F.2d 1136 (9th Cir. 1991) ............................................20

**STATUTES**

9 U.S.C. § 1.....................................................................11

9 U.S.C. § 2.....................................................................22

9 U.S.C. § 3.....................................................................25

9 U.S.C. § 4.....................................................................10

## I.    **INTRODUCTION**

Defendant and moving party Essential Consultants, LLC ("EC") and Plaintiff Stephanie Clifford aka "Stormy Daniels" aka "Peggy Peterson" aka "PP" (herein, "Clifford") are signatories to a written *Confidential Settlement Agreement and Mutual Release* dated October 28, 2016 (the "Settlement Agreement").  Declaration of Michael D. Cohen ("Cohen Decl."), Ex. A, Settlement Agreement.

This motion seeks to enforce the arbitration provision in the Settlement Agreement, which was negotiated at arms' length by the parties' respective counsel, and pursuant to which Clifford accepted $130,000 as consideration.  The strong policy favoring arbitration set forth by Congress in the Federal Arbitration Act ("FAA") dictates that this motion be granted, and that Clifford be compelled to arbitration, as she knowingly and voluntarily agreed to do.

Paragraph 5.2 of the Settlement Agreement contains an arbitration provision that requires Clifford to arbitrate any and all claims that may arise between Peggy Peterson ("PP") and David Dennison ("DD"), stating in pertinent part:

> Dispute Resolution.  In recognition of the mutual benefits to
> DD and PP of a voluntary system of alternative dispute
> resolution which involves binding confidential arbitration of
> all disputes which may arise between them, it is their
> intention and agreement that any and all claims or
> controversies arising between DD on the one hand, and PP
> on the other hand, shall be resolved by binding confidential
> Arbitration to the greatest extent permitted by law.

According to Clifford's allegations, Peggy Peterson ("PP") is a pseudonym for Clifford, and David Dennison ("DD") is a pseudonym for Defendant Donald J. Trump ("Mr. Trump").  Declaration of Brent H. Blakely ("Blakely Decl."), Ex. B, Complaint, ¶ 18 and Ex. C, First Amended Complaint ("FAC"), ¶ 19.

The first cause of action in the FAC is for Declaratory Relief against Mr.

1   Trump (and EC).  This claim undeniably falls within the arbitration provision:  a

2   claim or controversy between PP and DD.

3        Clifford asserts in the FAC that the Settlement Agreement was never formed

4   because it was not signed by Mr. Trump, and thus the arbitration provision contained

5   therein is unenforceable.  This argument is without merit.

6        The first paragraph of the Settlement Agreement defines the parties to the

7   agreement as EC, LLC "**and/or**" DAVID DENNISON (DD), "**on the one part**," and

8   PEGGY PETERSON (PP), "**on the other part**."  Ex. A, p. 0 (emphasis added).  This

9   provision demonstrates the parties' intent for the Settlement Agreement to be binding

10  once signed by EC and Clifford, and regardless of whether it was also signed by DD.

11       In conformance with this intent, and according to her own admissions, Clifford

12  and EC signed the Settlement Agreement, and Clifford accepted $130,000 in

13  consideration from EC, despite not receiving a signature from Mr. Trump.  Ex. B, ¶¶

14  16, 22-23; Ex. C, ¶¶ 17, 23-24.  Then, over the course of the next sixteen (16)

15  months, Clifford did not at any time:  reject the Settlement Agreement; offer to return

16  or return the $130,000; or assert that the Settlement Agreement is unenforceable

17  because it was not signed by Mr. Trump, or for any other reason.  Cohen Decl., ¶ 3.

18       In fact, Clifford did not assert any claim challenging the validity of the

19  Settlement Agreement until she filed this action on March 6, 2018.  To this day,

20  Clifford has not returned the $130,000 she received from EC.  Thus, there is no

21  question that a valid agreement to arbitrate Clifford's claims against DD (and EC)

22  was formed.  *See infra* Section III.b.

23       On March 26, 2018, Clifford filed the FAC, which added several new

24  challenges purportedly directed to the enforceability of the arbitration provision

25  itself, as opposed to the enforceability of the Settlement Agreement as a whole.

26  These allegations are a sham and were added in a transparent attempt to circumvent

27  the holding in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006),

28  which requires that Clifford's challenges to the Settlement Agreement be decided by

1  the arbitrator.  Blakely Decl., ¶¶ 7-8.[1]

2      Under the Ninth Circuit's "crux of the complaint" test, Clifford's challenges to

3  the enforceability of the arbitration clause are effectively the same as her challenges

4  to the Settlement Agreement as a whole.  *See Bridge Fund Capital Corp. v.*

5  *Fastbucks Franchise Corp.*, 622 F.3d 996, 1001 (9th Cir. 2010).  Thus, the Court

6  need not decide those issues for purposes of the instant motion.  However, to the

7  extent the Court does consider Clifford's challenges to the arbitration provision, they

8  should be rejected.  For example, Clifford's argument that the arbitration provision is

9  unconscionable fails for several reasons.  *See infra*, Section III.d.3.

10      Pursuant to well-established U.S. Supreme Court jurisprudence, the Court

11  simply needs to determine that Clifford agreed to arbitrate any claim or controversy

12  between her and DD arising under the Settlement Agreement.  Clifford's admissions

13  in her Complaint and FAC confirm that she agreed to do just that.

14      Accordingly, EC respectfully requests that the Court issue an order compelling

15  Clifford to arbitrate her dispute with DD (and EC).

16  **II.    FACTUAL BACKGROUND**

17      Clifford is an adult-film actress and exotic dancer.  In October 2016, according

18  to an exclusive news report, Clifford unsuccessfully attempted to sell a story about an

19  alleged one-night-stand with Mr. Trump to tabloid magazines and related outlets for

20  $200,000.  Blakely Decl., Ex. D, 3/29/18 *Daily Mail* Article.

21      Instead, on or about October 28, 2016, Clifford (who was represented by legal

22  counsel) entered into the Settlement Agreement with EC.  Ex. A, p. 14; Ex. B, ¶ 22;

23  Ex. C, ¶ 23; Cohen Decl., ¶¶ 2-3.  In the Settlement Agreement, Clifford agreed to

24  _____

25      [1] Clifford also added a second cause of action against a newly named

26  defendant, Michael Cohen, for defamation.  This claim should be dismissed pursuant
   to California's anti-SLAPP statute.  Blakely Decl., Ex. I.  However, as set forth in

27  Section III.e. below, arbitration between EC and Clifford should proceed, regardless
   of whether Clifford's claim against Mr. Cohen is also subject to arbitration.

28

accept $130,000 from EC in exchange for, among other things, her promise not to disclose any Confidential Information (as defined in the Settlement Agreement), including any of DD's "alleged sexual partners, alleged sexual actions or alleged sexual conduct." Ex. A, pp. 4-5; Ex. B, ¶¶ 16, 22-23; Ex. C, ¶¶ 17, 23-24. In the Settlement Agreement, Clifford also promised to arbitrate any dispute that might later arise between her and DD. Ex. A, pp. 10.

EC paid Clifford the sum of $130,000, as required under the Settlement Agreement. Ex. B, ¶ 23; Ex. C, ¶ 24; Cohen Decl., ¶ 3. For the next sixteen months, Clifford did not: reject the Settlement Agreement; assert that the Settlement Agreement was unenforceable because it was not signed by Mr. Trump; or make any attempt to return the $130,000 that she was paid by EC. Cohen Decl., ¶ 3.

During that time, Clifford performed all of her obligations under the Settlement Agreement, and made no public statements disclosing Confidential Information. Cohen Decl., ¶ 4. Prior to February 2018, Clifford's only complaint relating to the Settlement Agreement was in October 2016, when she complained that she was not receiving the $130,000 due to her under the Settlement Agreement quickly enough. *Id.*

In February 2018, Clifford threatened to breach the Settlement Agreement by publicizing allegations that constitute Confidential Information. On or about February 22, 2018, EC filed an arbitration proceeding with ADR Services, Inc. ("ADRS") in Los Angeles (the "Arbitration"), pursuant to the arbitration provision in the Settlement Agreement. Cohen Decl., ¶ 5. Upon EC's emergency application for a Temporary Restraining Order ("TRO"), the arbitrator (a retired California Superior Court judge) issued an order prohibiting Clifford from violating the Settlement Agreement by, among other things, disclosing any Confidential Information to the media or in court filings (the "TRO"). *Id.* at ¶¶ 6-7, Ex. E, TRO.

Clifford has violated the Settlement Agreement and the TRO by, among other things, filing the Complaint and FAC in this action, and also by disclosing

Confidential Information to the news media, including in a nationally televised

interview with Anderson Cooper on *60 Minutes*, which reportedly was watched by

twenty-two million viewers.  Clifford further breached the Settlement Agreement by

sending her attorney of record in this action, Michael Avenatti, to participate in

dozens of interviews on national television programs, wherein he has repeatedly

disclosed Confidential Information.[2]

Within days of filing this action, and the massive news coverage that it

generated, Clifford made appearances at various adult entertainment clubs, claiming

publicly that her pay has quadrupled from the publicity of this lawsuit.  Blakely

Decl., Ex. F, 3/11/18 CNN article and Ex. G, 3/9/18 *Rolling Stone* article.

On March 21, 2018, counsel for the parties participated in the Local Rule 7-3

conference of counsel.  Blakely Decl., ¶ 7.  During the conference, EC's counsel

specifically informed counsel for Clifford that, pursuant to *Buckeye Check Cashing,

Inc. v. Cardegna*, *supra*, Clifford's defenses to the enforcement of the Settlement

Agreement as a whole must be decided by the arbitrator, not the Court.  *Id*.  Five days

later, Clifford filed the FAC, which includes several new challenges to the arbitration

provision, and a second cause of action against Mr. Cohen.

## III.   CLIFFORD'S FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF SHOULD BE COMPELLED TO ARBITRATION

Where the making of an agreement to arbitrate is not "in issue," as is the case

here, the District Court should order the parties to proceed with arbitration upon

petition of the aggrieved party.  9 U.S.C. § 4.  Section 4 states, in pertinent part:

> A party aggrieved by the alleged failure, neglect, or refusal
>
> of another to arbitrate under a written agreement for
>
> arbitration may petition any United States district court

---

[2] Section 4.3.4 of the Settlement Agreement provides that any disclosure of
Confidential Information by Clifford's counsel is deemed to be a disclosure by her.

1    which, save for such agreement, would have jurisdiction

2    under title 28…for an order directing that such arbitration

3    proceed in the manner provided for in such agreement….

4    The court shall hear the parties, and **upon being satisfied**

5    **that the making of the agreement for arbitration or the**

6    **failure to comply therewith is not in issue**, the court shall

7    make an order directing the parties to proceed to arbitration

8    in accordance with the terms of the agreement.

9 *Id*. (emphasis added.)

10   Here, the Settlement Agreement contains an agreement by EC and Clifford to

11 arbitrate any dispute between PP and DD.  The Complaint and FAC were filed by

12 Clifford against DD and EC, assert a claim arising under the Settlement Agreement,

13 and thus undeniably fall within the scope of the arbitration provision.

14   Contrary to Clifford's assertion, a valid agreement to arbitrate was formed.  By

15 Clifford's own admission, she signed the Settlement Agreement, accepted the

16 consideration required of EC thereunder and did not raise any objection to its

17 enforceability until approximately sixteen months thereafter.  Thus, Clifford

18 knowingly and voluntarily agreed to arbitrate this dispute.  The Court need not go

19 any further to grant this motion and compel this matter to arbitration.  Thereafter,

20 Clifford's claims of invalidity or unenforceability of the Settlement Agreement

21 should be determined by the arbitrator.  *See infra,* Sections III.c. and III.d.

22   **a.**  **The Federal Arbitration Act Establishes A Liberal Policy Favoring**

23     **The Enforcement Of Arbitration Agreements**

24   "[T]he Federal Arbitration Act (FAA or Act), 9 U.S.C. § 1 *et seq.* (2000 ed.

25 and Supp. V), establishes a national policy favoring arbitration when the parties

26 contract for that mode of dispute resolution."  *Preston v. Ferrer*, 552 U.S. 346, 349

27 (2008); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1,

28 24 (1983) ("Section 2 is a congressional declaration of a liberal federal policy

1    favoring arbitration agreements."); *Mortensen v. Bresnan Comm., LLC*, 722 F.3d

2    1151, 1160 (9th Cir. 2013) ("the FAA's purpose is to give preference (instead of

3    mere equality) to arbitration provisions.").  "The Act, which rests on Congress'

4    authority under the Commerce Clause, supplies not simply a procedural framework

5    applicable in federal courts; it also calls for the application, in state as well as federal

6    courts, of federal substantive law regarding arbitration." *Id*.

7        The FAA "mandates that district courts *shall* direct the parties to proceed to

8    arbitration on issues as to which an arbitration agreement **has been signed**." *Dean*

9    *Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (bold added); *Republic of*

10   *Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 n.8 (9th Cir. 1991) (the FAA

11   "reflects the strong Congressional policy favoring arbitration by making such clauses

12   'valid, irrevocable, and enforceable.'").  The FAA "is phrased in mandatory terms,"

13   thus a District Court "has little discretion to deny an arbitration motion." *Republic of*

14   *Nicaragua*, *supra*, 937 F.2d at 475.  "If a contract contains an arbitration clause,

15   claims brought under or against that contract are presumed arbitrable." *Guadagno v.*

16   *E\*Trade Bank,* 592 F.Supp.2d 1263, 1272 (C.D. Cal. 2008).

17        In *Gaudagno v. E\*Trade Bank*, the plaintiff filled out an online application for

18   an E\*Trade account, and clicked a box acknowledging that she had reviewed

19   E\*Trade's account agreement, which contained an arbitration clause.  592 F.Supp.2d

20   at 1267.  This Court rejected plaintiff's argument that she did not assent to the

21   arbitration agreement, and granted defendant's motion to compel arbitration.  *Id*. at

22   1273.  In doing so, this Court held that any "[d]oubts should be resolved in favor of

23   arbitrability."  *Id*. at 1272; *see also Moses H. Cone Memorial Hosp. v. Mercury*

24   *Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of

25   arbitrable issues should be resolved in favor of arbitration.").

26       **b.**    <u>**Clifford Entered Into A Valid Arbitration Agreement**</u>

27        The Ninth Circuit uses "general state-law principles of contract interpretation

28   to decide whether a contractual obligation to arbitrate exists." *Goldman, Sachs & Co.*

1  *v. City of Reno*, *supra*, 747 F.3d at 743 (9th Cir. 2014).  Under those principles, there

2  should be no question that an enforceable arbitration agreement was reached.

3  Clifford admits that she (and EC) signed the Settlement Agreement, that she

4  was represented by counsel in connection therewith, and that EC paid her $130,000

5  pursuant to the Settlement Agreement.  Ex. B, ¶¶ 16, 22-23.  By doing so, Clifford

6  accepted the terms of Settlement Agreement, including her obligation to arbitrate

7  contained therein.  *See* Cal. Civ. Code § 1589 ("A **voluntary acceptance of the**

8  **benefit of a transaction** is equivalent to a consent to all the obligations arising from

9  it, so far as the facts are known, or ought to be known, to the person accepting.")

10  (emphasis added); Cal. Civ. Code § 1584 ("Performance of the conditions of a

11  proposal, or the **acceptance of the consideration offered with a proposal**, is an

12  acceptance of the proposal.") (emphasis added.)

13        1.   Clifford's Agreement To Arbitrate Is Enforceable Regardless Of

14              Whether DD Also Signed The Agreement

15  Clifford is bound by the terms of the Settlement Agreement, including the

16  arbitration provision, even though it was not signed by DD.  First, the Settlement

17  Agreement contemplated a binding agreement between Clifford and EC, regardless

18  of whether DD also signed.  Second, California law does not require all parties to

19  sign a contract for it to be binding on those who did sign it.  "It is not the rule that a

20  contract, which on its face purports to be between the parties named in the

21  instrument, must invariably be executed by all whose names appear in the instrument

22  before it will be binding on any."  *Kaneko v. Okuda*, 195 Cal.App.2d 217, 225

23  (1961).  "In the absence of a showing that a contract is not to be deemed complete

24  unless signed by all parties, **the parties signing may be bound though others have**

25  **not signed**."  *Id.* (emphasis added); *see also Angell v. Rowlands*, 85 Cal.App.3d 536,

26  540 (1978).

27  Here, the first paragraph of the Settlement Agreement demonstrates that the

28  parties intended for the Settlement Agreement to be binding regardless of whether it

1  was signed by DD.  It expressly defines the parties to the agreement as EC, LLC

2  "**and/or**" DAVID DENNISON (DD), "**on the one part**," and PEGGY PETERSON

3  (PP), "**on the other part**."  Ex. A, p. 0 (emphasis added).

4       If this language is not clear enough, it is well-settled under California law that

5  the Court need look no further than Clifford's subsequent conduct to determine that

6  she intended for the Settlement Agreement to be binding without DD's signature.

7  "Where any doubt exists as to the purport of the parties' dealings as expressed in the

8  wording of their contract, the court may look to…subsequent acts or declarations of

9  the parties 'shedding light upon the question of their mutual intention at the time of

10  contracting.' (citation)." *Barham v. Barham*, 33 Cal.2d 416, 423 (1949).  "[I]t is said

11  that 'a construction given the contract by the acts and conduct of the parties with

12  knowledge of its terms, before any controversy has arisen as to its meaning, is

13  entitled to great weight and will, when reasonable, be adopted and enforced by the

14  court.' (citation)."  *Id.*

15       In *Crestview Cemetery Ass'n v. Dieden*, 54 Cal.2d 744, 757 (1960), the

16  California Supreme Court held that the subsequent actions of the parties to a contract

17  demonstrated their belief that the "contract had been fully performed."  The Court

18  stated:  "The practical construction placed on the contract by the parties is far more

19  convincing than the construction arrived at in an attempt to escape a liability already

20  accrued."  *Id.* at 755.[3]

21

22  _____

23  [3] In doing so, the California Supreme Court quoted the following passage from its
   opinion in *Mitau v. Roddan*, 149 Cal. 1, 14 (1906):

24      It is to be assumed that parties to a contract best know what was

25      meant by its terms, and are the least liable to be mistaken as to its
       intention; that each party is alert to his own interests, and to

26      insistence on his rights, and that whatever is done by the parties
       contemporaneously with the execution of the contract is done

27      under its terms as they understood and intended it should be.

28      Parties are far less liable to have been mistaken as to the intention
   (footnote continued)

-14-

MEMORANDUM OF POINTS AND AUTHORITIES

1    Clifford signed the Settlement Agreement, accepted the $130,000 that EC was

2   obligated to pay her, and, despite not receiving any signature from Mr. Trump,

3   Clifford did not reject the Settlement Agreement, did not deem it null and void

4   because it was supposedly missing a signature, and did not return, or offer to return,

5   the $130,000 she was paid, prior to filing this lawsuit approximately sixteen months

6   thereafter.  Ex. B, ¶¶ 16, 22-23; Ex. C, ¶¶ 17, 23-24; Cohen Decl., ¶ 3.  Further,

7   Clifford performed all of her obligations under the Settlement Agreement during

8   those sixteen months and made no public statements that EC is aware of disclosing

9   Confidential Information.  Cohen Decl., ¶ 4.  Prior to February 2018, Clifford's only

10   complaint relating to the Settlement Agreement was that she was not receiving the

11   payment quickly enough.  *Id*.  This is powerful evidence that Clifford intended for the

12   Settlement Agreement to be binding absent DD's signature.

13          2.    Clifford Received Adequate Consideration Under The Settlement

14                Agreement

15    Under California Civil Code § 1550, "sufficient cause or consideration" is

16   necessary for an enforceable contract.  However, "[a]dequacy of consideration need

17   not be proved where the defendant has already accepted the consideration."  *Abers v.*

18   *Rounsavell*, 189 Cal.App.4th 348, 362 (2010), citing *Beab, Inc. v. First Western Bank*

19   *& Tr. Co.*, 204 Cal.App.2d 680, 685 (1962).  Because Clifford accepted EC's

20   consideration under the Settlement Agreement ($130,000), and made no attempt to

21   _____

22          of their contract during the period while harmonious and practical

23          construction reflects that intention, than they are when subsequent

          differences have impelled them to resort to law, and one of them

24          then seeks a construction at variance with the practical

          construction they have placed upon it.

25   *Crestview Cemetery Ass'n v. Dieden*, 54 Cal.2d at 753; *see also City of Hope Nat.*

26   *Med. Ctr. v. Genentech, Inc.*, 43 Cal.4th 375, 393 (2008) ("A party's conduct

27   occurring between execution of the contract and a dispute about the meaning of the

   contract's terms may reveal what the parties understood and intended those terms to

28   mean.")

1  reject such consideration for nearly sixteen months, there should be no question that

2  such consideration was adequate.

3       Regardless, "[a] consideration of one dollar is ordinarily sufficient to support a

4  contract at law." *Abers v. Rounsavell*, *supra*, 189 Cal.App.4th at 362.  "'A written

5  instrument is presumptive evidence of a consideration' (Civ.Code, § 1614), and in

6  any event all the law requires for sufficient consideration is the proverbial

7  'peppercorn.'" *San Diego City Firefighters, Local 145, AFL-CIO v. Bd. of Admin. of*

8  *San Diego City Employees' Ret. Sys.*, 206 Cal.App.4th 594, 619 (2012).

9       Moreover, the consideration that Clifford received from EC ($130,000) was

10 sufficient to support all of her obligations under the Settlement Agreement, including

11 to arbitrate, independent of whether the Settlement Agreement also provided for non-

12 monetary consideration from DD.  "[W]here there is consideration for any of the

13 agreements specified in a contract[,] the contract as a whole cannot be said to lack

14 mutuality or consideration, nor can any particular promise or agreement contained

15 therein be singled out and deemed inoperative because no special or particular

16 consideration appears to have been given or promised for it." *Brawley v. Crosby*

17 *Research Found*., 73 Cal.App.2d 103, 118 (1946), quoting *Tennant v. Wilde*, 98

18 Cal.App. 437, 442 (1929).  "In other words, '[w]hile consideration is a necessary

19 element of every contract, it is not necessary that each separate promise or covenant

20 should have a distinct consideration.'" *Daily Transit Mix, LLC v. Daily Transit Mix*

21 *Corp.*, 2011 WL 5416188, at *10 (Cal. Ct. App. Nov. 9, 2011), citing *Brawley v.*

22 *Crosby Research Found*., *supra*, 73 Cal.App.2d at 118.  Thus, Clifford should be

23 required to arbitrate this dispute, regardless of whether she received separate

24 consideration from DD under the Settlement Agreement.

25       **c.**       **Clifford's Challenges To The Contract As A Whole Should Be**

26                 **Decided By The Arbitrator, Not The Court**

27       The U.S. Supreme Court has held that "a challenge to the validity of the

28 contract as a whole, and not specifically to the arbitration clause, must go to the

MEMORANDUM OF POINTS AND AUTHORITIES

arbitrator." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. at 444.  In *Buckeye Check Cashing*, the Court held that a claim that the subject contract was illegal and void *ab initio* must be decided by the arbitrator, not the court.  *Id*; *see also Preston v. Ferrer*, *supra*, 552 U.S. at 349.  The holding in *Buckeye Check Cashing* followed the decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-404 (1967), wherein the Supreme Court held that the FAA "does not permit the federal court to consider claims of fraud in the inducement of the contract generally," as opposed to a claim of "fraud in the inducement of the arbitration clause itself."  *See also Mentor Capital, Inc. v. Bhang Chocolate Co.*, No. 3:14-CV-3630 LB, 2014 WL 6485666, at *4-6 (N.D. Cal. Nov. 19, 2014) (held that claim for rescission of entire agreement for failure of consideration must be decided by arbitrator), citing *Buckeye Check Cashing v. Cardegna, supra*, 546 U.S. at 444-446.

"[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."  *Buckeye Check Cashing, Inc. v. Cardegna*, *supra*, 546 U.S. at 445-446.  "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."  *Id; Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (the Supreme Court requires "the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene.").  In *Guadagno v. E*Trade Bank*, *supra*, 592 F.Supp.2d at 1270, this Court held:  "If a party challenges the validity of an arbitration clause itself, rather than the entire contract containing the clause, the arbitration clause's validity is for the court, rather than an arbitrator, to decide." (citing *Buckeye Check Cashing, Inc. v. Cardegna*, *supra*, 546 U.S. at 445-446.)

### d.   The "Crux Of The Complaint" Is A Challenge To The Settlement Agreement As A Whole, Not The Arbitration Provision

Clifford's newly added, sham challenges to the validity of the arbitration provision should be viewed as nothing more than challenges to the Settlement Agreement as a whole, and thus are to be decided by the arbitrator.  Following the

U.S. Supreme Court's holding in *Buckeye Check Cashing*, the Ninth Circuit Court of Appeals has "applied the 'crux of the complaint' rule as a method for differentiating between challenges to the arbitration provision alone and challenges to the entire contract." *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1001 (9th Cir. 2010). "The 'crux of the complaint' matters when the complaint itself makes clear that the challenge to the arbitration clause is the same challenge that is being made to the entire contract." *Id.*

In *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1263-1264 (9th Cir. 2006), the Ninth Circuit held that "when the crux of the complaint challenges the validity or enforceability of the agreement containing the arbitration provision, then the question of whether the agreement, as a whole, is unconscionable must be referred to the arbitrator." Prior to Clifford's thinly veiled attempt to circumvent the holding of *Buckeye Check Cashing, Inc.* by filing the FAC, the Complaint demonstrated that Clifford's challenges to arbitration clause are the same as her challenges to the Settlement Agreement as a whole:

- Paragraph 38 alleges, in pertinent part, that the Settlement Agreement was "never formed" because "Mr. Trump never signed" it; and "as a ... result, there is no agreement to arbitrate between the parties."

- Paragraph 39 alleges, in pertinent part, that the Settlement Agreement is "invalid, unenforceable, and/or void under the doctrine of unconscionability"; and "as a ... result, there is no agreement to arbitrate between the parties."

- Paragraph 40 alleges, in pertinent part, that the Settlement Agreement is "invalid, unenforceable, and/or void because [it] is illegal and/or violate[s] public policy"; and "as a ... result, there is no agreement to arbitrate between the parties."

Ex. B, pp. 6-7. Clifford's newly asserted defenses to the enforceability of the arbitration provision in the FAC are also the same as her defenses to the validity of

the Settlement Agreement as a whole:

- Paragraph 41 alleges, in pertinent part, that "no agreement was ever formed or existed" and "as a … result, there is no agreement to arbitrate between the parties."

- Paragraphs 42 and 43 allege that the Settlement Agreement as a whole is unconscionable, while paragraph 58 also alleges that the arbitration provision is unconscionable.

- Paragraphs 44 through 55 allege that the Settlement Agreement as a whole is void *ab initio* because it is illegal and violates public policy, while paragraphs 59 through 61 allege that the arbitration provision is void *ab initio* because it is illegal and violates public policy.

Ex. C, pp. 8-15.

Thus, the "crux of the complaint" is a challenge to the Settlement Agreement as a whole, not the arbitration provision contained therein.

    1.    <u>The Authorities Relied Upon By Clifford To Argue That The Court Should Decide "Formation" Are Highly Distinguishable</u>

Clifford contends that her challenge to the formation of the Settlement Agreement should be decided by the Court, not the arbitrator.  However, the authorities Clifford relied upon during the parties' Local Rule 7-3 conference of counsel are highly distinguishable.  Blakely Decl., ¶ 7.

In *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 964 (9th Cir. 2007), the plaintiff alleged that she never received, much less signed, the membership agreement containing the arbitration clause, and that she did not even known about the membership until approximately 13 months after she was supposedly sent the agreement.  *Id*. at 958-959.  Under those facts, the Ninth Circuit held that the District Court should determine whether an enforceable arbitration agreement was formed. This case is very different:  here, Clifford acknowledges that she signed and received the agreement, along with the consideration required of EC thereunder.

MEMORANDUM OF POINTS AND AUTHORITIES

1    In *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1144

2 (9th Cir. 1991), the cities of Lawndale, San Marino, and Palmdale, and the Palmdale

3 Redevelopment Agency, claimed that the person who signed the subject agreements

4 on their behalf, an individual "who worked in various financial capacities for those

5 entities," did not have authority to bind them to those agreements, which opened

6 investments accounts with defendant (in which the plaintiffs lost $8 million).  *Id*. at

7 1140–1141.  Under those facts, the Ninth Circuit held that the District Court should

8 determine whether the signatory to the agreements containing the arbitration clauses

9 had authority to bind the plaintiffs to those agreements.  *Id.*  By contrast, Clifford has

10 not, nor can she, make any argument that she lacked the authority to enter into the

11 Settlement Agreement.

12    In *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 741, 747 (9th Cir.

13 2014), the Ninth Circuit held that the forum selection clauses in Goldman, Sachs &

14 Co.'s Broker-Dealer Agreements with the City of Reno, which stated that "all actions

15 and proceedings ... shall be brought in the ... District of Nevada," superseded

16 Goldman's default obligation to arbitrate under FINRA's general rules.  Here,

17 Clifford makes no such argument.

18    In *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 303-304 (2010),

19 the Court held that the District Court should determine arbitrability of a dispute over

20 **when** the contract was formed, because this issue governed whether the arbitration

21 agreement was in existence and enforceable during the relevant time period.  Here,

22 there is no dispute that the Settlement Agreement was executed by Clifford and EC

23 more than a year before this dispute arose.

24    Moreover, the cases cited in Clifford's Motion for Expedited Jury Trial for the

25 proposition that the court should decide her challenges to the formation of the

26 Settlement Agreement also are highly distinguishable.  Dkt. No. 16, pp., 11-12.

27    In *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir.

28 2009), the Ninth Circuit held that an arbitrator did not have the authority to issue an

-20-

MEMORANDUM OF POINTS AND AUTHORITIES

injunction against non-parties, "such as cousins of former spouses" of signatories, and a "a non-party grandmother" of a signatory, to an arbitration agreement.  The Court held that "these collateral relatives are not in privity with the…signatories." *Id*.  Here, there is no dispute that EC is seeking to enforce the arbitration provision against a signatory to the Settlement Agreement (Clifford).

In *Doherty v. Barclays Bank Delaware*, No. 16-CV-01131-AJB-NLS, 2017 WL 588446, at *4 (S.D. Cal. Feb. 14, 2017), the defendant, one of the top ten issuers of credit cards in the United States, alleged that plaintiff was bound by the arbitration provision contained in defendant's "Cardmember Agreement" because plaintiff was an authorized user of his father's credit card account.  However, the plaintiff claimed that he did not know he was an authorized user on the account, and that he was added as an authorized user without his knowledge.  *Id*. at *1, 4.  Under those facts, the District Court denied the defendant's motion to compel arbitration.  *Id*. at *4.  Here, there is no dispute that Clifford signed the Settlement Agreement.

In *Switch, LLC v. Ixmation, Inc.*, No. 15-CV-01637-MEJ, 2015 WL 4463672, at *3 (N.D. Cal. July 21, 2015), the plaintiff argued that "it did not sign or otherwise agree to" the defendant's "Proposal," which contained the subject arbitration provision.  Under those facts, the District Court denied the defendant's motion to compel arbitration.  *Id*. at *5.  Again, there is no similar dispute here.

In contrast to the authorities relied upon by Clifford, in *Teledyne, Inc. v. Kone Corp*., 892 F.2d 1404, 1410 (9th Cir. 1989), the Ninth Circuit held that the arbitrator, not the District Court, must decide whether an agreement signed by both parties, but that defendant claimed was an unenforceable "DRAFT", was formed.  In doing so, the Court held that cases must "be submitted to arbitration unless there is a challenge to the arbitration provision which is *separate* and *distinct* from any challenge to the underlying contract."  *Id*. (emphasis in original), citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, *supra*, 388 U.S. at 402-404.

2. <u>The Arbitration Provision Is Not Unconscionable</u>

Clifford argues that the arbitration provision in the Settlement Agreement is unconscionable based on various theories.  To the extent the Court even decides this issue, it should find that none of these arguments have merit.

**First**, under the FAA, there are strict limits on the types of unconscionability arguments that may be raised against an arbitration agreement.  9 U.S.C. § 2 limits the grounds for denying enforcement of arbitration agreements to "such grounds as exist at law or in equity for the revocation of any contract."  The U.S. Supreme Court has interpreted this rule to prohibit unconscionability arguments directed to the substantive effect of the arbitration clause itself.  Thus, in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 340-341 (2011), the Court held that a California doctrine holding that contractual waivers of class action arbitration were unconscionable was preempted by the FAA, even though it was an application of a state law rule.  Thus, to the extent that Clifford seeks to use unconscionability doctrine to impose substantive limits on the arbitration clause, these arguments must fail.

**Second** and independently, the arbitration clause is not unconscionable under California law.  "Under California law, unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results."  *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201, 1210 (9th Cir. 2016) (broad delegation of arbitrability issues to arbitrator is not unconscionable) (internal quotations omitted).  "**Both substantive and procedural unconscionability must be present in order for a court to find a contract unconscionable**, but they need not be present in the same degree… Recently, the California Supreme Court has emphasized that unconscionability requires a substantial degree of unfairness beyond a simple old-fashioned bad bargain… Rather, unconscionable contracts are those that are so one-sided as to shock the conscience."  *Id.* (emphasis added; internal quotations omitted).

1      "Procedural unconscionability focuses on two factors in contract formation:

2 oppression and surprise.... Oppression arises when there is inequality in bargaining

3 power between the parties to a contract, resulting in no real opportunity to negotiate

4 the terms of the contract and the absence of meaningful choice.  Surprise involves the

5 extent to which the supposedly agreed terms were hidden from the party seeking to

6 avoid enforcement of the agreement."  *Chalk v. T-Mobile USA, Inc.*, 560 F.3d 1087,

7 1093-94 (9th Cir. 2009) (arbitration clause in readable type in cellular service

8 agreement was not procedurally unconscionable).

9      Here, there is no procedural unconscionability.  There is no evidence that

10 Clifford was forced to enter into the Settlement Agreement, had no meaningful choice

11 to do so, or had no choice but to accede to the terms of the arbitration clause as

12 drafted.  The Settlement Agreement was the antithesis of standard form adhesion

13 contracts imposed by large corporations that the procedural ucnconscionability

14 doctrine addresses.  Clifford had the power to walk away, the power to negotiate the

15 terms of the agreement, and only entered into the agreement after she unsuccessfully

16 attempted to sell her story for $200,000.  Ex. D.  Because there is no procedural

17 unconscionability, all of Clifford's unconscionability defenses fail.

18      In any event, Clifford also has not shown substantive unconscionability.  Her

19 contention is exactly what *Mohamed* states cannot constitute substantive

20 unconscionability, namely, that she made an old fashioned bargain that she now

21 regrets, not that any terms of the Settlement Agreement shock the conscience.

22 Clifford has shown no unfairness in the arbitration process (an argument that is barred

23 under *Concepcion* anyway), and no unfairness in the terms of the arbitration clause.

24 For instance, Clifford has not shown how she is prejudiced by being required to go to

25 the arbitrator to get an injunction to enforce the Settlement Agreement, or that the

26 choice of law rule in the Settlement Agreement has harmed her in any way.  Nor has

27 she shown that the other terms of the agreement—a straightforward promise to pay

28 $130,000 in exchange for various confidentiality obligations—were so one-sided as to

-23-
MEMORANDUM OF POINTS AND AUTHORITIES

1  shock the conscience.  If this agreement is unconscionable, then any confidentiality

2  agreement is unconscionable, and that is not the law.  *Borgarding v. JP Morgan*

3  *Chase Bank*, 2016 WL 8904413 at *9 (C.D. Cal. Oct. 31, 2016) ("A confidentiality

4  clause, however, does not, render the entire arbitration agreement substantively

5  unconscionable.").

6         Finally, even if there is a provision (such as the choice of law provision) of the

7  arbitration agreement that is found to step too far under unconscionability doctrine,

8  any such provision is severable from the rest of the arbitration agreement.  The core

9  agreement is to arbitrate all disputes arising under the Settlement Agreement;

10  restrictions on injunctive relief and special choice of law rules are not central to the

11  bargain and can be excised if the Court determines that they are unconscionable.

12  *Mohamed v. Uber Technologies, Inc*, *supra*, 848 F.3d at 1213-14 (holding that waiver

13  of private attorney general suits, which was unenforceable, was severable from

14  remainder of arbitration clause).

15         **e.  The Newly Added Second Cause Of Action Against Michael Cohen**

16              **Does Not Prevent Arbitration Of The First Cause Of Action**

17         Clifford cannot avoid arbitration of her first cause of action against DD and EC

18  on the basis that her second cause of action asserts a non-arbitrable claim against Mr.

19  Cohen.  "[W]hen a complaint contains both arbitrable and nonarbitrable claims, the

20  [Federal Arbitration] Act requires courts to 'compel arbitration of pendent arbitrable

21  claims when one of the parties files a motion to compel, even where the result would

22  be the possibly inefficient maintenance of separate proceedings in different forums.'"

23  *KPMG LLP v. Cocchi*, 565 U.S. 18, 22 (2011), citing *Dean Witter Reynolds Inc. v.*

24  *Byrd*, 470 U.S. 213, 217 (1985).  "The Act has been interpreted to require that if a

25  dispute presents multiple claims, some arbitrable and some not, the former must be

26  sent to arbitration even if this will lead to piecemeal litigation." *Id*. at 19.

27         "Moreover, a plaintiff cannot avoid arbitration merely by claiming that one or

28  more of its claims for relief is against a defendant who is not a signatory to the

-24-

MEMORANDUM OF POINTS AND AUTHORITIES

agreement." *Encore Prods., Inc. v. Promise Keepers*, 53 F.Supp.2d 1101, 1113 (D. Colo. 1999), citing *Hilti, Inc. v. Oldach*, 392 F.2d 368, 369 n. 2 (1st Cir. 1968) ("arbitration should not be foreclosed simply by adding persons to a civil action who are not parties to the arbitration agreement because such an inclusion would thwart the federal policy in favor of arbitration"); *Steinberg & Lyman v. Takacs*, 774 F.Supp. 885, 888 (S.D.N.Y.1991) ("while [plaintiff] asserts that notions of judicial economy favor having this Court try the entire action at one time, rather than sending only two of the defendants to arbitration, such an argument does not withstand the mandate of the [FAA].")

## IV.  THE COURT SHOULD STAY THIS ACTION PENDING THE OUTCOME OF THE ARBITRATION

The Court should stay all proceedings with respect to the first cause of action, pending the completion of the arbitration.  9 U.S.C. § 3.  Section 3 provides, in pertinent part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had…

## V.  CONCLUSION

For the foregoing reasons, the instant Motion to Compel Arbitration should be granted; Clifford should be ordered to arbitration in the currently pending arbitration between the parties with ADRS, consistent with the parties' agreement; and the first cause of action in the FAC should be stayed pending the outcome of the arbitration.

1  Dated: April 2, 2018            BLAKELY LAW GROUP

2

3                       By:  */s/ Brent H. Blakely*

4                            BRENT H. BLAKELY
                              ***Attorneys for Defendant***

5                            ***ESSENTIAL CONSULTANTS, LLC***

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES

# Exhibit 5

1 │ AVENATTI & ASSOCIATES, APC
    │ Michael J. Avenatti, State Bar No. 206929
2 │ Ahmed Ibrahim, State Bar No. 238739
    │ 520 Newport Center Drive, Suite 1400
3 │ Newport Beach, CA 92660
    │ Telephone: 949.706.7000
4 │ Facsimile: 949.706.7050

5 │ Attorneys for Plaintiff Stephanie Clifford
    │ a.k.a. Stormy Daniels a.k.a. Peggy Peterson

6

7

8 │              **UNITED STATES DISTRICT COURT**

9 │              **CENTRAL DISTRICT OF CALIFORNIA**

10

11 │ STEPHANIE CLIFFORD a.k.a.            │ CASE NO.:  2:18-cv-02217-SJO-FFM
     │ STORMY DANIELS a.k.a. PEGGY         │
12 │ PETERSON, an individual,            │ **PLAINTIFF'S OPPOSITION TO**
     │                                     │ **DEFENDANT ESSENTIAL**
13 │              Plaintiff,             │ **CONSULTANT, LLC'S MOTION TO**
     │                                     │ **COMPEL ARBITRATION**
14 │       vs.                           │
15 │                                     │
16 │ DONALD J. TRUMP a.k.a. DAVID        │ **Hearing Date:  April 30, 2018**
     │ DENNISON, and individual,          │ **Hearing Time: 10:00 a.m.**
17 │ ESSENTIAL CONSULTANTS, LLC, a       │ **Location:      350 West 1st Street**
     │ Delaware Limited Liability Company, │ **                Courtroom 10C**
18 │ MICHAEL COHEN and DOES 1            │ **                Los Angeles, CA 90012**
     │ through 10, inclusive,             │
19 │                                     │
20 │              Defendants.           │

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................. 1

II.  STATEMENT OF FACTS ...................................................... 2

   A.   The Settlement Agreement ............................................ 2

   B.   Mr. Cohen Claims Mr. Trump Had Nothing to Do With the
        Agreement. ............................................................... 2

   C.   Mr. Trump and the White House Deny Any Involvement With
        the Settlement Agreement. ............................................ 3

III. ARGUMENT ..................................................................... 3

   A.   Plaintiff's Assertion that No Agreement Was Formed Is an
        Issue For the Court to Decide. ....................................... 3

   B.   EC Does Not Have Standing to Compel Arbitration. ............ 5

   C.   Mr. Trump Does Not Petition to Compel Arbitration and Has
        Not Met His Burden. ................................................... 6

   D.   No Agreement Was Formed Because Mr. Trump Failed to
        Sign the Agreement and Deliver the Promised Consideration
        to Plaintiff. .............................................................. 7

        1.   No Agreement Exists Because Mr. Trump's Signature
             Was an Express Condition to the Formation of the
             Agreement. ....................................................... 7

        2.   Mr. Trump Was Incapable of Consenting to a Contract
             Which Imposed Duties on Him That He Was
             Supposedly Unaware Of. ..................................... 10

        3.   EC's Argument Regarding Adequacy of Consideration
             Is Irrelevant to this Motion................................... 12

   E.   The Presence of the Term "And/Or" in the Agreement in
        Connection With the Parties Does Not Save the Agreement. .... 13

   F.   Plaintiff's Signature on the Settlement Agreement and Her
        Acceptance of Funds Did Not Create a Contract. ............... 16

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

G.   Defendants' Position that Mr. Trump Was Not a Contemplated Party Constitutes Fraud in the Execution Rendering the Agreement Void. ........................................................................ 19

IV.   CONCLUSION .................................................................................... 20

# TABLE OF AUTHORITIES

## <u>CASES</u>

Abraham Zion Corp. v. Lebow,
  761 F.2d 93 (2d Cir.1985) .................................................................. 11

Am. Aeronautics Corp. v. Grand Cent. Aircraft Co.,
  155 Cal. App. 2d 69 (1957) ................................................................. 9

AT & T Techs., Inc. v. Commc'ns Workers of Am.,
  475 U.S. 643 (1986) .......................................................................... 4

Bank Bldg. & Equip. Corp. of Am. v. Georgia State Bank,
  132 Ga. App. 762, 209 S.E.2d 82 (1974) ............................................ 13

Banner Entertainment, Inc. v. Superior Court,
  62 Cal. App. 4th 348 (1998) ......................................................... passim

Barnhart Aircraft v. Preston,
  212 Cal. 19 (1931) ........................................................................... 18

Barraza v. Cricket Wireless LLC
  No. C 15-02471 WHA, 2015 WL 6689396 (N.D. Cal. Nov. 3, 2015) ......... 4

Beck v. American Health,
  211 Cal. App. 3d 1555 (1989) ............................................................ 9

Britton v. Co-op Banking Grp.,
  4 F.3d 742 (9th Cir. 1993) ................................................................. 6

Buckeye Check Cashing, Inc. v. Cardegna,
  546 U.S. 440 (2006) ......................................................................... 5

Bustamante v. Intuit, Inc.,
  141 Cal. App. 4th 199 (2006) ........................................................... 10

California Shipbuilding Corp. v. Indus. Acc. Comm'n,
  85 Cal. App. 2d 435 (1948) .............................................................. 14

Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC,
  816 F.3d 1208 (9th Cir. 2016) ................................................... 4, 5, 10

Comedy Club, Inc. v. Improv W. Assocs.,
  553 F.3d 1277 (9th Cir. 2009) ....................................................................4

Comer v. Micor, Inc.,
  278 F.Supp.2d 1030 (N.D. Cal. 2003) .......................................................11

CPR for Skid Row v. City of Los Angeles,
  779 F.3d 1098 (9th Cir. 2015) ..................................................................14

Davison v. Stephens Inst.,
  No. A138953, 2014 WL 6654690 (Cal. Ct. App. Nov. 24, 2014) ..............17

De Mott v. Amalgamated Meat Cutters & Butcher Workmen of N. Am.,
  157 Cal. App. 2d 13 (1958) .......................................................................9

Dinkins v. Am. Nat'l Ins. Co.,
  92 Cal. App. 3d 222 (1979) ......................................................................14

DKS, Inc. v. Corp. Bus. Sols., Inc.,
  675 F. App'x 738 (9th Cir. 2017) ..............................................................20

Doherty v. Barclays Bank Delaware,
  No. 16-CV-01131-AJB-NLS, 2017 WL 588446 (S.D. Cal. Feb. 14, 2017)................4

Duferco Steel Inc. v. M/V Kalisti,
  121 F.3d 321 (7th Cir. 1997) .....................................................................7

Duick v. Toyota Motor Sales, U.S.A., Inc.,
  198 Cal. App. 4th 1316 (2011) .............................................................19, 20

Duran v. Duran,
  150 Cal. App. 3d 176 (1983) ......................................................................9

Esparza v. Sand & Sea, Inc.,
  2 Cal. App. 5th 781 (2016) ...................................................................10, 11

Estakhrian v. Obenstine,
  320 F.R.D. 63 (C.D. Cal. 2017)..................................................................11

Evox Prods. LLC v. Kayak Software Corp.,
  No. CV15-5053 PSG (AGRX), 2017 WL 5634858 (C.D. Cal. Apr. 4, 2017) ...........18

F.B.T. Prods., LLC v. Aftermath Records,
  621 F.3d 958 (9th Cir. 2010) ....................................................................18

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

Goldman, Sachs & Co. v. City of Reno,
    747 F.3d 733 (9th Cir. 2014) .................................................................5

Granite Rock Co. v. Int'l Bhd. of Teamsters,
    561 U.S. 287 (2010) ..............................................................................5

Grill v. BAC Home Loans Servicing LP.,
    No. 10-CV-03057-FCD/GGH, 2011 WL 127891 (E.D. Cal. Jan. 14, 2011) ...............8

Guadagno v. E*Trade Bank,
    592 F. Supp. 2d 1263 (C.D. Cal. 2008) ...............................................5, 6

Helperin v. Guzzardi,
    108 Cal. App. 2d 125 (1951) ...............................................................9

Herbert H. Post & Co. v. Sidney Bitterman, Inc.,
    219 A.D.2d 214, 639 N.Y.S.2d 329 (1996) .........................................13

In re Bell,
    19 Cal. 2d 488 (1942) ......................................................................13

In re Captain Blythers, Inc.,
    311 B.R. 530 (B.A.P. 9th Cir. 2004) .................................................15

J.B. Enterprises Int'l, L.L.C. v. Sid & Marty Krofft Pictures Corp.,
    No. CV 02-7779 CBM (SHX), 2003 WL 21037837 (C.D. Cal. Mar. 3, 2003) ......8, 17

Jackson v. Grant,
    890 F.2d 118 (9th Cir. 1989) ...........................................................13

Kaneko v. Okuda,
    195 Cal. App. 2d 217 (1961) ...........................................................10

Khajavi v. Feather River Anesthesia Med. Grp.,
    84 Cal. App. 4th 32 (2000) ...............................................................8

Knutson v. Sirius XM Radio Inc.,
    771 F.3d 559 (9th Cir. 2014) ...........................................................18

Kramer v. Toyota Motor Corp.,
    705 F.3d 1122 (9th Cir. 2013) ...........................................................6

Los Angeles Rams Football Club v. Cannon,
    185 F. Supp. 717 (S.D. Cal. 1960) ......................................................8

PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION

1    Lyne v. Bonner,
2        129 Cal. App. 2d 743 (1954) ......................................................................... 9

3    Monterey Bay Unified Air Pollution Control Dist. for People of State of California v. U.S.
     Dep't of Army,
4        176 F. Supp. 2d 979 (N.D. Cal. 2001)..................................................... 15, 16

5    Mundi v. Union Sec. Life Ins. Co.,
6        555 F.3d 1042 (9th Cir. 2009) ...................................................................... 6

7    No. B077509,
8        1994 WL 814244 (Cal. Ct. App. Sept. 22, 1994)........................................ 14

9    Ollilo v. Clatskanie Peoples' Util. Dist.,
         170 Or. 173, 132 P.2d 416 (1942) ............................................................... 13
10

11   Ortiz v. America's Servicing Co.,
         No. EDCV 12-191 CAS SPX, 2012 WL 2160953 (C.D. Cal. June 11, 2012) ............ 8
12

13   Perez v. DirecTV Grp. Holdings, LLC,
         251 F. Supp. 3d 1328 (C.D. Cal. 2017)....................................................... 18
14

15   PSM Holding Corp. v. Nat'l Farm Fin. Corp.,
         339 F. App'x 693 (9th Cir. 2009)........................................................... 8, 17
16

17   Rebolledo v. Tilly's, Inc.,
         228 Cal. App. 4th 900 (2014)...................................................................... 8

18   Robinson v. OnStar, LLC,
19       No. 16-56412, 2018 WL 1323630 (9th Cir. Mar. 15, 2018) ....................... 18

20   Romo v. Y–3 Holdings, Inc.,
21       87 Cal. App. 4th 1153 (2001) ...................................................................... 8

22   Rosenthal v. Great W. Fin. Sec. Corp.,
23       14 Cal. 4th 394 (1996)................................................................................ 20

24   Roth v. Garcia Marquez,
         942 F.2d 617 (9th Cir. 1991) ................................................................... 1, 8
25

26   S.E.C. v. Daifotis,
         No. C 11-00137 WHA, 2011 WL 3295139 (N.D. Cal. Aug. 1, 2011) ........................ 7

27   Sanford v. MemberWorks, Inc.,
28       483 F.3d 956 (9th Cir. 2007) ....................................................................... 4

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

Switch, LLC v. ixmation, Inc.,
  No. 15-CV-01637-MEJ, 2015 WL 4463672 (N.D. Cal. July 21, 2015) ...................... 4

Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.,
  925 F.2d 1136 (9th Cir. 1991) ......................................................................... 4

## **STATUTES**

9 U.S.C. § 4 .......................................................................................................... 2, 7

Cal. Civ. Code § 1550 ............................................................................................ 10

Cal. Civ. Code §1565(3) ........................................................................................ 10

Cal. Civ. Code § 1558 ............................................................................................ 13

Cal. Civ. Code § 1589 ...................................................................................... 17, 18

Cal. Civ. Code § 1641 ............................................................................................ 15

## **OTHER AUTHORITIES**

1 Witkin, Summary of Cal. Law, Contracts § 143 (9th ed. 1987) .................................. 8

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

## I.     INTRODUCTION

Plaintiff Stephanie Clifford (aka Stormy Daniels) ("Plaintiff") filed this action seeking declaratory relief confirming she is not bound by any of the terms and conditions of a settlement agreement containing a mutual release and terms of non-disclosure, including the provision of the agreement providing for arbitration (the "Settlement Agreement" or "Agreement").  Defendant Essential Consultants, LLC's ("EC") current motion to compel arbitration, to which defendant Donald Trump ("Mr. Trump") "consents," is without merit for several reasons.

*First*, EC has no standing to bring this motion because the arbitration clause is between Plaintiff and "DD."  Further, DD (presumably Mr. Trump) has not met any threshold burden of demonstrating he is an actual party to the Agreement, or to the arbitration clause.

*Second*, paragraph 8.6 of the Settlement Agreement states that "this Agreement, **when signed by all Parties**, is a valid and binding agreement, enforceable in accordance with its terms" (emphasis added).  Mr. Trump, however, never signed the Agreement. The agreement was, therefore, never formed as a matter of law.  See <u>Roth v. Garcia Marquez</u>, 942 F.2d 617, 626 (9th Cir. 1991); <u>Banner Entertainment, Inc. v. Superior Court</u>, 62 Cal. App. 4th 348, 358 (1998).  Thus, there never was an agreement to arbitrate.

*Third*, the contract was a "Settlement Agreement" to resolve potential litigation between Mr. Trump and Plaintiff that required Mr. Trump to personally provide consideration to Plaintiff in the form of releases, and representations and warranties described as a "material inducement" to Plaintiff to enter into the Agreement.  As a result, Plaintiff's signature and her receipt of funds from EC are insufficient to form a contract. Without the essential consideration from Mr. Trump to Plaintiff, and further, without Mr. Trump's signature on the Agreement or any form of communicated assent to accept the obligations he owed to Plaintiff, no contract could have been created.

*Fourth*, EC's dubious attempt to argue that the use of the term "and/or" saves the agreement is devoid of merit.  To the contrary, courts have repudiated the use of the term

1  as creating rampant ambiguity.   Plaintiff also submits the declaration of Professor

2  Lawrence Solan, a leading expert in the field of linguistic analysis and the law, including

3  in the use of the terms "and" and "or" in legal writings.  Professor Solan concurs that the

4  term "and/or" as used in the Agreement leaves it unclear as to who the parties actually are

5  and causes too much uncertainty.   Moreover, as shown below, reading the Settlement

6  Agreement in its entirety leads to the inescapable conclusion that there can be no serious

7  dispute that Mr. Trump was a contemplated party to the Agreement.

8      Finally, Plaintiff demands a jury trial pursuant to 9 U.S.C. § 4 for a determination of

9  whether the Settlement Agreement (which contains the arbitration clause EC seeks to

10  enforce) was ever formed.   In addition, to meaningfully oppose this motion, Plaintiff

11  requires limited discovery, as set forth in Plaintiff's concurrently filed Renewed Motion

12  for Expedited Discovery.  Accordingly, before the Court issues a ruling on the motion, the

13  Court must first allow Plaintiff to conduct discovery and must conduct the trial.

14      For these reasons and the reasons stated below, Plaintiff respectfully requests that

15  the Court stay consideration of the motion to compel arbitration until after discovery is

16  complete and the completion of trial.  In the alternative, Plaintiff requests the Court deny

17  the motion to compel arbitration in its entirety.

18  ## II.    STATEMENT OF FACTS

19  ### A.    The Settlement Agreement

20      The Settlement Agreement is attached to the Declaration of Stephanie Clifford as

21  Exhibit 1.

22  ### B.    Mr. Cohen Claims Mr. Trump Had Nothing to Do With the Agreement.

23      As alleged in the FAC, Mr. Cohen is an attorney licensed in the State of New York.

24  [FAC, ¶16.]   Mr. Cohen worked as the "top attorney" at the Trump Organization from

25  2007 until after the election and presently serves as Mr. Trump's personal attorney.  [Id.]

26  He is also generally referred to as Mr. Trump's "fixer."  [Id.]  Mr. Cohen is also alleged to

27  have formed EC on October 17, 2016, just weeks before the 2016 presidential election and

28  11 days before he signed the Agreement.  [Id., ¶18; Cohen Decl., ¶3.]

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

1   On February 13, 2018, Mr. Cohen issued a statement that said in part: "In a private
2   transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to
3   Ms. Stephanie Clifford. Neither the Trump Organization nor the Trump campaign was a
4   party to the transaction with Ms. Clifford, and neither reimbursed me for the payment,
5   either directly or indirectly." [FAC, ¶27.]

6   On March 9, 2018, regarding the $130,000 payment, Mr. Cohen said "[t]he funds
7   were taken from my home equity line and transferred internally to my LLC account in the
8   same bank." [Declaration of Michael Avenatti ("Avenatti Decl."), Ex. 3.]

9   In a March 19, 2018 *Vanity Fair* article, Mr. Cohen again suggested Mr. Trump had
10  no knowledge of the Settlement Agreement or payment. [Avenatti Decl., Ex. 4.] In it, he
11  is quoted as saying: "What I did defensively for my personal client, and my friend, is
12  what attorneys do for their high-profile clients." [Id.] The article also states that Mr.
13  Cohen "claims that Trump did not know that he had paid Clifford the $130,000." [Id.]

14
15  ### C.  Mr. Trump and the White House Deny Any Involvement With the Settlement Agreement.

16  White House and campaign representatives purportedly speaking on Mr. Trump's
17  behalf, have denied that Mr. Trump had any knowledge of, or involvement with, the
18  Settlement Agreement. [See Avenatti Decl., Ex. 5.]

19  On April 5, 2018, Mr. Trump, making his first public comments regarding this
20  dispute, denied having knowledge of the $130,000 payment to Plaintiff under the
21  Settlement Agreement. [Avenatti Decl., Ex. 6.] Mr. Trump stated he did not know where
22  the money came from, denied setting up a fund from which Mr. Cohen could draw from to
23  make the payment, and directed reporters' questions to Mr. Cohen. [Id.]

24  ## III.  ARGUMENT

25
26  ### A.  Plaintiff's Assertion that No Agreement Was Formed Is an Issue For the Court to Decide.

27  EC argues that the initial question of whether an agreement exists at all is one for
28  the Court to decide, not an arbitrator. This position is devoid of merit.

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

1    "It is axiomatic that '[a]rbitration is a matter of contract and a party cannot be

2    required to submit any dispute which he has not agreed so to submit.'"   Sanford v.

3    MemberWorks, Inc., 483 F.3d 956, 962 (9th Cir. 2007) (quoting AT & T Techs., Inc. v.

4    Commc'ns Workers of Am., 475 U.S. 643, 648 (1986)).  Thus, "[t]he strong public policy

5    in favor of arbitration does not extend to those who are not parties to an arbitration

6    agreement."   Comedy Club, Inc. v. Improv W. Assocs., 553 F.3d 1277, 1287 (9th Cir.

7    2009) (citation omitted).  For this reason, although it is true that questions "regarding

8    the *validity* or *enforcement* of a putative contract mandating arbitration should be referred

9    to an arbitrator," this is not true for "challenges to the *existence* of a contract as a whole" -

10   which "must be determined ***by the court prior to ordering arbitration***."   Sanford, 483

11   F.3d at 962 (emphasis added); see also Three Valleys Mun. Water Dist. v. E.F. Hutton &

12   Co., 925 F.2d 1136, 1140–41 (9th Cir. 1991).[1]

13       Accordingly, challenges to the making of the arbitration agreement encompass "*not

14   only challenges to the arbitration clause itself, but also challenges to the making of the

15   contract containing the arbitration clause*."   Sanford, 483 F.3d at 962 (emphasis added).

16   Here, Plaintiff asserts the purported Settlement Agreement was never formed.  Under

17   Sanford and the case law cited above, this is an issue that must be decided in this Court.

18       The Ninth Circuit's recent decision in Casa del Caffe Vergnano S.P.A. v.

19   ItalFlavors, LLC, 816 F.3d 1208 (9th Cir. 2016) is instructive.  There, as here, the contract

20   at issue contained an arbitration clause.  Id. at 1211.  The Court explained that "the

21   threshold issue" for the Court "is whether that document constituted a binding agreement

22   at all."  Id.  "If it did not" then "it follows that the arbitration provision is not

23   enforceable."  Id.  The Court concluded that because the asserted agreement "was a mere

24

_____

25   [1] District Courts in this Circuit are in accord.  See, e.g., Doherty v. Barclays Bank

26   Delaware, No. 16-CV-01131-AJB-NLS, 2017 WL 588446, at *3 (S.D. Cal. Feb. 14,
     2017); Barraza v. Cricket Wireless LLC, No. C 15-02471 WHA, 2015 WL 6689396, at *3

27   (N.D. Cal. Nov. 3, 2015); Switch, LLC v. ixmation, Inc., No. 15-CV-01637-MEJ, 2015
     WL 4463672, at *3 (N.D. Cal. July 21, 2015) (same).

28

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

1    sham" and not enforceable, there was no agreement to arbitrate.  Id. at 1214.

2         Importantly, even though EC contends there is a presumption in favor of

3    arbitration, where as here, "the parties contest the *existence* of an arbitration agreement,

4    the presumption in favor of arbitrability does not apply."  Goldman, Sachs & Co. v. City

5    of Reno, 747 F.3d 733, 742 (9th Cir. 2014) (emphasis in original).

6         EC misapplies the "crux of the complaint" rule, arguing that Plaintiff's challenges

7    to the Settlement Agreement must be decided by the arbitrator. In doing so, EC

8    strategically conflates Plaintiff's challenge to the *formation* of the Settlement Agreement

9    with a challenge to the *validity* of the Settlement Agreement.[2]  The Supreme Court in

10   Buckeye Check Cashing, Inc. v. Cardegna, recognized that "[t]he issue of the contract's

11   *validity* is different from the issue of whether any agreement between the alleged obligor

12   and obligee *was ever concluded*.  Our opinion today addresses only the former, and does

13   not speak to the issue decided in the cases . . . ***which hold that it is for courts to decide***

14   ***whether the alleged obligor ever signed the contract***."  546 U.S. 440, 444 n. 1 (2006)

15   (emphasis added).  Indeed, the Supreme Court reaffirmed four years later that "where the

16   dispute at issue concerns contract formation, the dispute is generally for courts to decide."

17   Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 296 (2010).

18        **B.     EC Does Not Have Standing to Compel Arbitration.**

19        As a threshold matter, EC's motion should be denied because EC has no standing to

20   compel Plaintiff to arbitrate.  Simply put, the plain language of the arbitration clause

21   demonstrates there is no agreement to arbitrate between EC and Plaintiff.

22        Paragraph 5.2 of the Settlement Agreement, entitled "Dispute Resolution," contains

23   the arbitration clause.  It states, in relevant part:

24   _____

25   [2] For this reason, this Court's opinion in Guadagno v. E*Trade Bank, 592 F. Supp. 2d
26   1263 (C.D. Cal. 2008), is quoted out of context.   The Court indicated that challenges to
     the "validity" of the entire contract would be for the arbitrator, but made no ruling
27   suggesting that challenges to the "formation" or "existence" of a contract containing an
28   arbitration clause are for the arbitrator.  Id. at 1271.

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

1
2
3
4

> In recognition of the mutual benefits to **DD and PP** of a voluntary system of alternative dispute resolution which involves binding confidential arbitration of all disputes **which may arise between them**, it is their intention and agreement that any and all claims or controversies **arising between DD on the one hand, and PP on the other hand**, shall be resolved by binding confidential Arbitration to the greatest extent permitted by law.

5 [Agreement, ¶5.2 (emphasis added).]

6      Here, EC is not a party to the arbitration agreement nor is it even mentioned in the

7 arbitration clause.  "Generally, the contractual right to compel arbitration 'may not be

8 invoked by one who is not a party to the agreement and does not otherwise possess the

9 right to compel arbitration.'"  Kramer v. Toyota Motor Corp., 705 F.3d 1122, 1126 (9th

10 Cir. 2013)) (quoting Britton v. Co-op Banking Grp., 4 F.3d 742, 744 (9th Cir. 1993)); see

11 also Britton, 4 F.3d at 748 (non-party "lacked standing to enforce the arbitration clause.");

12 Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042, 1045 (9th Cir. 2009).  As a result, EC's

13 motion must be denied.

14
15

### C.    Mr. Trump Does Not Petition to Compel Arbitration and Has Not Met His Burden.

16      Because EC is the only moving party, Plaintiff cannot be compelled to arbitrate.

17 This is especially true because Mr. Trump has not filed *his own* motion to compel

18 arbitration.  Rather, Mr. Trump, through his counsel, merely filed a "joinder" in support of

19 EC's motion whereby he "consents."  [Dkt No. 21.]  This "joinder," however, does not

20 suffice under the record presently before the Court.

21      "A defendant seeking to compel arbitration has the burden of showing that an

22 agreement to arbitrate exists."  Guadagno v. E*Trade Bank, 592 F. Supp. 2d 1263, 1270

23 (C.D. Cal. 2008).  But Mr. Trump has failed to meet this burden.  The arbitration

24 agreement is between "DD" and "PP," but Mr. Trump has not submitted ***any*** evidence

25 demonstrating he is DD.  In addition, EC's motion argues that Mr. Trump is not a party to

26 Settlement Agreement.  [Dkt No. 20-1 at 7.]  In fact, Mr. Trump's counsel during meet

27 and confer discussions relating to this Motion refused to tell Plaintiff's counsel whether

28 Mr. Trump is a party.  [Avenatti Decl., ¶5.]  This alone is dubious and remarkable.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S MOTION TO COMPEL ARBITRATION**

1    Further, by failing to sign the Agreement or otherwise communicate his consent to

2    the Agreement, Mr. Trump failed to make himself a party to the Agreement—precluding

3    the very existence of the Agreement to begin with.  [See Agreement, ¶8.6; section III(D),

4    infra.]  Nor do EC or Mr. Trump contend that Mr. Trump should be deemed a third-party

5    beneficiary of the Settlement Agreement.  Mr. Trump, therefore, has not met his burden.

6        Moreover, as noted, Mr. Trump did not file his own motion to compel arbitration.

7    In fact, he merely "joins" in EC's motion, and, far from actually "*seeking*" to compel

8    arbitration, he states passively that he "consents" to arbitration (whatever that means).

9    The Federal Arbitration Act, however, requires more than merely "consenting" to

10   arbitration; a party aggrieved by another's failure to arbitrate under a written agreement

11   must "**petition** . . . for an order directing that such arbitration proceed in the manner

12   provided for in such agreement."  9 U.S.C. § 4 (emphasis added); Duferco Steel Inc. v.

13   M/V Kalisti, 121 F.3d 321, 326 (7th Cir. 1997) ("[B]ecause neither party petitioned the

14   district court for an order compelling arbitration, Duferco's contention that § 4 required

15   the district court to compel arbitration has no force."); cf. S.E.C. v. Daifotis, No. C 11-

16   00137 WHA, 2011 WL 3295139, at *6–7 (N.D. Cal. Aug. 1, 2011) (disallowing

17   defendant's "me too" joining in, and incorporation of, other defendant's brief).  Under the

18   facts of this case, this distinction carries substantive import.

19       Mr. Trump, therefore, should not be permitted to engage in a "shell game" before

20   this Court.  He should not be allowed to, on the one hand, invoke "plausible deniability"

21   by distancing himself from the Agreement and thereby avoid the myriad of consequences

22   of associating himself with the Agreement, while at the same time he attempts to enjoy the

23   possible benefits of that very Agreement he claims to have nothing to do with.

24   **D.    No Agreement Was Formed Because Mr. Trump Failed to Sign the**
25        **Agreement and Deliver the Promised Consideration to Plaintiff.**

26        **1.    No Agreement Exists Because Mr. Trump's Signature Was an**
27           **Express Condition to the Formation of the Agreement.**

28   The  well-settled  rule  in  California  is  that  "'[i]f  the  evidence  shows  that  the

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

1  signatures of other parties were required as one of the conditions of the completed

2  agreement, it is incomplete and not binding upon those who sign until the others sign.'"

3  Roth v. Garcia Marquez, 942 F.2d 617, 626 (9th Cir. 1991) (quoting 1 Witkin, Summary

4  of Cal. Law, Contracts § 143 (9th ed. 1987))).  Stated differently, "[w]hen it is clear, both

5  from a provision that the proposed written contract would become operative *only* when

6  signed by the parties as well as from any other evidence presented by the parties that both

7  parties contemplated that acceptance of the contract's terms would be signified by signing

8  it, the failure to sign the agreement means no binding contract was created."  Banner

9  Entertainment, Inc. v. Superior Court, 62 Cal. App. 4th 348, 358 (1998).   This rule is

10  repeatedly, and routinely, applied by the Ninth Circuit,[3] District Courts in California,[4] and

11  California appellate courts.[5]

12

13  [3] Roth, 942 F.2d at 626–27 (agreement not binding where author's signature was a
     condition precedent); PSM Holding Corp. v. Nat'l Farm Fin. Corp., 339 F. App'x 693, 695
14  (9th Cir. 2009) (where "plain terms of the agreement dictate that no contract was formed
     because the signature lines for" various parties "were left blank[,]" holding that "none of
15  the parties could be liable under its terms.").

16  [4] Ortiz v. America's Servicing Co., No. EDCV 12-191 CAS SPX, 2012 WL 2160953, at
17  *3 (C.D. Cal. June 11, 2012) ("[W]hen it is clear that the proposed written contract would
     become operative only when signed by the parties, the failure to sign the agreement
18  means no binding contract was created.") (quoting Grill v. BAC Home Loans Servicing
19  LP., No. 10-CV-03057-FCD/GGH, 2011 WL 127891, at *3 (E.D. Cal. Jan. 14, 2011));
     J.B. Enterprises Int'l, L.L.C. v. Sid & Marty Krofft Pictures Corp., No. CV 02-7779 CBM
20  (SHX), 2003 WL 21037837, at *2 (C.D. Cal. Mar. 3, 2003) ("When the parties
21  contemplate that acceptance of a contract's terms would be signified in writing, no
     binding contract is created when the parties fail to sign the agreement."); Los Angeles
22  Rams Football Club v. Cannon, 185 F. Supp. 717, 721-22 (S.D. Cal. 1960) (no contract
23  based on express condition requiring Commissioner approval where he did not sign).

24  [5] Rebolledo v. Tilly's, Inc., 228 Cal. App. 4th 900, 923 (2014) (modification to original
25  employment agreement signed by employee was unenforceable because it did not, as
     required, contain the signatures of three of the employer's executives); Romo v. Y–3
26  Holdings, Inc., 87 Cal. App. 4th 1153, 1159–60 (2001) (affirming denial of motion to
27  compel arbitration where employee handbook containing the arbitration agreement
     contemplated signature from the employee and employee did not sign); Khajavi v. Feather
28  River Anesthesia Med. Grp., 84 Cal. App. 4th 32, 61–62 (2000) ("[W]here the parties
     Continued on the next page

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

1    Here, the Settlement Agreement is unequivocal: "**Each of the Parties represents**

2    **and warrants . . . that this Agreement, <u>when signed by all Parties</u>, is a valid and**

3    **binding agreement, enforceable in accordance with its terms.**"   [Agreement, ¶8.6

4    (emphasis added).]  Despite this clear requirement, neither the Settlement Agreement nor

5    the Side Letter Agreement were signed by Mr. Trump.

6    In fact, execution of the Settlement Agreement and Side Letter Agreement was

7    deemed so important, it is repeatedly mentioned throughout both documents, including in

8    paragraph 4.3.2 which contains an "express acknowledgment that DD is *executing* this

9    Agreement in reliance on" certain agreements, warranties and representations.  [See <u>also</u>

10   Agreement, ¶¶3.3 (requiring delivery of property "[c]oncurrently upon **execution** of this

11   Agreement . . ."), 4.3(a) ("[E]ach Party acknowledges that she/he is **executing** this

12   Agreement" in reliance on certain "agreements, warranties, and representations . . . made

13   by DD . . ."), p. 14 ("IN WITNESS WHEREOF, by *their signatures* below, the Parties

14

Continued from the previous page

15   understood that the proposed agreement is not complete until reduced to formal writing

16   and signed, no binding contract results until this is done."); <u>Beck v. American Health</u>, 211

17   Cal. App. 3d 1555, 1562 (1989) ("[W]here it is part of the understanding between the

     parties that the terms of their contract are to be reduced to writing and signed by the

18   parties, the assent to its terms must be evidenced in the manner agreed on or it does not

19   become a binding or a completed contract."); <u>Duran v. Duran</u>, 150 Cal. App. 3d 176, 180

     (1983) (same); <u>De Mott v. Amalgamated Meat Cutters & Butcher Workmen of N. Am.</u>,

20   157 Cal. App. 2d 13, 25 (1958) ("When an agreement is signed and handed over with the

21   understanding that it will not be used or become operative until it is signed by another

     who is expected to join therein, it does not become a contract until the additional signature

22   has been obtained."); <u>Am. Aeronautics Corp. v. Grand Cent. Aircraft Co.</u>, 155 Cal. App.

23   2d 69, 80 (1957) ("[W]hen it is a part of the understanding between the parties that the

     terms of their contract are to be reduced to writing and signed by the parties, the assent to

24   its terms must be evidenced in the manner agreed upon, or it does not become a binding or

25   completed contract."); <u>Lyne v. Bonner</u>, 129 Cal. App. 2d 743, 746 (1954) (contract signed

     by three of four owners not binding on any of the owners); <u>Helperin v. Guzzardi</u>, 108 Cal.

26   App. 2d 125, 128 (1951) ("When an agreement is signed and handed over with the

27   understanding that it will not be used or become operative until it is signed by another

     who is expected to join therein, it does not become a contract until the additional signature

28   is obtained.")

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

1    each have approved and executed this Agreement as of the effective date first set forth

2    above."); Side Letter Agreement, p. 2 ("By *signing* below, *each* of the Parties signifies

3    their agreement to the terms hereof and each of their respective counsel signify their

4    approval as to the form of this letter agreement.").]

5         The circumstances here are thus strikingly similar to <u>Banner</u> and <u>Roth</u>, and are

6    indistinguishable from the litany of cases cited above.  In short, Mr. Trump's failure to

7    sign the Settlement Agreement is fatal and ends the Court's inquiry.  No contract was ever

8    formed, and hence, there is no agreement to arbitrate.

9         EC's reliance on <u>Kaneko v. Okuda</u>, 195 Cal. App. 2d 217 (1961), is unavailing.

10   Indeed, the very excerpt quoted by EC states "*[i]n the absence of a showing that a*

11   *contract is not to be deemed complete unless signed by all parties*, the parties signing may

12   be bound though others have not signed."  <u>Id.</u> (emphasis added).  Here, unlike the

13   defendants in <u>Kaneko</u>, Plaintiff *has* made such a showing - Paragraph 8.6 of the

14   Agreement clearly provides that no agreement is formed unless signed by all parties.

### 2.    Mr. Trump Was Incapable of Consenting to a Contract Which Imposed Duties on Him That He Was Supposedly Unaware Of.

17        "[T]here is no contract until there has been a meeting of the minds on all material

18   points."  <u>Banner</u>, 62 Cal. App. 4th at 357–58.  Consent is an essential element of a

19   contract.  Cal. Civ. Code § 1550.  The "failure to reach a meeting of the minds on all

20   material points prevents the formation of a contract *even though the parties have orally*

21   *agreed upon some of the terms, or have taken some action related to the contract.*"

22   <u>Bustamante v. Intuit, Inc.</u>, 141 Cal. App. 4th 199, 215 (2006) (emphasis in original).

23   "Further, the consent of the parties to a contract must be communicated by each party to

24   the other."  <u>Esparza v. Sand & Sea, Inc.</u>, 2 Cal. App. 5th 781, 788 (2016) (citing Cal. Civ.

25   Code §1565(3)).    Consequently, "where the parties to a 'contract' have not

26   mutually consented to be bound by their agreement, they have not formed a true contract."

27   <u>Casa del Caffe</u>, 816 F.3d at 1212.

28        Here, the fundamental element of consent cannot exist. If Mr. Trump and Mr.

1   Cohen are to be believed (a matter that will have to be tested in discovery), Mr. Trump
2   never consented to the Settlement Agreement because he never even knew about it. And
3   further, without knowledge of the Agreement and his obligations under the Agreement, he
4   could not have possibly communicated his consent. See Esparza, 2 Cal. App. 5th at 788.
5   Indeed, if he knew nothing about the Agreement, Mr. Trump could not have possibly
6   consented to provide the consideration he owed to Plaintiff.

7        EC's signature on the Settlement Agreement is insufficient to create a contract for
8   several reasons. *First*, as argued above, the signature of all parties was an express
9   condition of the contract. *Second*, nothing in the contract indicates that EC was acting as
10  Mr. Trump's agent (nor do EC or Mr. Cohen argue that they were acting as such). EC is
11  described as a separate party to the Agreement and, more to the point, if Mr. Trump did
12  not even know about the Agreement or the payment, then no such agency could have been
13  created. *Third*, and perhaps most important, Mr. Trump is not a passive third-party
14  beneficiary of the Settlement Agreement.[6] To the contrary, Mr. Trump *is a party* who was
15  required to deliver material consideration to Plaintiff. Specifically:

16  •   As the title indicates, the contract is a "Settlement Agreement and Mutual Release"
17      which recognizes the parties' desire to avoid "potential litigation" and defines
18      potential claims of Plaintiff *and* of Mr. Trump as the "PP Claims" and the "DD
        Claims," respectively. [Agreement, ¶¶2.2(a), 2.2(b), 2.5.]

19  •   Mr. Trump was required to release Plaintiff of liability for the "DD Claims."
20      Specifically, paragraph 6.1 of the Agreement states in part that: "DD . . . discharges
21      PP . . . from any and all claims, . . . actions and causes of actions of every kind and

22  _____
    [6] EC does not argue it was Mr. Trump's agent, or that Mr. Trump is a third-party
23  beneficiary, and Plaintiff would object to any such argument being introduced for the first
    time on Reply. Indeed, any arguments Defendants have failed to raise in their moving
24  papers must be deemed waived. Estakhrian v. Obenstine, 320 F.R.D. 63, 91 (C.D. Cal.
    2017) (argument not raised in opening brief was waived). Further, a "third-party
25  *beneficiary* is not a third-party *obligor*." Comer v. Micor, Inc., 278 F.Supp.2d 1030, 1041
    (N.D. Cal. 2003) (emphasis in original) (citing Abraham Zion Corp. v. Lebow, 761 F.2d
26  93, 103 (2d Cir.1985) (holding agreement could not be enforced against alleged third-
    party beneficiary of agreement); Motorsport Eng'g, Inc. v. Maserati SPA, 316 F.3d 26, 29
27  (1st Cir. 2002) ("But the third-party beneficiary, who did not sign the contract, is not
    liable for either signatory's performance and has no contractual obligations to either.")
28  Here, Mr. Trump owed affirmative obligations to Plaintiff and thus was an intended *party*,
    and not a third-party beneficiary.

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

nature whatsoever, . . . from the beginning of time to the effective date of this Agreement . . .”

- Mr. Trump's release obligations are reinforced earlier in the Agreement: “[t]he Parties agree that the claims released include but are not limited to DD's claims against PP” relating to disclosure of certain property to others and includes a release from “any harm suffered by DD therefrom.” [Agreement, ¶2.5.] This provision, along with others, is described as “essential, integral, and material terms of this Agreement.” [Agreement, ¶2.6.]

- Mr. Trump was also obligated to provide certain representations and warranties to Plaintiff, along with a covenant not to sue. Paragraph 4.3(a) of the Agreement is titled “<u>Representations & Warranties & Agreements By DD</u>” and acknowledges “agreements, warranties and representations made by DD[.]”

- Specifically, pursuant to paragraph 4.3(b) of the Agreement:

    DD warrants and represents that, as relates to or in connection with any of PP's attempts to sell, exploit and/or disseminate the Property <u>prior</u> to the date of this Agreement, DD and his counsel will refrain (i) from pursuing any civil action against PP, and/or (ii) absent a direct inquiry from law enforcement, from disclosing PP's name to the authorities.

- Paragraph 4.3(a) states that the paragraph 4.3(b) “agreements, warranties and representations **are made by DD <u>as material inducements to PP</u> to enter into this Agreement, and each Party acknowledges that she/he <u>is executing this Agreement in reliance thereon</u>[.]”** [Agreement, ¶4.3(a) (emphasis added).]

In sum, the necessity of Mr. Trump's consent to the Settlement Agreement, and his express agreement to accept the obligations imposed on him, are self-evident.[7]   No agreement, therefore, was ever formed. EC's motion must be denied.

### 3.   EC's Argument Regarding Adequacy of Consideration Is Irrelevant to this Motion.

EC contends that Plaintiff received adequate consideration under the Settlement Agreement by her receipt of $130,000 for EC. EC's argument is a red herring. The relevant issue is not whether $130,000 is sufficient consideration to support a *hypothetical*

---

[7] Nor can Mr. Trump argue that the $130,000 payment was a communication of his acceptance of his obligations under the Agreement. *According to Mr. Trump, the payment was made by EC*, not Mr. Trump. [Agreement, ¶3.0.1.1.]

1   *contract* between Plaintiff and EC.  That is not the contract Plaintiff understood she was

2   entering into when she signed the Settlement Agreement.  [Clifford Decl., ¶5.]  Rather, the

3   real question is whether Plaintiff received the consideration she actually bargained for

4   under the Settlement Agreement—namely, the releases, representations and warranties,

5   and covenant not to sue, from Mr. Trump.  Recognizing she did not, EC asks the Court to

6   ignore the Settlement Agreement and rewrite it to create a new contract.  But Clifford

7   cannot be bound to an entirely different contract than the one she assented to simply

8   because she received *something*.

9
    **E.    The Presence of the Term "And/Or" in the Agreement in Connection
10           With the Parties Does Not Save the Agreement.**

11          Under California law, "[i]t is essential not only that the parties to [a] contract *exist*,

12   but that it is possible to identify them."  Jackson v. Grant, 890 F.2d 118, 121 (9th Cir.

13   1989) (citing Cal. Civ. Code § 1558).  Here, the Settlement Agreement is unintelligible as

14   to the intended parties to the Agreement.  Thus, no valid contract was formed.

15          Paragraph 1.1 of the Settlement Agreement states, in part, the following:

16                 This Settlement Agreement and Mutual Release . . . is made . . . by and
17                 between "EC, LLC" and/or DAVID DENNISON, (DD), on the one part, and
                   PEGGY PETERSON, (PP), on the other part.  ("EC, LLC," "DD" and "PP"
18                 are pseudonyms whose true identity will be acknowledged in a Side Letter
19                 Agreement attached hereto as "EXHIBIT A")

20          "The expression 'and/or' . . . has met with widespread condemnation."  Ex parte

21   Bell, 19 Cal. 2d 488, 499 (1942).[8]  Accordingly, the use of "and/or" gives "rise to

22
    _____

23   [8] See also Herbert H. Post & Co. v. Sidney Bitterman, Inc., 219 A.D.2d 214, 223, 639
24   N.Y.S.2d 329 (1996) (the "use of 'and/or' has been roundly condemned as a 'deliberate
     amphibology, susceptible of more than one interpretation and . . . a purposefully
25   ambiguous expression, useful in its self-evident equivocality.'") (citation and quotation
     omitted); Bank Bldg. & Equip. Corp. of Am. v. Georgia State Bank, 132 Ga. App. 762,
26   765, 209 S.E.2d 82, 84 (1974) (same); Ollilo v. Clatskanie Peoples' Util. Dist., 170 Or.
27   173, 180, 132 P.2d 416, 419 (1942) ("Courts struggle with 'and/or' to determine what it
     means and generally end in bewilderment.").
28

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

multiple meanings" and "it can mean either or it can mean both." <u>Dinkins v. Am. Nat'l Ins. Co.</u>, 92 Cal. App. 3d 222, 232 (1979), <u>disapproved of on other grounds by</u> <u>Moore v. Am. United Life Ins. Co.</u>, 150 Cal. App. 3d 610 (1984).  In <u>California Shipbuilding Corp. v. Indus. Acc. Comm'n</u>, 85 Cal. App. 2d 435, 436 (1948), for example, the Court held that the use of the words "and/or" in an order of a public commission rendered the commission's finding and award in favor of the employee "indefinite, uncertain and unintelligible" because there was no way of determining if the finding was against the employer, the managing representative, or both.  Similarly, in <u>Main Line Pictures, Inc. v. Basinger</u>, the Court held that a special verdict in favor of the plaintiff against "Basinger and/or Mighty Wind" are "prejudicially ambiguous and require reversal" because it was unclear whether the jury found that the contract at issue was breached by the actress Kim Basinger, her "loan-out" corporation Mighty Wind, or both.  No. B077509, 1994 WL 814244, at *6 (Cal. Ct. App. Sept. 22, 1994).[9]

Plaintiff also proffers the declaration of Professor Lawrence Solan.  [Declaration of Lawrence Solan ("Solan Decl."), ¶1.]  Professor Solan is a leading expert in the field of linguistic analysis and the law and is the author of the book *The Language of Judges* in which he devotes a section discussing issues that arise concerning the interpretation of the words "and" and "or."   [<u>Id.</u>, ¶¶2-6.]  According to Professor Solan, "and/or" leads to "interpretive problems" and, as used in the Agreement, "it is not clear who the parties actually are."  [<u>Id.</u>, ¶11.]  He explains that "read alone," paragraph 1.1 "causes too much uncertainty and ambiguity" and makes it "necessary to examine other provisions in the Agreement."  [<u>Id.</u>, ¶13.]  He concludes these provisions taken together "strongly imply that DD was intended to be understood to be a party to the Agreement."  [<u>Id.</u>, ¶15.]

Here, *read in isolation*, the plain language of paragraph 1.1 provides *no clarity* on who the parties are to the Settlement Agreement.  By stating that the agreement is "by and

---

[9] District courts may rely on California unpublished decisions as "persuasive authority."  <u>See</u> <u>CPR for Skid Row v. City of Los Angeles</u>, 779 F.3d 1098, 1117 (9th Cir. 2015).

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

1   between 'EC, LLC' and/or DAVID DENNISON, (DD), on the one part," the Agreement

2   leaves open the question of whether (1) only EC, (2) only Mr. Trump, or (3) both EC *and*

3   Mr. Trump are intended parties.  Indeed, the Agreement does not specify that EC (or any

4   individual party for that matter) holds the option of deciding who is a party, and who is

5   not a party, to the Agreement.  Significantly, DD and David Dennison's signature lines

6   and identities are not crossed out on the Settlement Agreement or Side Letter Agreement.

7   Moreover, although the Settlement Agreement states that the true identities of "EC, LLC,"

8   "DD," and "PP" are revealed in the Side Letter Agreement, the Side Letter Agreement

9   itself compounds the hopeless ambiguity of the identity of the parties because there is no

10  signature from Mr. Trump confirming that he is the "David Dennison" and "DD"

11  identified in the Settlement Agreement.  Nor does the Side Letter Agreement, which

12  provides that it is "deemed part of" the Settlement Agreement by way of amendment, use

13  the term "and/or" to describe the parties.  Instead, it lists *all three parties* while repeatedly

14  using the term "the Parties."  Importantly, Plaintiff understood at all times that Mr. Trump

15  was an intended party of the Settlement Agreement.  [Clifford Decl., ¶6.]

16        **In any event, paragraph 1.1 cannot be read in isolation**.  Rather, it is a well-

17  settled rule of contract interpretation that the "whole of a contract is to be taken together,

18  so as to give effect to every part, if reasonably practicable, each clause helping to interpret

19  the other."  Cal. Civ. Code § 1641; see also In re Captain Blythers, Inc., 311 B.R. 530,

20  536 (B.A.P. 9th Cir. 2004) ("[U]nder California law, 'one phrase of a contract should not

21  be interpreted so as to render another phrase of the contract meaningless'"); Monterey

22  Bay Unified Air Pollution Control Dist. for People of State of California v. U.S. Dep't of

23  Army, 176 F. Supp. 2d 979, 988 (N.D. Cal. 2001) (settlement agreement like any contract

24  "must be interpreted as a whole.").

25        Applying this rule of contract interpretation to the Settlement Agreement, EC's

26  attempted construction to exclude Mr. Trump as a party negates large, essential portions

27  of the Agreement and the consideration Plaintiff was to receive under the contemplated

28  agreement had it been finalized.  As noted above, Mr. Trump was required to provide to

PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION

1    Plaintiff releases, representations and warranties, and a covenant not to sue.  [Agreement,
2    ¶¶2.2, 2.5, 2.6, 4.3(a), 4.3(b), 6.1.]  Mr. Trump's releases were among "essential, integral
3    and material terms" of the Settlement Agreement [Agreement, ¶¶2.5-2.6], and the
4    representations and warranties made by Mr. Trump were "*material inducements*" to
5    Plaintiff to enter into the Settlement Agreement.  [Agreement, ¶4.3(a) (emphasis added).]
6    The presence of these provisions is inconsistent with the notion that Mr. Trump was not
7    intended to be a party to the Settlement Agreement.  Nothing in the Agreement suggests
8    that this essential consideration could be supplied by EC rather than Mr. Trump.

9        As further evidence that Mr. Trump is an intended party of the Settlement
10   Agreement, the Settlement Agreement also contemplates that Mr. Trump is a party by
11   acknowledging throughout the Agreement that he is "entering" into the Agreement.
12   [Agreement, ¶¶2.4, 4.3.2, 4.3.3.]  The Agreement also grants remedies and enforcement
13   rights *exclusively* to Mr. Trump, including the right to seek damages, obtain injunctive
14   relief, and (as discussed above) to enforce the arbitration clause.  [Id., ¶¶5.1-5.2.]  *None of*
15   *these rights are conferred upon EC*.  Further, all duties Plaintiff is contemplated to owe
16   under the Settlement Agreement extend only from Plaintiff to Mr. Trump.  [See, e.g.,
17   Agreement, ¶¶3.1, 3.2, 3.3, 4.3.2, 4.3.6.]  No obligations are owed to EC.  Nor is EC
18   granted any rights or authorities to take action, or receive consideration, on behalf of Mr.
19   Trump.  ***In fact, EC is mentioned by name only six (6) times in the Settlement***
20   ***Agreement, whereas Mr. Trump (i.e., "DD") is mentioned over 130 times.***

21       In sum, the only rational interpretation of the plain text of the Settlement
22   Agreement is that the Agreement could not possibly exist without Mr. Trump and that he
23   is therefore an intended party who was required to sign the Agreement for it to have been
24   finalized.  At the very minimum, the Agreement is vague as to the identity of the parties.
25   For these additional reasons, no contract was formed in this case and thus, there is no
26   agreement to arbitrate.  EC's motion should be denied.

27       **F.    Plaintiff's Signature on the Settlement Agreement and Her Acceptance**
              **of Funds Did Not Create a Contract.**
28

PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION

1    EC argues that Plaintiff's signature on the Settlement Agreement, her acceptance of

2    the $130,000 payment, and her refraining from filing suit until March 2018 were sufficient

3    to create a contract.  EC's contentions are without merit for several reasons.

4    *First*, EC's argument ignores the indisputable fact that the Settlement Agreement

5    called upon Mr. Trump himself to provide additional consideration to Plaintiff *above and*

6    *beyond* the $130,000 payment from EC.  [Agreement, ¶¶2.2, 2.5, 2.6, 4.3(a), 4.3(b), 6.1.]

7    In other words, the purpose of the Settlement Agreement was to resolve potential

8    litigation, not simply to pay money to Plaintiff.  Because Mr. Trump never completed the

9    Agreement by providing his signature on the Agreement, no contract came into existence.

10    *Second*, EC ignores the express condition of the Settlement Agreement requiring

11    Mr. Trump to sign the Agreement.  [See Agreement, ¶8.6.]  This ends the inquiry.  EC

12    cannot point to mere conduct to circumvent the plain language of the Agreement, and

13    further, cannot point to any case law where a court has cast aside an express condition

14    requiring signature even where acts of performance or conduct are shown.  In fact, the

15    very same argument advanced by EC was rejected in J.B. Enterprises, 2003 WL

16    21037837.  There, the letter of intent at issue explicitly stated that the obligation to

17    complete a stock purchase would only arise upon the signing of a purchase agreement.

18    The Court thus concluded that "[t]he parties never executed the Purchase Agreement and

19    they are not bound by the terms of the draft agreement.  *The Krofft Group may not look to*

20    *the parties' conduct to imply that the Letter of Intent contains an obligation that*

21    *contradicts the express language of the Letter of Intent.*"  Id. at *3 (emphasis added); see

22    also PSM Holding, 339 F. App'x at 694 ("The extrinsic evidence regarding the parties'

23    behavior . . . cannot substitute the parties' signatures on the agreement."); Davison v.

24    Stephens Inst., No. A138953, 2014 WL 6654690, at *5 (Cal. Ct. App. Nov. 24, 2014) (the

25    defendant's "mere acts of performance" of "allowing [the plaintiff] to teach and paying

26    him—cannot validate the agreements without the required signature.")

27    *Third*, EC's reliance on California Civil Code section 1589 is misplaced.  Section

28    1589 states that "[a] voluntary acceptance of the benefit of a transaction is equivalent to a

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

1   consent to all the obligations arising from it, *so far as the facts are known, or ought to be*

2   *known, to the person accepting."*   Cal. Civ. Code § 1589 (emphasis added).   EC

3   conveniently ignores the italicized portion of the statute.   Here, Plaintiff understood that

4   she was entering into a contract with Mr. Trump, was unaware that Mr. Trump did not

5   sign the agreement, and had no idea that Mr. Trump would later claim that he was not a

6   party.   [Clifford Decl., ¶¶5-6.]   Thus, it was not "known" to Plaintiff that Mr. Trump

7   would take the position that he is not a party to the Settlement Agreement.   That he now

8   so claims *after the fact* is no different from EC and Mr. Trump attempting to introduce

9   *new* terms of the Agreement that Plaintiff never consented to.   See, e.g., Robinson v.

10  OnStar, LLC, No. 16-56412, 2018 WL 1323630, at *1 (9th Cir. Mar. 15, 2018) (applying

11  section 1589 and reversing district court decision dismissing complaint pursuant to

12  arbitration clause because the plaintiff cannot be deemed to have accepted additional

13  terms and conditions after activation of subscription); Knutson v. Sirius XM Radio Inc.,

14  771 F.3d 559, 566 (9th Cir. 2014); Perez v. DirecTV Grp. Holdings, LLC, 251 F. Supp. 3d

15  1328, 1340 (C.D. Cal. 2017).

16      *Fourth*, EC's reliance on Plaintiff's "subsequent conduct" is also unavailing.

17  Plaintiff's conduct was based on the understanding that Mr. Trump was a party to the

18  Settlement Agreement, which included his obligations to provide consideration to

19  Plaintiff.   Reliance on conduct to interpret a contract requires that "such acts must be

20  direct, positive, and deliberate, and must show that the acts so done were done in an

21  attempted compliance with the terms of the contract or agreement."   Barnhart Aircraft v.

22  Preston, 212 Cal. 19, 24–25 (1931).   Relying on this principle, the Ninth Circuit rejected

23  the argument that conduct supported the defendant's interpretation of a contract involving

24  music royalties where the plaintiff received statements for years, but only became aware

25  the parties were not interpreting the contract in the same manner after the statements were

26  audited.   See F.B.T. Prods., LLC v. Aftermath Records, 621 F.3d 958, 966-67 (9th Cir.

27  2010); see also Evox Prods. LLC v. Kayak Software Corp., No. CV15-5053 PSG

28  (AGRX), 2017 WL 5634858, at *7 (C.D. Cal. Apr. 4, 2017) (post-contract conduct did not

-18-

1    support defendant's interpretation when plaintiff was unaware of defendant's breach).

2       *Finally*, EC's proposed handling of the Settlement Agreement is ill equipped to

3    address a very important problem: If Plaintiff's acceptance of the $130,000 and her

4    signature created a binding settlement agreement exclusively between Plaintiff and EC

5    (and not Mr. Trump or DD), what exactly are the terms of *that* agreement?  In other

6    words, if Mr. Trump is not a party to the agreement, then which parts, if any, of the

7    Settlement Agreement survive?  As noted above, EC's only role in the Settlement

8    Agreement was payment of the $130,000.  EC has no rights of enforcement.  EC is not

9    entitled to seek remedies.  EC is not a party to the arbitration clause.  Further, the

10    "Settlement Agreement" is to resolve potential litigation between Plaintiff and Mr. Trump,

11    *not* between Plaintiff and EC.  Moreover, EC does not claim (nor can it claim) that it was

12    Mr. Trump's agent, that it was authorized to provide releases, and representations and

13    warranties, on behalf of Mr. Trump, or that the Agreement was structured to make Mr.

14    Trump a beneficiary as opposed to a contracting party.[10]

### G.    Defendants' Position that Mr. Trump Was Not a Contemplated Party Constitutes Fraud in the Execution Rendering the Agreement Void.

17       "California law distinguishes between fraud in the 'execution' or 'inception' of a

18    contract and fraud in the 'inducement' of a contract."  <u>Duick v. Toyota Motor Sales,</u>

19    <u>U.S.A., Inc.</u>, 198 Cal. App. 4th 1316, 1320 (2011).  "Fraud in the inception" as opposed to

20    fraud in the inducement, "will render a contract 'wholly void, despite the parties' apparent

21    assent to it, when, '*without negligence on his part,* a signer attaches his signature to a

22    paper assuming it to be a paper of a different character.'"  <u>Id.</u> at 1321 (emphasis in

23    original).  "[C]laims of fraud in the execution of the entire agreement are not arbitrable

---

25    [10] To the extent the Court finds it relevant to its analysis, Plaintiff notes that although not

26    ripe for the Court on the present motion (and not raised by the pleadings in the case), Plaintiff makes no argument that she is entitled to *both* a judgment declaring the

27    Settlement Agreement void *and* retention of the $130,000 payment.  Plaintiff is thus

28    prepared to return the money if so ordered by the Court.

**PLAINTIFF'S OPPOSITION TO DEFENDANT ESSENTIAL CONSULTANTS, LLC'S
MOTION TO COMPEL ARBITRATION**

1  under either state or federal law" because if "the entire contract is void *ab initio* because

2  of fraud, the parties have not agreed to arbitrate any controversy." Rosenthal v. Great W.

3  Fin. Sec. Corp., 14 Cal. 4th 394, 416 (1996); see also DKS, Inc. v. Corp. Bus. Sols., Inc.,

4  675 F. App'x 738, 739 (9th Cir. 2017) (affirming denial of motion to compel arbitration

5  based on allegation that the contract was void due to fraud in the execution.).

6        Here, Plaintiff believed, and was led to believe, that the contemplated Agreement

7  was between herself and Mr. Trump to settle possible claims between the two of them.

8  [Clifford Decl., ¶¶5-6.]  This understanding was, as discussed above, reasonable based on

9  the language of the document itself and the promises and consideration offered therein.

10  Indeed, the Agreement itself specifically represents that Mr. Trump makes certain

11  warranties and promises, and provides releases to Plaintiff, which would necessarily

12  imply that he is a party to the Agreement.

13        To the extent that EC now seeks to seize upon the ambiguity of the use of "and/or"

14  to allow Mr. Trump to evade association with the contemplated Settlement Agreement,

15  the Agreement was plainly drafted "in such a way as to conceal from [Plaintiff] the true

16  nature" of the document and the fact that EC either had no authority to bind Mr. Trump or

17  that Mr. Trump was not in fact releasing any potential claims against Plaintiff. Duick,

18  198 Cal. App. 4th at 1322.  Consequently, a fraud was committed against Plaintiff and the

19  alleged agreement is void along with any arbitration clause contained therein. Id.

20  **IV.    CONCLUSION**

21        For the reasons set forth above, Plaintiff respectfully requests that the Court stay

22  consideration of EC's Motion to Compel Arbitration (to which Mr. Trump "consents") to

23  allow the completion of discovery and the FAA section 4 jury trial.  In the alternative,

24  Plaintiff requests the Court deny EC's motion (in which Mr. Trump joins) in its entirety.

25  Dated:  April 9, 2018                    AVENATTI & ASSOCIATES, APC

26                                          By:  _____/s/ Michael J. Avenatti_____

27                                              Michael J. Avenatti
                                                Ahmed Ibrahim
                                                Attorneys for Plaintiff Stephanie Clifford
28                                              a.k.a. Stormy Daniels a.k.a. Peggy Peterson

# Exhibit 6



Remarks

# Remarks by President Trump in Press Gaggle en route Washington, D.C.

Issued on: April 5, 2018

- Share:
- 
- 

- 

Aboard Air Force One

En Route Washington, D.C.

4:22 P.M. EDT

THE PRESIDENT:  (In progress) — very happy.  Thought it was really great.

Q    How are you feeling about Scott Pruitt, Mr. President?  Is he —

THE PRESIDENT:  I think he's done a fantastic job at EPA.  I think he's done an incredible job.  He's been very courageous.  Hasn't been easy, but I think he's done an absolutely fantastic job.  I think he'll be fine.

Q    (Inaudible.)

THE PRESIDENT:  I think he'll be fine.  Yeah, I want to look at it.  I haven't seen the details, but I can tell you, at EPA he has done a fantastic job.

Q    Are you bothered by the reports about him, sir?

THE PRESIDENT:  On Scott?

Q    Yeah.

THE PRESIDENT:  Who's saying that?  I have to look at it, and close.  You know, I hear different versions of it.  But I'll make that determination.

But he's a good man.  He's done a terrific job.  But I'll take a look at it very closely.

Q    What did you think of his interview?

THE PRESIDENT:  You know, I didn't — with Ed Henry?

Q    Yes.

THE PRESIDENT:  Which one?  Ed Henry?

Q    Yes.  With Fox.

THE PRESIDENT:  It's an interesting interview.  (Laughs.)

Q    Are you thinking about switching him out for Attorney General?

THE PRESIDENT:  No, no.  No, Scott is doing a great job where he is.

Q    How many National Guard do you want to see at the border?

THE PRESIDENT:  Anywhere from 2,000 to 4,000.  We're looking at a combination of from 2,000 to 4,000.  We're moving that along.

Q    How much do you think that's going to cost?

THE PRESIDENT:  We're looking at it, but, I mean, I have a pretty good idea.  But it depends on what we do.  But we're looking from 2,000 to 4,000.  And we'll probably keep them, or a large portion of them, until such time as we get the wall.

Did you enjoy the roundtable?  A little different, right?

Q    (Inaudible) — about Amazon.  You've been tweeting a lot about that.  Are you going to actually take some action to change the law that would affect Amazon?

THE PRESIDENT:  Well, Amazon is just not on an even playing field.  You know, they have a tremendous lobbying effort, in addition to having The Washington Post, which is, as far as I'm concerned, another lobbyist.  But they have a big lobbying effort.  One of the biggest, frankly.  One of the biggest.  And it's — you know, what they have is a very uneven playing field.  You look at the sales tax situation — which is going to be taken up, I guess, very soon — it's going to be a decision by the Supreme Court.  So we'll see what happens.

The Post Office is not doing well with Amazon, that I can tell you.  But we're going to see what happens.  The playing field has to be level for everybody.  That's very important.

Q    Would you like to make changes to make that level playing field?

THE PRESIDENT:  Well, I'm going to study it and we're going to take a look.  We're going to take a very serious look at that.  But I want, as long — hey, it's very important for me.  It's got to be an even playing field for everybody.

Q    Mr. President, did you know about the $130,000 payment to Stormy Daniels?

THE PRESIDENT:  No.  No.  What else?

Q    Then why did Michael Cohen make those if there was no truth to her allegations?

THE PRESIDENT:  Well, you'll have to ask Michael Cohen.  Michael is my attorney.  And you'll have to ask Michael Cohen.

Q    Do you know where he got the money to make that payment?

THE PRESIDENT:  No, I don't know.  No.

Q    Did you ever set up a fund of money that he could draw from?

Q    I'm sorry, I couldn't hear your response earlier about Scott Pruitt.  Are you still —

THE PRESIDENT:  About who?

Q    About Pruitt.  I was — I couldn't hear it.

THE PRESIDENT:  I think that Scott has done a fantastic job.  I think he's a fantastic person.  I believe — you know, I just left — I just left coal and energy country.  They love Scott Pruitt.  They feel very strongly about Scott Pruitt, and they love Scott Pruitt.

Thank you very much everybody.  I'll see you back in New York.  Thank you.

END

4:26 P.M. EDT



The White House

- Live
- Jobs
- Get Involved
- Copyright Policy
- Privacy Policy

- Twitter
- Facebook
- Instagram
- Contact

# Exhibit 7

# Michael Cohen says he used his own home equity line for Stormy Daniels payment

 By Veronica Stracqualursi, CNN
Updated 7:59 PM ET, Fri March 9, 2018






**Cohen: I used home equity line to pay Daniels**


Polygraph: Stormy Daniels truthful about Trump


Stormy Daniels' friend: She fears for her life


Stormy's lawyer: Some incidents took place during Trump presidency


Lawy was t threa

**Washington (CNN)** — President Donald Trump's personal lawyer used funds from his own home equity line to make a $130,000 payment to porn star Stormy Daniels on Trump's behalf, he told CNN.

"The funds were taken from my home equity line and transferred internally to my LLC account in the same bank," Michael Cohen said in a statement.

Cohen also confirmed that he used his Trump Organization email account to communicate details of a payment transfer to Stephanie Clifford, the adult film star known as Stormy Daniels, who allegedly had an affair with the President before his time in office.

Earlier Friday, Clifford's lawyer, Michael Avenatti, provided an email to CNN in which Cohen confirmed the transfer to Daniels' former attorney, Keith Davidson. In the email, both Cohen's personal email account and trumporg.com email account were used. The deposit was confirmed to Cohen by a First Republic Bank employee.

**From:** Michael Cohen
**To:** Keith Davidson
**Subject:** Fwd: FW: First Republic Bank Transfer
**Date:** October 26, 2016 1:53:14 PM

---------- Forwarded message ----------
From: Michael Cohen <mcohen@trumporg.com>
Date: Wed, Oct 26, 2016 at 4:49 PM
Subject: FW: First Republic Bank Transfer
To: <mdcohen██@gmail.com> <mdcohen██@gmail.com>

**From:** ██████ [mailto██████
**Sent:** Wednesday, October 26, 2016 4:15 PM
**To:** Michael Cohen <mcohen@trumporg.com>
**Subject:** RE: First Republic Bank Transfer

Good Afternoon Mr. Cohen,

The funds have been deposited into your checking account ending in x1897.

Best,

██████████

**First Republic Bank**

1230 Ave of the Americas, 3rd Floor | New York, NY 10020

Cohen responded later Friday, saying that he regularly used his business email account for personal matters.



## CNN
×

### Receive **Fareed Zakaria's Global Analysis**

including insights and must-reads of world news

| Email address | **Activate Fareed's Briefing** |

By subscribing you agree to our privacy policy.

"I sent emails from the Trump Org email address to my family, friends as well as Trump business emails. I basically used it for everything. I am certain most people can relate," he said.

Avenatti, speaking on MSNBC, said Cohen's use of his business email to conduct this transaction could be an indication that he was acting in an official capacity as a legal counsel to Trump when he transferred the money to Clifford.

While this development brings the payment to Clifford closer to Trump himself, it is not proof that he knew about it. Any involvement by Trump would indicate the payment was an in-kind campaign contribution which was not disclosed to the Federal Election Commission, which would be a violation of federal law, according to Paul S. Ryan, a campaign finance attorney who works for Common Cause.

The email does not say where the funds originated from.



**Related Article:** Law firm handling Stormy Daniels case for Cohen also did legal work with Trump campaign

NBC News first reported Cohen's use of the email account.

The day after the email, Cohen wired money from First Republic Bank to Davidson's bank account, according to NBC News.

Davidson did not respond to a request for comment from CNN. First Republic Bank declined to comment to the network.

Trump's 2017 financial disclosures listed an account at First Republic Bank, valued between $15,001 and $50,000.

Cohen also regularly used that same email account to negotiate with Clifford last year before she signed a nondisclosure agreement, NBC News reported.

Last month, Cohen said he wired Clifford $130,000 of his own money right before the 2016 election in exchange for her silence about the alleged affair.

Cohen said Friday that he is in the midst of a "witch hunt," saying, "These incessant attacks against me are meritless and are concocted by the liberal mainstream media to continue to malign our President and distract the country from his historic achievements over the past year. This witch hunt has now gone from ludicrous to insane."

He has denied the Trump Organization's involvement in the payment, and both Cohen and the White House have denied any sexual encounter between the President and Clifford.



**Related Article:** Stormy Daniels' attorney argues 'cover-ups matter'

"In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford," Cohen said in a statement in February. "Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly."

favor" regarding the case. The statement is an admission that the nondisclosure agreement exists and that it directly involves Trump. It was the first time the White House had admitted the President was involved in any way with Clifford.

 

Clifford filed suit against Trump on Tuesday, alleging that he never signed a hush agreement regarding the alleged affair and therefore the agreement is void.

*CNN's Wolf Blitzer contributed to this report.*



BREAKING NEWS
TRUMP LAWYER: I USED HOME EQUITY LINE FOR STORMY DANIELS PAYOUT   **CNN**

Now Playing Cohen: I used home...

# Exhibit 8

# "I Have Never Threatened Her in Any Way": Michael Cohen Offers His Side of the Stormy Daniels Saga

ɎɎ **vanityfair.com**/news/2018/03/michael-cohen-offers-his-side-of-the-stormy-daniels-saga

### Stormy Daniels

A week before Stephanie Clifford's widely anticipated interview with Anderson Cooper, Trump's longtime personal lawyer proclaims his innocence—and his unbreakable bond with his old boss.

Emily Jane Fox

March 19, 2018 4:17 pm





Michael Cohen speaks to reporters after a closed-door meeting with the Senate Intelligence Committee on Capitol Hill in Washington, Sept. 19, 2017.

By Al Drago/The New York Times/Redux.

"Remember something," **Michael Cohen** told me, unbuttoning his navy cashmere double-breasted Moncler coat and unrumpling his gray turtleneck. "If she would have come to me a month before, or three months before, I would have done the same thing." It was a Wednesday afternoon and Cohen, President **Donald Trump's** longtime personal attorney and loyal fixer, was sitting on a desk chair in the office of a friend's townhouse on the Upper East Side. He was referring, of course, to

**Stephanie Clifford,** the adult-film actress also known as Stormy Daniels, who has alleged that she and Trump had a consensual affair in 2006. As Cohen spoke, his combativeness and notoriously deep fealty to Trump were indeed evident. "People are mistaking this for a thing about the campaign," he continued. "What I did defensively for my personal client, and my friend, is what attorneys do for their high-profile clients. I would have done it in 2006. I would have done it in 2011. I truly care about him and the family—more than just as an employee and an attorney."

Stormygate has, in many ways, become a quintessential political saga for the Trump Age. And Cohen is a fitting star. Once a bit player inside Trump's New York inner sanctum, he has gained his own twisted notoriety during his boss's ascent. Last year, Cohen sued BuzzFeed for libel after the news organization published the infamous dossier alleging that he <u>met with Russian officials</u> in Prague during the summer of 2016. (Cohen said he has never been to Prague and was visiting the University of Southern California with his son at the time that the dossier had him taking the meetings.) But that crisis has hardly compared to the scrutiny Cohen has received since January, when *The Wall Street Journal* first reported that he facilitated a $130,000 payment to Clifford weeks before the 2016 presidential election. Cohen has reiterated, as he noted in his friend's sunlit office, that the six-figure payout came out of his own pocket, and that he was not reimbursed by the Trump Organization or the Trump campaign. It was not an election issue, in other words. In fact, it seemed that Cohen, like the rest of the world, was surprised by his boss's win. At the time, Cohen said, he was "hopeful and optimistic" about Trump's chance in the election, but "everyone said that you can't beat the Clinton machine. The election would be over in a few weeks."

Yet Trump did win, and in the two months since the *Journal* story, there have been numerous questions surrounding whether Cohen's payment violated federal-election law; what the president knew; why Cohen had paid Clifford out of his own pocket, particularly after she had already shared her <u>story</u> with *In Touch Weekly* (which reportedly shelved the story for over six years, after Cohen <u>threatened Trump would sue their parent company</u>); and if the contract could actually be enforced. In order to answer some of these questions, a government watchdog group has filed a complaint with the Federal Election Commission. (There are laws and ethics and rules that require the reporting of any outlay that could influence one candidate's standing. Trump had not reported Cohen's settlement. Cohen has claimed that his client didn't know about the payment at the time, and told me that it was not a campaign donation. "There is clear case law that negates the F.E.C. complaint raised against me.") Meanwhile, Cohen, who was compelled to respond to the complaint, <u>issued</u> a statement describing his actions to *The New York Times* in mid-February—a move that Clifford's manager subsequently claimed violated the terms of her non-disclosure agreement, thus allowing her to tell her version of the story. (Both Cohen and the White House have denied Clifford's accusations.)

At the end of February, Cohen obtained a temporary restraining order through an arbitrator in California to prevent Daniels from speaking about the alleged sexual encounters. Clifford's new attorney, **Michael Avenatti,** followed up with a lawsuit of his own at the beginning of March, contending that the non-disclosure agreement was void because Trump did not personally sign it. (Avenatti filed a civil suit in Los Angeles claiming that the agreement was signed by both his client and Cohen, but Trump himself did not sign the agreement, which he argues makes it invalid, unenforceable, and void.) Then, a couple weeks back, Clifford taped an interview with **Anderson Cooper,** which is set to air on CBS's *60 Minutes* on March 25. And if the interview hadn't already become a Super Bowl-sized media supernova, Avenatti went on a morning-show blitz, on Friday, to

promote what has essentially become possibly the most anticipated political interview since **Larry King** sat down with **Bill Clinton** in January 2000. When Avenatti appeared on MSNBC's *Morning Joe,* co-host **Mika Brzezinski** asked him if his client had been threatened in any way. "Yes," Avenatti responded. "Was she threatened with physical harm?" she followed up. "Yes."

Afterward, Cohen tried to dismiss his counterpart's tactics. "Unlike Mr. Avenatti, we are not handling this matter through the court of public opinion," he told me. "We are handling it through a court of competent jurisdiction." As Cohen presumably knew, however, the court of public opinion was already inching toward a verdict. Later that afternoon, Cohen filed papers to move Clifford's lawsuit to federal court, and claimed that she could owe upwards of $20 million for violating the terms of the agreement. In another Trumpian twist, **Charles Harder**—the attorney best known for representing **Hulk Hogan** in his lawsuit against Gawker—is handling the case on behalf of Trump.

Cohen and I spoke a number of times last week, as events transpired rapidly. As Avenatti appeared with CNN's **Chris Cuomo,** after the MSNBC hit on Friday, social media swelled with guesswork regarding who he was referring to when he intimated that Clifford had been physically threatened. While Cuomo conducted his interview, I conducted another with Cohen by phone, as we both watched Avenatti on television. Cohen told me that he had never threatened Clifford. "In fact, I have never spoken to her. I have never e-mailed her. I have never met her. I have never texted her," he told me. "Every interaction with Ms. Clifford was always through her previous attorney." I asked if he knew whether she was threatened by anyone with any connection to Donald Trump. "I can only speak for myself," he said. "I reiterate: I have never threatened her in any way and I am unaware of anyone else doing so."

Cohen denied reports from earlier in the week claiming that he was considering legal actions in an attempt to stop CBS from airing Clifford's sit-down. "I have not spoken to CBS, and I'm not aware that my counsel has spoken to CBS." And if her sit-down should air as scheduled, Cohen said "it's just another breach by Ms. Clifford and will only further increase the damages I will be seeking pursuant to the agreement." Those damages could very quickly turn crippling. According to the agreement, Clifford is required to pay $1 million for each breach of her non-disclosure deal. The court documents filed on Friday made it clear that Cohen and Trump plan to collect.

Avenatti has continued to counter that the agreement was void because Trump never signed it. Cohen told me, however, that he disagreed. "The only person who decrees it such is Mr. Avenatti," he said in his signature bluster. "His decrees carry no weight, as this issue will be decided not by him, but by the court." Cohen contends that the agreement is a two-party contract between the L.L.C. he set up to pay Clifford and the actress herself, which would deem a signature from anyone else unnecessary to execute the agreement.

We also spoke about the chatter on cable news and social media over whether or not he could make an agreement on behalf of his client without his client knowing, as he claims that Trump did not know that he had paid Clifford the $130,000. Cohen told me that he has recently conferred with counsel, and their determination was that there is no bar-association violation for his action. As to confusion regarding why he would pay six-figures of his own money without expecting to get paid back, he told me that he did it for his own reasons and it's irrelevant if people believe him or not. When I asked if he bullied Clifford or if she signed the agreement under duress, he responded, "Absolutely not."

Cohen is a loyal fixer by trade and street fighter by nature, often earning him comparisons in the media to the character Ray Donovan. "I only take offense to CNN's depiction of me as a less sexy version of him," he told me. His handling of the Clifford payment is, to a degree, merely an extension of the job he'd been undertaking for a decade. In explaining how the election-time payment came to fruition, he jumped back several years. He said that he didn't know that Clifford had even met his boss until her former attorney, **Keith Davidson,** called him in 2011. At that time, Clifford denied the affair and wanted an interview about their alleged encounter removed from a Web site that had published her account. (The *Washington Post* reported over the weekend that Cohen tried to bury the story then, too.)

Cohen said that he did not hear about the matter again until 2016, when he caught wind of media interest in Clifford's story. "I called Mr. Davidson and asked if this was true. He told me that he would find out." Cohen says Davidson called back and relayed that there was media interest. Cohen responded if there was a price to own the story. Cohen says that Davidson replied that her number was $130,000. It was a strange, not entirely rounded number, but Cohen accepted. He then recalled asking Davidson why she would tell her story when she had previously denied it. "He said that she needed the money. I didn't come up with this number." (Davidson told me on Friday that he could not comment on these matters.)

Even if Cohen did not bully or intimidate Clifford into signing an agreement, a restraining order binding Clifford from speaking appeared as a different kind of intimidation, particularly because it involved such a great power divide—with the president of the United States on one side and a porn star on the other. These types of agreements are often inherently based on this sort of imbalance, only now, with one party in the White House, the disparity is cartoonish. Cohen, who's spent years figuring out how to defend and downplay and get rid of these things, had a response at the ready. "It is irrelevant who the client is," Cohen told me. "These types of arbitration clauses exist and are used frequently. The agreement specifically called for obtaining the injunction based upon a breach or threat of a breach. We followed the executed agreement as written."

Did he use these types of agreements frequently for this particular client, I asked? "I don't discuss things I've done for my clients," he responded. "There are thousands of lawyers who, in order to protect their high-profile clients, draft these sorts of documents daily."

Because this small little world has turned into a long-running episode of The Trump Show, Cohen left our interview for his son's baseball game before going to dinner with his wife and some friends at Avra, a scene-y Greek restaurant on Madison Avenue. His wife elbowed him when she saw Avenatti walk in and sit down a few tables away. Cohen got out of his chair and tapped him on the shoulder. "I just wanted to introduce myself," he says he told Avenatti. "It was totally cordial."

It is impossible to know what Michael Cohen was thinking in October of 2016, when he made the payment—whether it was the muscle memory of a lifetime defending Trump, or something perhaps more calculated. What is clear now is that he is up against a worthy adversary. Avenatti has, in fact, pulled a remarkably Trumpian move, in raising the specter of a bombshell revelation to come in an interview then more than a week away, dropping little hints about what it could be, and urging audiences to tune in live and judge for themselves. As the guessing game builds about what Clifford actually said, what she actually knows, and what actually happened to her, the questions will keep coming, the speculation will keep building.

Cohen, for his part, said that for as many questions as can be asked, "the only issue that will ultimately be decided is the amount of damages Ms. Clifford will owe." If a judge does ultimately order Clifford to pay damages, Cohen said that any money he receives will go to pay lawyers first. After that, he said, the balance will be donated to various charities. "You know what?" he added. "The more I'm thinking about it, I might even take an extended vacation on her dime."

Donald Trump
FOLLOW

Bill Clinton
FOLLOW

Follow to get the latest news and analysis about the players in your inbox.

See All Players
Share

Emily Jane FoxEmily Jane Fox is a reporter for the Hive covering Wall Street, Silicon Valley, and the .001 percent everywhere.

# Exhibit 9

1    HARDER LLP
2    CHARLES J. HARDER (CA Bar No. 184593)
     RYAN J. STONEROCK (CA Bar No. 247132)
3    132 S. Rodeo Drive, Fourth Floor
4    Beverly Hills, California 90212
     Telephone: (424) 203-1600
5    Facsimile: (424) 203-1601
     Email:      CHarder@HarderLLP.com
6    Email:      RStonerock@HarderLLP.com
7
8    Attorneys for Defendant
     DONALD J. TRUMP
9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| STEPHANIE CLIFFORD a.k.a. STORMY DANIELS a.k.a. PEGGY PETERSON, an individual, | Case No. 2:18-CV-02217 |
| | **JOINDER OF DEFENDANT DONALD J. TRUMP IN MOTION TO COMPEL ARBITRATION BY DEFENDANT ESSENTIAL CONSULTANTS, LLC** |
|        Plaintiff, | |
|    v. | |
| DONALD J. TRUMP a.k.a. DAVID DENNISON, an individual, ESSENTIAL CONSULTANTS, LLC, a Delaware Limited Liability Company, and DOES 1 through 10, inclusive, | Assigned for All Purposes to the Hon. S. James Otero |
| | **Date:**       **April 30, 2018** <br> **Time:**      **10:00 a.m.** <br> **Location:**   **350 West 1st Street** <br>                **Courtroom 10C, 10th Floor** <br>                **Los Angeles, CA 90012** |
|        Defendants. | Action Filed: March 6. 2018 |

Defendant Donald J. Trump hereby joins in defendant Essential Consultants, LLC's ("EC") Motion to Compel Arbitration and consents to arbitration of the claims against him and EC in this matter.

Dated: April 2, 2018                    HARDER LLP

By: _/s/ Charles J. Harder_____
   CHARLES J. HARDER
   Attorneys for Defendant
   DONALD J. TRUMP

JOINDER IN MOTION TO COMPEL ARBITRATION